## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

**[Filed Electronically]**

| | | |
|---|---|---|
| **DAVID BELL** | ) | **CIVIL ACTION NO. _____** |
| | ) | |
| **and** | ) | |
| | ) | |
| **CINDY WILDER BELL,** | ) | |
| **HUSBAND AND WIFE** | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| **v.** | ) | **VERIFIED COMPLAINT** |
| | ) | **FOR MONETARY DAMAGES,** |
| | ) | **DECLARATORY JUDGMENT,** |
| **KOKOSING INDUSTRIAL, INC.** | ) | **AND INJUNCTIVE RELIEF** |
| **6235 WESTERVILLE ROAD** | ) | |
| **WESTERVILLE, OHIO 43081** | ) | |
| | ) | |
| **Serve: CT Corporation System** | ) | |
| **306 W. Main Street** | ) | |
| **Suite 512** | ) | |
| **Frankfort, KY  40601** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **CITY OF CINCINNATI, OHIO** | ) | |
| **801 PLUM STREET** | ) | |
| **CINCINNATI, OHIO 45202** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **THE METROPOLITAN SEWER DISTRICT** | ) | |
| **OF GREATER CINCINNATI** | ) | |
| **1600 GEST STREET** | ) | |
| **CINCINNATI, OHIO 45204** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **ATC GROUP SERVICES LLC** | ) | |
| **221 RUE DE JEAN** | ) | |
| **SUITE 300** | ) | |
| **LAFAYETTE, LA 70508** | ) | |
| | ) | |
| **Serve: CT Corporation System** | ) | |

| | |
|---|---|
| **306 W. Main Street** | ) |
| **Suite 512** | ) |
| **Frankfort, KY  40601** | ) |
| | ) |
| **AKA** | ) |
| **ATC ASSOCIATES. INC.** | ) |
| **11121 CANAL ROAD** | ) |
| **CINCINNATI, OHIO 45241** | ) |
| | ) |
| **And** | ) |
| | ) |
| **ASHCRAFT SAND & GRAVEL** | ) |
| **COMPANY, INC.** | ) |
| **5850 Dry Fork Rd** | ) |
| **Cleves, OH 45002** | ) |
| | ) |
| **Serve: RICK ASHCRAFT** | ) |
| **5850 DRY FORK RD** | ) |
| **CLEVES OH 45002** | ) |
| | ) |
| **DEFENDANTS** | ) |

Come the Plaintiffs, Cindy and David Bell, and for their Verified Complaint state as follows:

## I.   PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs are husband and wife and citizens of Commonwealth of Kentucky and at all times relevant herein resided at 486 River Road, Villa Hills, Kenton County, Kentucky.

2.      Defendant, Kokosing Industrial, Inc. (hereinafter "Kokosing"), is a foreign corporation, organized under the laws of the State of Ohio, with its principal place of business in Fredericktown, Ohio. Its principal corporate office is located at 6235 Westerville Road, Westerville, OH 43081. Kokosing is registered to do business in the Commonwealth of Kentucky with the Kentucky Secretary of State. Kokosing is and at all times relevant herein was the general contractor for the City of Cincinnati and the Metropolitan Sewer District of Greater

Cincinnati (hereinafter "MSD") on the Lick Run Valley Conveyance System Project (hereinafter, "sewer project").

3.      Defendant, City of Cincinnati, is a municipal corporation and is responsible for the operation and management of MSD pursuant to an agreement between the City of Cincinnati and the Hamilton County Board of Commissioners. At all times herein, the City of Cincinnati has and continues to act as the agent of MSD.

4.      Defendant, MSD, was formed in 1968 as a county sewer district under Ohio state law. MSD is governed by a 50-year agreement between the City of Cincinnati and Hamilton County, known as the 1968 Agreement. As set forth in this Agreement, the City is responsible for the management and operation of the sewer district while the Board of County Commissioners of Hamilton County, Ohio, retains the authority to establish sewer service charges, adopt rules and regulations, and approve operating and capital improvement program budgets.

5.      Defendant, ATC Group Services LLC, is a foreign limited liability corporation registered to do business in Kentucky with the Kentucky Secretary of State and operates under the assumed name of ATC Associates Inc. (hereinafter jointly, severally, and individually referred to as "ATC").  As a large, highly experienced environmental consulting firm, ATC was responsible for identifying and characterizing soil encountered during construction activities at the sewer project to ensure proper management, handling, and disposal of soil and other materials excavated or removed as part of the sewer project by Kokosing and its subcontractors.

6.      Defendant, Ashcraft Sand & Gravel Company, Inc. (hereinafter "Ashcraft"), is an Ohio corporation that is not registered with the Kentucky Secretary of State to do business in Kentucky. Ashcraft's principal place of business is 5850 Dry Fork Road, Cleves, Ohio 45002.

Ashcraft transported contaminated black foundry sand and other fill materials from the sewer project in Ohio across state lines and dumped them on Plaintiffs' property in Kentucky.

7.     This action arises under Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1961, *et seq.* This action is also brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. An actual controversy presently exists between Plaintiffs and Defendant, Kokosing, relating to the terms and conditions of a contract between them.  A judicial determination resolving this controversy is necessary and appropriate at this time.

8.     The district court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the complaint presents a claim under federal law, RICO 18 U.S. Code § 1961, *et seq*. The district court also has jurisdiction under 28 U.S.C. §1332 because complete diversity of citizenship exists between Plaintiffs and Defendants and the amount in controversy is more than $75,000. Plaintiffs further invoke supplemental jurisdiction of this district court pursuant to 28 U.S.C. §1367(a) to hear and decide any and all related state-law claims.

9.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in and the real property that is the subject of this action is situated in this judicial district. Moreover, the claims for violations of 18 U.S.C. § 1961, *et seq.*, arose in this district and these Defendants, among other things, conspired to act and did in fact take action in this district that caused injury to Plaintiffs.

## II.  STATEMENT OF THE FACTS

### A.     Lick Run Valley Conveyance System Project

10.     As part of an amended federal consent decree among the City of Cincinnati, MSD, and the U.S. EPA, (C-1-02-107, Judge Spiegel)(hereinafter, "the consent decree"), the City of Cincinnati and MSD accepted Kokosing's bid of $89,900,000 to serve as the general

contractor on the sewer project on or about May 23, 2017. MSD announced that Kokosing would be the general contractor on the sewer project by letter dated June 5, 2017.

11.     The sewer project is located on the west side of Cincinnati, Ohio. At all times relevant herein, both MSD and the City of Cincinnati had their own engineers and employees oversee and document the activities of all contractors and subcontractors working at the sewer project on a daily basis.

12.     The sewer project is designed to keep stormwater out of the City of Cincinnati's combined sewer system through a variety of new storm sewers, bioswales, stream restoration, stormwater detention basins, bio-infiltration gardens, and the creation of a mile-long constructed waterway that will mimic a natural stream. The sewer project required large-scale excavations. Much of the excavated material was hauled away from the sewer project and dumped off-site.

13.     The consent decree filed in the Southern District of Ohio has firm time deadlines by which certain portions of the sewer project must be completed. Under Section 3.5, <u>Liquidated Damages</u>, of the contract between Kokosing, MSD, and the City of Cincinnati, Kokosing agreed to pay $5,000 per diem for missing deadlines for the sewer project set out in the consent decree. Under Section 3.6 of the contract, Kokosing also agreed to pay any civil penalties, stipulated penalties, and all other damages assessed by U.S. EPA against the City of Cincinnati and MSD for missing the sewer project deadlines set forth in the consent decree.

14.     The City of Cincinnati and MSD contracted with ATC to be their environmental consultant on the sewer project. ATC was tasked with the responsibility of locating, identifying, and determining the vertical and horizontal limits of contaminated soil along the length of the sewer project. ATC advertises itself as having "comprehensive expertise in air, land, and water combined with full design, project management, and implementation services" sufficient to "handle any challenge from consulting to completion."

15.     During the sewer project, ATC was required to test suspect material encountered during construction activities even if the suspicious material was not previously identified by soil analytical data, ground penetrating radar, and electromagnetic survey data on construction drawings. ATC had to test and classify suspicious material encountered during the project so that Kokosing would properly handle, manage, transport, and dispose of soil and other material excavated from the ground in a manner that complied with local, state, and federal law.

16.     Under the arrangement with the City of Cincinnati and MSD, ATC had the duty, *inter alia,* to identify and classify fill material that could or could not be used as fill material on residential property in the Commonwealth of Kentucky.

17.      Kokosing's contractual bid for the sewer project included $14,858,742.40 for the excavation, hauling, and disposal of non-contaminated soil. Kokosing's winning bid included $2,537,535 for managing contaminated soil that did not require pre-treatment before disposal at a permitted waste facility.

18.     As a large and highly sophisticated construction contractor, Kokosing has significant training, expertise, and experience in: (a) the engineering characteristics and behavior of fill materials, (b) identifying, handling, and managing contaminated soil, (c) complying with state and federal environmental laws during construction activities; and (d) identifying and classifying materials suspected of being contaminated that are encountered in and around a work site.

19.     Despite this training, expertise, and experience, Kokosing bid the Project in a manner that grossly inflated the amount of "non-contaminated" material it needed to excavate at the sewer project. This approach substantially reduced Kokosing's excavation disposal costs because "non-contaminated" material does not need to be transported to and disposed of at a regulated waste facility.

20.     Kokosing saved a substantial sum of money by classifying this contaminated material as "non-contaminated" and dumping it at an unregulated site -- Plaintiffs' property.

### B.     Plaintiffs live in Villa Hills, Kenton County, Kentucky

21.     Plaintiffs live in a small house located on about a one-acre tract of land on Route 8 in a residential zone in the City of Villa Hills, Kenton County, Kentucky. Plaintiffs' property is contiguous on its northern boundary with the Ohio River. The single-family home contains about 1,105 square feet and was built in 1952. It is Plaintiffs' largest single asset.

22.     The front of Plaintiffs' residence faces south, fronting on Route 8. Plaintiffs' back yard and side yards are contiguous with a wide bend in the Ohio River. At its original elevation, a portion of Plaintiffs' backyard and side yard was located within the 100-year-flood zone of the Ohio River.

23.     Plaintiffs sought and obtained various fill permits from local, state, and federal authorities prior to placing fill material on and raising the elevation of their property. Under federal and state law and their fill permits, Plaintiffs could place only non-contaminated fill material on their property.

24.     Plaintiff, Mrs. Bell, holds fee simple title to the approximately 1.5-acre tract of real property and improvements. Mrs. Bell (nee Cindy Wilder) inherited the property from her mother's estate in 2003.

25.     Under current Villa Hills zoning regulations, the tract is too small in acreage to be subdivided. No additional residential dwellings can be placed on the property. The City of Villa Hills is considering amending its zoning regulations. If the proposed amendments are adopted, Plaintiffs' property could be divided into five separate residential building lots.

26.     In the event that the City of Villa Hills amends its zoning code to permit Plaintiffs' land to be subdivided into five residential building lots, Plaintiffs would likely subdivide it and sell the lots for residential development.

27.     Plaintiffs wanted to fill in and elevate their yard, which naturally sloped steeply downward toward the river on its east, west, and north sides, to have a large level side yard. If the City of Villa Hills does not amend its zoning code to allow Plaintiffs' land to be subdivided, then after the yard was filled in, elevated out of the flood plain, and leveled, Plaintiffs intended to create a campground overlooking a scenic bend in the Ohio River and an organic garden for the use and benefit of the members of their church and other campers. Raising the elevation of the property would also reduce the potential for damaging flood events in the future.

28.     Plaintiffs' plans also included building a boat ramp down to the Ohio River to serve people using the proposed campground. Plaintiffs applied for and obtained a permit from the Kentucky Department of Transportation to construct the boat ramp on the east side of their property.

29.     Prior to the events giving rise to this lawsuit, Plaintiffs applied for and received all necessary fill permits from federal, state and local authorities to fill in and raise the elevation of their property and to build a boat ramp extending from Route 8 down to the Ohio River.

30.     Plaintiff, Cindy Bell, received title to the property on May 16, 2003. Prior to that date, local municipalities and other entities placed clean fill material on a portion of Plaintiffs' property. Defendants have multiple aerial maps showing that the lot had fill material placed on it over several decades prior to Plaintiffs owning the property.

**C.**      **Kokosing contracts with Plaintiffs to bring clean, non-contaminated fill material to their property after Kokosing's deal to dump this material in Campbell County collapses.**

31.      In or around July 2017, Kokosing was negotiating a contractual agreement to transport fill material from the sewer project and dump it at a location in Highland Heights, Campbell County, Kentucky. Upon information and belief, Kokosing's potential deal to dump fill material in Campbell County fell through and Kokosing needed to immediately find another location to transport and dump fill material from the sewer project to meet the deadlines in the contract among Kokosing, MSD, and the City of Cincinnati and the consent decree.

32.      In or around August 2017, one or more authorized representatives of Kokosing approached Plaintiffs at their home and offered to transport and deliver clean, non-contaminated fill material to their residential property at 468 River Road, Villa Hills, Kentucky.

33.      During the visit, Kokosing walked and inspected Plaintiffs' property along the Ohio River and observed that the lot sloped sharply down to the riverbank on its north and east sides.

34.      Kokosing knew or should have known that compaction, settlement, or stability issues associated with placing fill material on the property would be complicated by potential river flooding events and groundwater flowing underneath the property to and from the river.

35.      Kokosing inquired as to whether Plaintiffs held the necessary federal, state, and local fill permits to dump clean fill material within the 100-year floodplain. When Plaintiffs replied that they did, Kokosing requested copies of all of their permits for the corporation's inspection, review, and potential approval of the property as a site to deposit clean fill material.

36.      Plaintiffs provided Kokosing with copies of all of their permits authorizing them to fill in that portion of their property situated within the floodplain. Kokosing told Plaintiffs that Kokosing would provide a copy of the permits to its headquarters, MSD, and the City of

Cincinnati. Kokosing told Plaintiffs that each of these three entities would independently examine their fill permits to place material in the floodplain and all three entities had to approve this potential dumping site before Kokosing could sign a contract with Plaintiffs and begin to place clean fill material on their property.

37.     Plaintiffs' fill permits, copies of which were provided to Kokosing, prohibited the parties from dumping contaminated fill material on Plaintiffs' property. State environmental law forbids dumping and/or use of contaminated fill on Plaintiffs' residential property.

38.     Kentucky's environmental laws and regulations explicitly require that contaminated soil be dumped at permitted waste-disposal facilities. Plaintiffs did not hold (and have never held) a permit to dispose of contaminated soil on their property. Kokosing was, or should have been aware, of that fact because Kokosing had complete copies of all of Plaintiffs' permits. Kokosing also had substantial knowledge, expertise, and experience with state and federal environmental law.

39.     Kokosing was required to provide copies of Plaintiffs' fill permits, commercial driveway permit, and the contractual agreement with Plaintiffs to the City of Cincinnati and MSD for a separate review and approval before Kokosing was authorized by MSD and the City of Cincinnati to transport and/or dump fill material from the sewer project onto Plaintiffs' property.

40.     Based upon a reasonable review of the documents and a very simple knowledge of black-letter environmental law, Kokosing, the City of Cincinnati, and the MSD all knew, or should have known, that dumping contaminated fill material on Plaintiffs' residential property was illegal and a flagrant violation of Plaintiffs' fill permits.

41.     The same document also reveals that ATC and the general counsel for MSD reviewed Kokosing's contract with Plaintiffs, the fill permits for Plaintiffs' property, the

commercial driveway permit for Plaintiffs' property issued by the Kentucky Division of Transportation, and Kokosing's contract with Plaintiffs.

42.     The same document discloses that "soil from Area 20 are Type I as per ATC. The undercut area it (sic) going to be further tested by ATC this could fall into the Type II category. Also, I reminded Kokosing that they must submit fill sites as per the specification. For this site 30k cy of soil was trucked to the site before submitting the paperwork."

43.     Thus, Defendants, Kokosing, ATC, Ashcraft, the City of Cincinnati, and MSD all knew or should have known that only clean, non-contaminated materials excavated from the sewer project could legally be deposited on Plaintiffs' property, but contaminated materials could *not* be dumped on Plaintiffs' property.

44.     Plaintiffs, who are both lay individuals, did not have representation of legal counsel during the negotiation of the contract. Kokosing representatives told Plaintiffs that they did not need to retain an attorney in dealing with the company. Plaintiffs trusted Kokosing and accepted its word and proceeded without legal representation in dealing with the company. Upon information and belief, Kokosing *did* have representation and its lawyers were involved in drafting the contract that Kokosing induced Plaintiffs to sign.

45.     As an inducement to get Plaintiffs to sign the contract, Defendant Kokosing told Plaintiffs that the company had enough clean, non-contaminated fill material available from the sewer project to completely fill in and level out their yard. Kokosing promised Plaintiffs that once the work was done, the elevated yard would be out of the floodplain, level, and stable.

46.     Kokosing promised Plaintiffs that it would transport clean fill material across state lines, deliver it to their property, and spread it out with heavy equipment without any cost to Plaintiffs in exchange for them giving Kokosing a contractual right to dump non-contaminated

fill material on their land. Thus, Kokosing did not pay Plaintiffs a tipping fee for dumping fill material on their property.

47.     Kokosing promised Plaintiffs that the level fill area would be suitable for use by them, members of their church, and other campers as a recreational area when Kokosing was done.

48.     In reliance on Kokosing's promises, Plaintiff David Bell agreed to allow clean, non-contaminated fill material from the sewer project be placed on Plaintiffs' land in the manner and under the conditions that Kokosing had described. Kokosing gave a pre-printed form contract to David Bell in or around August 2017. For reasons that are unknown to Plaintiffs, as to numerical order, Kokosing's form contract presented to David Bell did not contain a paragraph numbered 8 or a paragraph numbered 9. A copy of the signed contract is attached hereto as Exhibit 1 and incorporated by reference ("contract" or "Waste Agreement").

49.     Plaintiff, Cindy Bell, did not participate in the negotiations and did not sign the form contract.

50.     Kokosing's pre-printed form contract presented to Plaintiff David Bell was styled a "Waste Agreement." Before signing it, David Bell struck the phrase "other material ("waste material") from numbered paragraph. 1.  As amended by David Bell, paragraph 1 and paragraph 4 of the Waste Agreement read:

> 1.     **DEFINITION OF WASTE**:  The term "waste material," as used in this Agreement is a common term used in the construction industry and it is defined as the removing of *dirt, earth, rock, concrete subsurface* and ~~other material ("waste material")~~ from a construction project and depositing the waste materials at another location. Subject waste material is not the property of the Metropolitan Sewer District of Cincinnati. (Emphasis added.)

> 4.     **TYPE OF WASTE MATERIAL TO BE DEPOSITED:**  Contractor shall have the right to deposit any and all waste material except: ASPHALT on the property in the Location specified, but *the waste material shall not contain any contaminants as defined by state and/or federal law*." (Emphasis added.)

51.     Sand was not included in the definition of "waste material," as used in the contract between Plaintiffs and Kokosing. Plaintiffs did not want sand dumped on their property next to the Ohio River because it likely would be unstable and would wash away if the river flooded the property.

52.     The contract between Plaintiffs and Kokosing did *not* authorize or permit the dumping of any fill material onto Plaintiffs' property that contained *any contaminants,* as state and/or federal law define that term. That provision in the contract meant Plaintiffs would receive only clean, nonadulterated fill material from the sewer project, i.e., fill material that complied with the terms of their fill permits issued by federal and state agencies.

53.     Before signing it, Plaintiff David Bell modified Kokosing's form contract by striking out certain language in Section 1, 2, 5, 7, and 17. Plaintiff David Bell placed an "X" through Sections 10, 11, and 12 to strike them from the contract. Plaintiff David Bell also struck language written on a separate page that held MSD harmless for claims that may arise from the contract.  Plaintiff David Bell also wrote the phrase "No contaminated material of any type" to the bottom of Section 5 and "Kenton" to Section 17 of the form contract to reflect the proper county in which his property was located.

54.     Plaintiff David Bell then signed the contract on page 6 and hand-delivered the document to a Kokosing agent or representative, who represented that the document -- as modified and signed by Plaintiff David Bell -- would be reviewed by Kokosing management and signed by an authorized representative of the corporation and returned to Plaintiffs. Plaintiffs did not keep a copy of the contract signed by Plaintiff David Bell in reliance on the promise of Kokosing agent to return a fully signed document.

55.     Kokosing did not return a copy of the fully executed contract despite multiple requests by Plaintiffs and assurances by Kokosing's representatives and agents that it would give Plaintiffs the requested document.

56.     On or about July 27, 2018, long after the events giving rise to this legal dispute occurred, Kokosing's counsel emailed an altered "contract" to Plaintiffs' counsel. Without Plaintiffs' knowledge, permission, or consent, Kokosing added paragraph numbered 23 titled "<u>MSD HELD HARMLESS</u>" to the contract and struck his hand-written modification that read "No contaminated material of any type" at the bottom of paragraph number 5.

57.     Jonathon A. Turton, an agent for Kokosing, signed the same signature page that Plaintiff David Bell had signed, but attached that signature page to a copy of Kokosing's "Waste Agreement" that did not include Plaintiffs' hand-written modifications to paragraph 5. In the altered contract, Kokosing also added a paragraph numbered 23 to the contract, a hold harmless clause in favor of MSD, which David Bell had previously rejected by drawing an "X" through the language. Plaintiff David Bell never agreed to the changes that Kokosing unilaterally made to paragraph numbers 5 and 23 of the contract and never even saw these changes until Kokosing's attorney provided the contract to Plaintiffs' counsel on July 27, 2018.

58.     The actions of Kokosing in taking the signature page from the proposed contract signed by Plaintiffs and attaching it to a contract that Plaintiffs never agreed to constitutes fraud, for which Plaintiffs are entitled to exemplary or punitive damages as well as compensatory damages.

59.     The contract, even in the form signed by Jonathan A. Turton, as the agent of Kokosing, did *not* grant Kokosing a right to dump "sand" or any contaminated material on Plaintiffs' property.  Paragraph numbered 1 of the contract limited Kokosing to transporting and dumping "dirt, earth, rock and concrete subsurface" from the sewer project.

60.     Paragraph numbered 4 of the contract states that all fill material transported to Plaintiffs' property "shall not contain any contaminants as defined by state and/or federal law." That provision in the contract was essential to the agreement because dumping contaminated material on Plaintiffs' property violated Kentucky law and the terms of Plaintiffs' permits issued by federal, state, and local authorities.

61.     Despite being repeatedly promised and frequently requesting a copy of the fully signed contract, Kokosing did not provide Plaintiffs with a copy of the fully executed contract before or during the time Kokosing dumped and spread thousands of tons of fill material on their property.

62.     Under the terms of the Waste Agreement, Kokosing agreed to indemnify and hold Plaintiffs harmless for any losses, liabilities, suits, costs, or expense whatsoever arising from Kokosing's dumping of fill material on their property.

63.     Further, Kokosing agreed to indemnify Plaintiffs for attorney fees and legal expenses incurred as a result of legal disputes arising from Kokosing's dumping of fill material on their property.

64.     An internal document from MSD and the City of Cincinnati discloses that MSD contacted authorities from Kenton County, Kentucky, to inquire about Plaintiffs' fill permits because material from the sewer project would be placed in the flood plain. The document specifically states that the City of Cincinnati and MSD recognized and acknowledged that only clean, safe, non-contaminated fill material without special handling requirements could be dumped on Plaintiffs' property.

65.     Internal documents from MSD and the City of Cincinnati show that ATC also obtained, reviewed, and approved Kokosing's contract with Plaintiffs, its floodplain

development permit, and its commercial driveway permit from the Kentucky Transportation Cabinet.

66.     All Defendants named in this lawsuit knew or should have known that they could not legally excavate, transport, dump, and spread contaminated materials on Plaintiffs' residential property in Kentucky without violating state environmental law, the terms and conditions of Plaintiffs' fill permits, and the contract between Kokosing and Plaintiffs.

67.     Beginning in August 2017, Kokosing excavated, transported, and began to dump fill material on Plaintiffs' property from the sewer project. Between the beginning date in August 2017 and September 29, 2017, Defendant Ashcraft, acting for and as the actual or ostensible agent of all the named Defendants, transported approximately 1,523 loads of fill material to Plaintiffs' property.

68.     Based upon information and belief, the fill material dumped in August and September 2017 onto Plaintiffs' property consisted of dirt, earth, rock, and concrete subsurface. However, despite Plaintiffs requesting documentation on multiple occasions, Kokosing would not or could not provide Plaintiffs with any type of proof showing that the fill material dumped and spread on their property in August and September 2017 was free of contaminants. Kokosing apparently does not have any documentation identifying the location or locations where the material was excavated from at the sewer project during that time period.

69.     Instead of providing any documentation, Kokosing representatives repeatedly assured Plaintiffs that all fill material was free of contaminants and that the material fully complied with the contract, Plaintiffs' fill permits, and all applicable local, state, and federal environmental laws and regulations.

### D. Beginning in or around September 2017, Kokosing begins to excavate contaminated fill material from Contaminated Soil Area 20

70.     Soil excavated during the sewer project belonged to the City of Cincinnati because the City purchased the private property encompassed by the sewer project through eminent domain or negotiated sales.

71.     MSD and the City of Cincinnati commissioned and had engineering drawings prepared for the sewer project. Among other things, the engineering drawings identified and designated areas with contaminated soil and other contaminated material.

72.     At the sewer project, MSD and the City of Cincinnati also had procedures and protocols in place to investigate and test suspected contaminated material encountered during excavation work, even if the contamination was not identified on its engineering drawings.

73.     Contaminated materials excavated during the sewer project required specific handling, transportation, and disposal requirements to be followed by Kokosing, the City of Cincinnati, MSD, ATC, and Ashcraft to comply with local, state, and federal law. Plaintiffs' property was not a site where contaminated materials could be legally dumped, deposited, or otherwise disposed of.

74.     The City of Cincinnati and MSD's engineering drawings for the sewer project included an area designated as "Contaminated Soil Area 20."  Contaminated Soil Area 20 was the former location of a McDonalds Restaurant located at 2321 Beekman Street, Cincinnati, Ohio.

75.     Contaminated Soil Area 20 was identified on the project's engineering drawings because the City of Cincinnati, ATC, and MSD knew (or should have known) that the parcel at 2321 Beekman Street was back-filled with a thick layer of chemically contaminated and hazardous black foundry sand.

76.     The City of Cincinnati and MSD knew or should have known that black foundry sand was highly likely to contain heavy metals and polyaromatic hydrocarbons. An old industrial waste site would be a "Recognized Environmental Concern,"[1] which would require special handling requirements, such as dumping contaminated materials at a permitted waste facility if the waste was dug up, managed, transported, and dumped under state and federal environmental law and the prevailing standard of care.

77.     The City of Cincinnati, ATC, and MSD had knowledge of a Recognized Environmental Concern underneath 2321 Beekman Street from three prior events set out in the internal records of MSD and the City of Cincinnati.

78.     First, in 2002, ATC informed the City of Cincinnati and MSD that the parcel at 2321 Beekman Avenue was reported to have been backfilled with waste foundry sand from the former Lunkenheimer Valve Company, which was located at 1519 Tremont Avenue, Cincinnati, Ohio. The building is at the corner of Beekman and Tremont Avenues in Cincinnati.

79.     Lunkenheimer used foundry sand as a mold in the casting of valves. Molten metal was poured into sand molds. After the metal cooled, the sand molds were broken and the casting removed.

80.     After one or more casts of molten metal, the foundry sand became fouled and was discarded. Lunkenheimer generated huge amounts of waste sand that was dumped in and around the old Lick Run Creek, which was near where the McDonalds parcel sat and where a portion of the sewer project would later be built.

---

[1] Recognized Environmental Concern ("REC") is one of the terms used to identify environmental liability within the context of a Phase I Environmental Site Assessment. American Standard for Testing and Materials defines the recognized environmental condition in the E1527-13 standard as "the presence or likely presence of any hazardous substances or petroleum products in, on, or at a property: (1) due to release to the environment; (2) under conditions indicative of a release to the environment; or (3) under conditions that pose a material threat of a future release to the environment. . ."

81.     Waste foundry sand contains heavy metals and polyaromatic hydrocarbons ("PAHs")[2] that are picked up in the casting of molten metals and exceed modern environmental regulatory standards. Heavy metals are human neurotoxins and polyaromatic hydrocarbons are potentially cancerogenic. For that reason, materials containing those substances are considered to be contaminated and could not be legally dumped or disposed of on Plaintiffs' property in Kentucky.

82.     Once informed that the parcel at 2321 Beekman Street was backfilled with foundry sand, the City of Cincinnati, ATC, and MSD knew or should have known that the black sand underneath the parcel almost certainly contained heavy metals and PAHs.

83.     Second, in January 2010, Weston Solutions, a different environmental consulting firm hired by MSD and the City of Cincinnati, reviewed environmental conditions at 2321 Beekman Street and recommended that a Phase II Environmental Site Assessment ("ESA") be conducted to determine the concentration of heavy metals and PAHs in the backfill.

84.     A Phase II ESA would require a consultant to take samples of the black foundry sand under the property for analysis to determine the concentration of heavy metals and PAHs. The City of Cincinnati and MSD apparently ignored Weston Solutions' recommendation because Defendants have produced no documentation showing that such testing was done.

85.     Third, in 2014 and continuing into the spring of 2015, the City of Cincinnati and MSD negotiated with the McDonalds Corporation to purchase the property at 2321 Beekman Street in Cincinnati for the sewer project. Authorization for a Phase II ESA was pending at the time of the sale. Defendants have produced no documentation showing that such testing was

---

[2] PAHs are a class of organic compounds produced by incomplete combustion or high-pressure processes. PAHs form when complex organic substances are exposed to high temperatures or pressures. Certain PAHs are classified by various government health and environmental agencies as possible or probable human carcinogens. They are linked to skin, lung, bladder, liver, and stomach cancer.

done. Still, the property at 2321 Beekman Street was identified on the engineering drawings for the sewer project as "Contaminated Soil Area 20."

86. The City of Cincinnati purchased "Contaminated Soil Area 20" -- the property at 2321 Beekman Street -- in the spring of 2015 for more than $2 million dollars.

87. Consistent with the prior warnings from multiple environmental consultants, the black foundry sand from the Lunkenheimer Foundry is black, fine-grained sand that is contaminated with PAHs and heavy metals.

**E.** **Kokosing begins transporting and dumping contaminated fill material from Contaminated Soil Area 20 onto Plaintiffs' property**

88. In or around September 2017, Kokosing began excavating black foundry sand from Contaminated Soil Area 20. After Kokosing dug up the black contaminated sand and loaded it into dump trucks, Ashcraft transported the material from Cincinnati, across the Ohio River, to Plaintiffs' property in Kentucky, where Defendants intentionally and illegally dumped it in violation of the terms of the contract between Plaintiffs and Kokosing and in violation of state and federal law.

89. Defendants thereafter continued to haul many other loads of contaminated black foundry sand from Contaminated Soil Area 20 and illegally dump them on Plaintiffs' residential property. As a result, Defendants intentionally and illegally dumped tens of thousands of tons of contaminated foundry sand and other contaminated materials onto Plaintiffs' land.

90. On or about October 12, 2017, Kokosing requested ATC to perform testing and analysis of the black foundry sand Kokosing was excavating from Contaminated Soil Area 20. Kokosing requested the testing because the black foundry sand emitted a strong petroleum odor as it was being excavated from the ground.

91.    After ATC took samples of the black odiferous sand, Kokosing continued to excavate the suspect black foundry sand, load it into Ashcraft's trucks, transport it to Plaintiffs' property, and dump it there. None of the Defendants informed Plaintiffs that the materials being dumped on their property was or was suspected to be old contaminated foundry waste. Instead, Defendants continued to assure Plaintiffs that the material was totally harmless and the black "city dirt" complied with the terms of the contract.

92.    On or about October 13, 2017, the U.S. Coast Guard took photographs of Plaintiffs' property from a boat on the Ohio River for use by the U.S. Army Corps of Engineers, who were apparently conducting an investigation into Kokosing's dumping of black foundry sand on Plaintiffs' property, which is located within the 100-year flood zone.

93.    On or about October 16, 2017, ATC verbally told Kokosing that "preliminary tests" of the samples in Contaminated Soil Area 20 were clear of contaminants.

94.    On or about October 17, 2107, Kokosing temporarily stopped transporting material to Plaintiffs' property because ATC gave Kokosing additional information about the black foundry sand that contradicted what ATC allegedly had told Kokosing the prior day.

95.    By October 17, 2017, Kokosing had excavated and Ashcraft had transported black foundry sand to Plaintiffs' property for about three to four weeks. Kokosing requested that MSD, the City of Cincinnati, and ATC confirm that the black foundry sand transported to Plaintiffs' property was "Type 1 Soil" and appropriate to be dumped on residential property.

96.    Kokosing flatly ignored the fact that paragraph number 4 of the Waste Agreement between Kokosing and Plaintiffs stated, "… the waste material shall not contain any contaminants as defined by state and/or federal law."

97.    On or about October 20, 2017, ATC, the City of Cincinnati, and MSD notified Kokosing, in writing, that the soils taken to Plaintiffs' property were "classified as Type 1, but

restricted to commercial/industrial use." That classification made it clear that the material in question was, in fact, contaminated and could not lawfully be dumped onto residential property, including Plaintiffs' land. It was also patently clear that the contaminated black sand did not comply with the terms of the contract between Kokosing and Plaintiffs.

98.     In the same correspondence, ATC, the City of Cincinnati, and MSD warned Kokosing that because the black foundry sand was contaminated with PAHs and heavy metals, it presented "a potential future liability if disposed at a residential property."

99.     By October 20, 2017, all Defendants knew that large quantities of the contaminated sand had been dumped on Plaintiffs' residential property over multiple weeks, yet not one of Defendants ever told Plaintiffs what had happened.

100.     A MSD internal document dated October 20, 2017, claims that neither MSD nor the City of Cincinnati had representatives or agents at the sewer project during the excavation, nor was the soil approved for use at Plaintiffs' property when the first 30,000 cubic yards of foundry sand from Contaminated Soil Area 20 was dug up, transported, dumped, and spread on Plaintiffs' property. In fact, Defendants Kokosing and Ashcraft were acting as actual or apparent agents and contractors for MSD and the City of Cincinnati when they dug up the contaminated material, transported it, and dumped it on Plaintiffs' residential property.

101.     On October 27, 2017, Kokosing wrote to MSD and demanded confirmation that the material at Contaminated Soil Area 20 is "Type 1 Soil - Non-Contaminated Soil" and "can be used in fills with no restriction on land use and that this material does not have any special handling requirements."

102.     In the same letter, Kokosing sought confirmation from MSD "that all material hauled from Site 20 to our 'Ludlow Bromley fill site' over the past 3 to 4 weeks is 'Type 1' material which does not contain chemicals of concern in excess of Applicable or Relevant and

Appropriate Requirements for unrestricted land use." Kokosing's use of the phrase "Ludlow Bromley fill site" in the communication is an apparent reference to Plaintiffs' property, which is actually located in Villa Hills, just west of the cities of Ludlow and Bromley.

103.    In the October 27 letter, Kokosing asked MSD and its consultant, "How is Site 20 material residing at the Ludlow Bromley fill site to be handled?"

104.    Despite having knowledge of the facts described in paragraphs 92-94 above, on November 2, 2017, Kokosing wrote to MSD that "Kokosing will resume hauling Site 20 soils to the Ludlow Bromley offsite fill (David Bell property) based exclusively on MSD's Type 1 soil designation for the Site 20 soils. We also need to clarify … City representatives were on site for the removal of Type 1 material and approved the Type 1 designation. No material left the site without the City's knowledge and approval."

105.    On November 20, 2017, Kokosing wrote to MSD: "As with all of the soil on the Lick Run Project, the soil residing at the Ludlow Bromley and Edgewater offsite fills is the City's responsibility to classify. If the City changes the classification of the soil, after loading and hauling to an offsite fill, regardless of the location, it is the City's responsibility to resolve."

106.    In the same letter, Kokosing also informed MSD that Kokosing "will immediately resume hauling and placing Type 1 soil at any of our permitted offsite fill areas, specifically the Ludlow Bromley site. Should the City change, at any time, the designation of the soil already hauled offsite, the City is responsible for any and all costs to resolve. Kokosing will not incur any additional testing, analyses, excavation, hauling, or tipping fees without a prior approved Work Directive Change."

107.    Plaintiffs, from time to time during the period when the foundry sand was being dumped on their property, questioned Kokosing representatives about whether the black foundry sand was contaminated.  Kokosing representatives, repeatedly and falsely, assured Plaintiffs that

the sand was "safe, without contaminants, and fully complied with the terms and conditions of their contract."

108.    Kokosing never mentioned or told Plaintiffs anything about the then-ongoing discussions and finger-pointing among Kokosing, ATC, MSD and the City of Cincinnati about whether the sand was contaminated and therefore illegal and unsafe for use on their residential property. Instead, Kokosing willfully and fraudulently concealed those concerns from Plaintiffs.

109.    To deceive Plaintiffs and to try to keep them quiet, Kokosing repeatedly assured Plaintiffs the black sand was just "city soil" and repeatedly told Plaintiffs the sand was black in color only because of it was dug up in an old section on the west side of Cincinnati. Kokosing falsely and fraudulently represented to Plaintiffs that they had nothing to worry about and need not ask further questions about the fill material.

110.    Defendant Kokosing promised, represented, and assured Plaintiffs in both verbal communications and in its written contract that Plaintiffs would and had received good, unadulterated, clean fill material suitable and proper for use at their residential property.

111.    Because of petroleum odors emanating from the fill material, Plaintiffs began to question the veracity of Kokosing's representations to them that the thousands of tons of black sand material were not contaminated.

112.    On or about November 21, 2017, Plaintiffs took several samples of the black material to an analytical laboratory for testing. The analytical analysis found that the soil was highly contaminated with heavy metals and PAHs.

113.    Disposal of the contaminated sand on Plaintiffs' residential property violated the contract between Plaintiffs and Kokosing, Plaintiffs' fill permits, and Kentucky law. Moreover, the level of PAHs in the sand dumped on Plaintiff's property was and is unsafe for human health and the environment.

114.    After Plaintiffs advised Kokosing of the analytical findings, Kokosing stopped dumping black foundry sand on their property in or around November 2017. Shortly thereafter, Kokosing's agent presented an entirely new contract to Plaintiffs and asked them to sign it, which Plaintiffs refused to do.

115.    Kokosing and its agents then covered up the black foundry sand with a shallow layer of clean fill dirt and removed all of their equipment from Plaintiffs' property.

116.    Kokosing's actions in hiding contaminated black foundry sand beneath a thin layer of clean fill soil was an attempt to conceal the fact that Kokosing had knowingly, illegally, and intentionally dumped tens of thousands of tons of contaminated fill material on Plaintiffs' property in violation of state and federal law and the contract between Kokosing and Plaintiffs.

117.    On December 4, 2017, an anonymous tipster notified the Kentucky Division of Waste Management ("KDWM") of Kokosing's suspected dumping of contaminated material from the sewer project onto Plaintiffs' residential property.

118.    On or about December 18, 2017, KDWM inspectors entered Plaintiffs' property and took 16 separate samples of the black fill material for analytical testing at the state laboratory.

119.    The state laboratory test results were completed on January 4, 2018. All 16 samples contained PAH constituents above the EPA Region 3 Regional Screening levels. The state laboratory testing proved that the black foundry sand on Plaintiffs' residential property was contaminated and its disposal there was illegal under Kentucky law.

120.    KDWM issued David Bell, MSD, and Kokosing a Notice of Violation because the black foundry sand contained PAHs in excess of Kentucky state law and the contaminated material was dumped at a site that did not have a permit issued by Kentucky to receive contaminated waste.

121.    On or about August 22, 2018, KDWM determined the "onsite contamination" at Plaintiffs' property posed an "imminent threat to human health and the environment" and needed to be removed or otherwise cleaned to a level that did not pose a threat to humans or the environment.

122.    KDWM then determined that the Bells and Defendants named in this Complaint were "potentially responsible parties" and legally liable to potentially pay civil penalties and needed to remove all of the contaminated material or cap the contamination and maintain the integrity of the cap in perpetuity.

123.    In or around September 2018, KDWM required Kokosing, ATC, MSD and David Bell to submit a site characterization plan so that the lateral and vertical boundaries of the contamination on Plaintiffs' property could be estimated. The site characterization plan also required additional samplings be conducted to determine whether the black foundry sand was contaminated.

124.    On or about September 4, 2018, ATC began working at Plaintiffs' property under a state-approved site characterization plan. This work included using a drilling rig to take more samples of the black foundry sand for analysis.

125.    ATC's drilling logs show that the layer of black foundry sand is approximately 26 feet thick along the sampling locations closest to the Ohio River.

126.    KDWM received the site characterization report on October 20, 2018, and requested a Corrective Action Plan (CAP) to address the contamination dumped on Plaintiffs' property. The CAP was to be prepared and submitted by Defendants, Kokosing, MSD, and ATC.

127.    The original due date for the corrective action plan was January 18, 2019, but that deadline has passed. At this date, not one scoop of contaminated material has been removed from Plaintiffs' property.

128.     Removing the black foundry sand from Plaintiffs' property and replacing it with clean fill will cost millions of dollars and take substantial environmental engineering expertise.

129.      The only other remedial option under state law is to leave the contaminated material in place and place an engineered cap overtop the contamination to hold it in place forever. To do so, Plaintiffs would have to record an environmental covenant in the chain of title of their property forever restricting the use of their property, maintain the integrity of the cap in perpetuity, perform other maintenance and repair work to the area encumbered by the environmental covenant, and file annual reports to the state agency until the end of time. That option would destroy the value and utility of Plaintiffs' land—turning it from an asset to a liability-- and is, therefore, unacceptable to them.

130.     The remedial option of capping the contamination in place on Plaintiffs' land also would cost millions of dollars and require the annual expenditures of large sums of money over time to repair and maintain the integrity of the cap in perpetuity. Such tasks would be complicated by naturally occurring events, such as floods, slippage, erosion, and underground migration of water flowing to and from the river on a continuous basis through the fill material placed on the property. Capping the contamination in place would also create a substantial and unreasonable threat to public health by the potential release of the contamination materials into the Ohio River, from which many municipalities obtain their public drinking water supply.

### III.  CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

131.     Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 130 of this Complaint, as if fully rewritten herein.

132.    Plaintiffs entered into a contract with Kokosing for the delivery of clean fill material without contamination to their property in Kenton County, Kentucky.

133.    In entering into the Waste Agreement with Plaintiffs, Kokosing was acting as the actual or apparent agent of MSD and the City of Cincinnati. Kokosing, the City of Cincinnati, and MSD are, therefore, jointly and severally liable to Plaintiffs for all the losses and damages arising from breach of this contract.

134.    Pursuant to Paragraph 4 of the contract, Kokosing promised it would *not* deliver fill material to Plaintiffs' property that contained any contaminants as defined by state and/or federal law.

135.    Kokosing, its employees, representatives and subcontractors -- acting for themselves and as the actual or apparent agents of the City of Cincinnati and MSD -- breached this contract by excavating, transporting, dumping, and spreading contaminated black foundry sand and other contaminated materials on Plaintiffs' property in violation of the contract and Kentucky law.

136.    Defendants crossed into Kentucky more than 3,400 times to dump contaminated waste material on Plaintiffs' property.

137.    By dumping contaminated waste material from the sewer project on Plaintiffs' property, Defendants avoided payment of a substantial amount of tipping fees at a permitted waste facility for all of the contaminated waste dumped on Plaintiffs' property.

138.    Defendants, to the extent they avoided payment of tipping fees, were unjustly enriched and Plaintiffs' unjustly damaged as a result of Defendants' dumping contaminated waste on Plaintiffs' property.

139.    Plaintiffs are entitled to recover damages from the Defendants, jointly and severally, in an amount of money equal to the amount by which Defendants were unjustly

enriched by dumping contaminated waste on Plaintiffs' property that allowed them to avoid paying tipping fees at a permitted waste facility.

140.    Kokosing's breach of the contract has so contaminated Plaintiffs' property that it will require millions of dollars to clean up this property and may result in civil fines, penalties, and other costs being assessed against Plaintiffs and their property by the Kentucky Environmental Protection Cabinet. Plaintiffs' property remains contaminated in violation of state law.

141.    Plaintiffs are entitled to recover from Defendants, jointly and severally, monetary damages in an amount sufficient to clean up contamination on their property, pay all civil fines, penalties, and other costs, and to put Plaintiffs' property in the condition it would have been in but for Defendants' breach of contract.

142.    Defendant Kokosing's breach of the contract has made it necessary for Plaintiffs to engage legal counsel and incur substantial legal fees and litigation expenses that are ongoing and increasing in amount in accordance with a written fee agreement between Plaintiffs and their counsel. Under the terms of the contract between Plaintiffs and Kokosing, Plaintiffs are entitled to recover these fees and expenses from Kokosing as damages.

143.    Defendant Kokosing's breach of the contract has made it necessary for Plaintiffs to retain experts and incur fees and expenses that are ongoing and increasing in amount. Under the terms of the contract between Plaintiffs and Kokosing, Plaintiffs are entitled to recover these fees and expenses from Kokosing as damages.

144.    Pursuant to Paragraph 13 of the contract, Kokosing was required to indemnify, save harmless, and defend Plaintiffs against any losses, liabilities, costs, expenses, suits, actions, claims, and all other obligations and proceedings whatsoever, including without limitations, all judgments rendered against and all fines and penalties imposed upon Plaintiffs, and any

reasonable attorneys' fees and any other costs of litigation arising out of injuries to persons, including disease or death, or damage to property caused by Kokosing, its employees, agents, subcontractor, or in any way attributable to the performance or breach of the contract.

145.    Plaintiffs' property has been damaged by the illegal dumping of contaminated foundry sand and other contaminated materials on this property by Kokosing and their agents. As a result, KDWM has demanded that Plaintiffs submit a corrective action plan to remove the contamination.

146.    As a result of Kokosing's breach of the contract, Plaintiffs' property has been damaged with contaminated material that has caused the fair market value of their property to diminish and be burdened with future expenses, for all of which Plaintiffs are entitled to recover as damages from Kokosing.

147.    As a result of Kokosing's breach of the contract, Plaintiffs have been served with a Notice of Violation from the Kentucky Division of Waste Management, Superfund Branch, requiring them to incur costs and potential penalties if the contamination is not addressed according to Kentucky law. Under the terms of the contract, Plaintiffs are entitled to recover all such costs and penalties from Kokosing as damages.

148.    As a result of Kokosing's breach of the contract, Plaintiffs' property is not suitable for its intended use and will not be so suited until the contamination is removed and replaced with clean, non-contaminated fill materials.

149     Kokosing has so far refused to discuss replacing contaminated fill material with clean fill that Kokosing promised Plaintiffs and what Plaintiffs reasonably expected under the contract. Likewise ATC, Ashcraft, MSD, and City of Cincinnati are adamant that they will not replace any contaminated fill material removed from Plaintiffs' property with clean, non-contaminated fill.

150.    Because Defendant Kokosing materially breached the contract, Plaintiffs are entitled to recover the cost to fill, level and stabilize Plaintiffs' property with non-contaminated fill as damages because Plaintiffs expected that Kokosing would deliver fill material to their property without any contaminants in an amount sufficient to level, stabilize, secure, and preserve Plaintiffs' property above the 100-year flood plain.

<u>**COUNT II**</u>
<u>**PROMISSORY ESTOPPEL**</u>

151.    Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 150 of this Complaint, as if fully rewritten herein.

152.    In the alternative -- if Defendant Kokosing alleges in its defense that there was no contract with Plaintiffs -- Kokosing repeatedly made multiple statements and representations to Plaintiffs to induce them to unknowingly accept contaminated fill material from the sewer project and to allow Kokosing to dump and spread this fill material on Plaintiffs' property.

153.    Defendant Kokosing promised Plaintiffs that all of the fill material delivered to Plaintiffs' property would be without any contaminants and repeatedly assured them during the dumping of this material on their property that it was clean fill.

154.    Kokosing promised Plaintiffs the clean fill material would be delivered to Plaintiffs' property in an amount necessary to elevate their property out of and above the river's 100-year flood plain.

155.    Kokosing promised Plaintiffs that the company would use its contractors, equipment, and expertise to push and work the fill material into a stable, level, permanent, and usable yard.

156.    Defendant Kokosing also promised to indemnify and hold Plaintiffs harmless from all costs and expenses arising from and/or related to dumping and spreading fill material on Plaintiffs' property, including attorney fees, litigation expenses and other related costs.

157.    Defendant Kokosing's dumping of contaminated fill material on Plaintiffs' property has resulted in millions of dollars in cleanup costs, real property damage, substantial legal fees, and litigation expenses, as well as personal injury and substantial damages to Plaintiffs, which can only be avoided by the court's enforcement of Kokosing's promises made to Plaintiffs.

**COUNT III**
**EQUITABLE ESTOPPEL**

158.    Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 157 of this Complaint, as if fully rewritten herein.

159.    In the alternative -- if Defendant Kokosing alleges in its defense that there was no contract with Plaintiffs -- Kokosing repeatedly made multiple false and misleading statements and representations to Plaintiffs to induce them to unknowingly accept contaminated fill material from the sewer project and to allow Kokosing to dump and spread this fill material on Plaintiffs' property.

160.    Defendant Kokosing falsely promised Plaintiffs that all of the fill material delivered to Plaintiffs' property would be clean, unadulterated, and without contaminants and repeatedly assured them during the dumping of this material on their property that it was clean fill.

161.    Kokosing falsely promised Plaintiffs the clean fill material would be delivered to Plaintiffs' property in an amount necessary to elevate their property out of and above the Ohio River's 100-year flood plain.

162.     Kokosing falsely promised Plaintiffs that the company would use its contractors, equipment, and expertise to push and work the fill material into a stable, level, permanent, and usable yard elevated above the flood plain of the Oho River.

163.     Defendant Kokosing also falsely promised to indemnify and hold Plaintiffs harmless from all costs and expenses arising from and/or related to dumping and spreading fill material on Plaintiffs' property, including attorney fees, litigation expenses and other related costs.

164.     Plaintiffs relied upon Defendant Kokosing's false promises and inducements, lies, and concealment of material facts to their grave detriment and substantial damage and injury. Defendant Kokosing's dumping of contaminated fill material on Plaintiffs' property has resulted in millions of dollars in cleanup costs, real property damage, substantial legal fees, and litigation expenses, as well as personal injury and substantial damages to Plaintiffs.

## COUNT IV
## FRAUDULENT MISREPRESENTATION

165.     Plaintiffs refer to and incorporate the preceding allegations in paragraphs 1-164 in this Complaint, as if fully rewritten herein.

166.     Kokosing entered into a written contract with Plaintiffs to excavate and transport clean, non-contaminated fill material from the sewer project and dump and spread this untainted fill material onto Plaintiffs' property. In proposing and entering into the contract with Plaintiffs, Kokosing was acting as the actual or apparent agent of the MSD and the City of Cincinnati.

167.     Defendants, Kokosing, City of Cincinnati, MSD, ATC, and Ashcraft each advanced and furthered a conspiracy or scheme to defraud Plaintiffs and each Defendant advanced, furthered, and benefited from these fraudulent acts and misrepresentations set out in the allegations below.

168.    In verbal communications prior to offering Plaintiffs a written contact and in the written contract itself, Kokosing represented to Plaintiffs that it would transport, dump, and spread clean, unadulterated fill material onto their property consisting only of dirt, earth, rock, and concrete subsurface.

169.    Kokosing explicitly represented in the written contract between Plaintiffs and the company that such fill material "shall not contain any contaminants as defined by state and/or federal law."

170.    Kokosing violated and breached its contract with Plaintiffs by illegally dumping fill material contaminated with toxic and carcinogenic contaminants on Plaintiffs' property. Every  contaminant is identified by state and federal environmental agencies  and publicly published lists of contaminants are easily available to anyone with an interest.

171.    When Plaintiffs questioned Kokosing agents and representatives about petroleum-like odors coming from the materials Kokosing was dumping on Plaintiffs' property, these agents lied and knowingly and fraudulently misrepresented to Plaintiffs that the dumped materials were harmless, non-toxic, non-hazardous "city dirt" that conformed to the limitations set forth in the Waste Agreement.

172.    Kokosing made these material false misrepresentations to Plaintiffs with the intention of inducing Plaintiffs to enter into a written contract to accept waste material from the sewer project, and thereafter, to induce Plaintiffs to continue to accept the illegal dumping of this contaminated and toxic industrial waste on their land.

173.    In the alternative, Kokosing recklessly made such misrepresentations without any knowledge of the truth of the statements and as a positive assertion with the intention of inducing Plaintiffs to sign the contract that allowed Kokosing and its co-conspirators to transport, dump, and spread contaminated fill materials on their property.

174.    After the contract was signed, Kokosing continued to make false and misleading representations to Plaintiffs with the intention of inducing Plaintiffs to continue to permit Kokosing to dump contaminated materials on Plaintiffs' property.

175.    Plaintiffs relied upon the verbal and written assurances of Kokosing and such assurances were material in inducing Plaintiff, David Bell, to sign the written contract that allowed Defendants to transport, dump, and spread fill materials onto Plaintiffs' residential property, and after the contract was signed, to permit Kokosing to continue dumping contaminated materials on Plaintiffs' property.

176.    Kokosing's representations that fill material hauled to Plaintiffs' property was clean and unadulterated were false because the sand dumped onto and spread about Plaintiffs' property contained dangerous levels of PAHs and heavy metals and violated the contract and Kentucky law. Defendants, Kokosing, City of Cincinnati, MSD, ATC, and Ashcraft knew or should have known that the representations made to Plaintiffs were false and misleading.

177.    Defendants, Kokosing, City of Cincinnati, MSD, ATC, and Ashcraft each conspired and acted to advance and further the scheme to defraud Plaintiffs and this conspiracy needed each of them to perform certain individual acts to further the scheme to defraud Plaintiffs.

178.     If Kokosing had honored the terms of its contract with Plaintiffs, it would have incurred additional transportation costs and tipping fees to legally dump contaminated fill from the sewer project into a permitted waste facility. Instead, Kokosing, City of Cincinnati, MSD, ATC, and Ashcraft acted together in a fraudulent scheme to dump the contaminated fill onto Plaintiffs' property and evade paying transportation and tipping fees at a permitted waste facility.

179.    Plaintiffs, to their substantial detriment, relied on the false and misleading representations of the Defendants and thereby sustained injuries and damages, all of which

Plaintiffs are entitled to recover from the Defendants, jointly and severally, as damages, in an amount that exceeds the minimum jurisdictional limits of this Court that will be proven at trial. The conduct of the Defendants constitutes the intentional tort of fraud or fraudulent misrepresentation for which Plaintiffs are entitled to recover both compensatory and punitive damages from the Defendants, jointly and severally.

## COUNT V
## NEGLIGENCE

180.     Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-179 of this Complaint, as if fully rewritten herein.

181.     The contaminated fill materials that Defendants conspired to transport, dump, and spread on and around Plaintiffs' property pose grave and genuine long-term dangers to human health and the environment. Such dangers will continue to exist until all of the contamination is safely removed and properly disposed of in a permitted waste facility. The generation, management, transportation, and disposal of contaminated materials are ultrahazardous activities and highly regulated by law.

182.     Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, are individually, jointly, and severally negligent in failing to properly identify and accurately characterize the physical type of material transported to and deposited on Plaintiffs' property, thereby dumping many thousands of tons of sand and other materials on Plaintiffs' property that were contaminated with industrial wastes.

183.     Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, are individually, jointly, and severally negligent in failing to properly identify and accurately characterize the chemical composition of contaminated fill material transported to and deposited on Plaintiffs' property.

184.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, are individually, jointly, and severally negligent in failing to exercise that degree of care usually exercised by ordinarily careful, prudent persons under like or similar circumstances. Such failure constituted negligence and has caused Plaintiffs to suffer damages and injuries in an amount that exceeds the minimum jurisdictional requirements of this Court that will be proven at trial. Plaintiffs are entitled to recover all damages so incurred from the Defendants, jointly and severally.

185.    Plaintiffs are entitled to receive compensatory and punitive damages against the Defendants, individually, jointly, and severally because the negligence was gross, willful, wanton, and malicious towards Plaintiffs.

## COUNT VI
## NEGLIGENCE  PER SE

186.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-185 of this Complaint, as if fully rewritten herein.

187.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, individually, jointly, and severally conspired to violate state and federal environmental law and regulations by failing to properly identify and accurately characterize the chemical composition of contaminated fill material transported to and deposited on Plaintiffs' property in violation of state and federal environmental law and regulations.

188.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, individually, jointly, and severally conspired to violate state and federal environmental laws and regulations by failing to transport and deposit contaminated fill material to a permitted waste facility. Defendants further violated federal and state law by transporting, depositing, and

spreading the contaminated fill on and about Plaintiffs' residential property, which they knew was not a permitted waste facility.

189.    The federal and state environmental laws that Defendants violated were intended to protect Plaintiffs and other innocent citizens and to prevent the illegal dumping of dangerous, toxic, and hazardous contaminated materials on residential property.

190.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, are individually, jointly, and severally negligent in failing to exercise that degree of care usually exercised by ordinarily careful, prudent persons under like or similar circumstances. Such failure constitutes negligence *per se* and has caused Plaintiffs damages and injury in an amount that exceeds the minimum jurisdictional requirements of this Court.

191.    Kentucky Revised Statute §446.070 provides that any person injured by violation of any statute may recover from the offender any damages sustained by reason of the violation. Pursuant to KRS §446.070, Plaintiffs are entitled to recover monetary damages from the defendants, jointly and severally, in an amount that exceeds the minimum jurisdictional limits of this court and will be proven by the evidence at trial to fairly and reasonably compensate Plaintiffs for all damages they have sustained by reason of the said violation(s).

## <u>COUNT VII</u>
## <u>INTENTIONAL TRESPASS</u>

192.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-191 of this Complaint, as if fully rewritten herein.

193.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, individually, jointly, and severally, had a limited contractual license to dump clean fill -- dirt, earth, rock and concrete subsurface that did not contain any contaminants as defined by state and federal law -- onto Plaintiffs' property.

194.    Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, individually, jointly, and severally, violated this limited contractual license by illegally, intentionally, and maliciously transporting, dumping, and spreading foundry sand and other materials that contained contaminants, including but not limited to PAHs and heavy metals, as defined by state and federal law, onto Plaintiffs' property. Such misconduct was intentional, willful, and malicious.

195.    Defendants' entry upon Plaintiffs' land to dump contaminated industrial waste was not authorized by contract and was without the consent or authorization of Plaintiffs. Such entry constituted an intentional act of trespass for which Plaintiffs are entitled to recover from Defendants both compensatory and punitive damages.

196.    Defendants' willful and intentional trespass was done without the permission or consent of Plaintiffs and this intentional trespass resulted in thousands of tons of contaminated sand being dumped on Plaintiffs' property, which will require millions of dollars to clean up and restore Plaintiffs' property and also may result in civil penalties and other relief being assessed against Plaintiffs for violation of state environmental laws.

197.    Plaintiffs are entitled to injunctive relief to abate the effects of Defendants' intentional trespass and to receive compensatory and punitive damages in an amount that exceeds the minimum jurisdictional limits of this Court as proven by the evidence at trial against the Defendants, individually, jointly, and severally, as a result of their intentional trespass.

## COUNT VIII
## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT,
## K.R.S. §367.110, *et seq.*

198    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-197 of this Complaint, as if fully rewritten herein.

199.    Defendants, acting individually, jointly, and severally, committed "unfair, false, misleading, or deceptive acts" in a consumer transaction by surreptitiously dumping and spreading contaminated foundry sand and other contaminated materials on Plaintiffs' property in violation of the Kentucky Consumer Protection Act and state law.

200.    While Defendants engaged in this illegal, unfair, and false scheme, Defendants repeatedly and frequently told Plaintiffs false and deceptive misrepresentations that the fill material was clean, unadulterated, and free of any contaminants and appropriate to be dumped and spread on Plaintiffs' residential property. Defendants knew or should have known that their statements to Plaintiffs were false, untrue, inaccurate, deceitful, and just plain outright lies designed to further, advance, and carry out an oppressive, malicious scheme against Plaintiffs. Other times, Defendants remained silent to Plaintiffs to further their illegal and fraudulent scheme.

201.    Defendants' unfair, false, misleading, and deceptive acts and gross misconduct resulted in injury and damages to Plaintiffs and their property. The contamination will cost millions of dollars to safely clean up and will require substantial environmental engineering expertise.

202.    Defendants' unfair, false, misleading, and deceptive acts have subjected Plaintiffs to a Notice of Violation and threat of substantial civil penalties from the Commonwealth of

Kentucky as well as liability and a responsibility to clean up the contamination as required by Kentucky Division of Waste Management.

203. Defendants' actions in dumping and spreading contaminated sand and other contaminated materials on Plaintiffs' property constitute fraud, oppression, malice, and/or gross negligence.

204. By dumping contaminated sand and other contaminated materials onto Plaintiffs' residential property and lying to Plaintiffs about the composition and characteristics of the contamination, Defendants were unjustly enriched by the fact they could avoid paying substantial amounts of money in tipping fees and transportation costs to dump the material at a permitted waste facility.

205. Plaintiffs are entitled to compensatory and punitive damages, as well as payment of their attorney fees as a result of Defendants' violation of the Kentucky Consumer Protection Act, for their fraudulent, oppressive, and malicious scheme to dump contaminated sand and other contaminated materials on Plaintiffs' property.

## COUNT IX
## VIOLATION OF KRS § 512.020, CRIMINAL MISCHIEF IN THE FIRST DEGREE

206. Plaintiffs refer to and incorporate here by reference all of the allegations in the foregoing paragraphs 1-205 of this complaint as if here fully set forth.

207. Defendants committed the crime of Criminal Mischief in the First Degree and violated KRS §512.020 when, having no right to do so or reasonable ground to believe that they had such right, they intentionally or wantonly damaged Plaintiffs' property by dumping tens of thousands of tons of contaminated, toxic, harmful, and carcinogenic material on Plaintiffs' residential real estate, thereby damaging Plaintiffs' property and causing pecuniary loss of $1,000 or more.

208.     KRS §446.070 provides a private cause of action and right to recover from offender(s) all damages sustained by reason of the violation of any statute. Plaintiffs are, therefore, entitled to recover from the Defendants, jointly and severally, an amount of money that exceeds the minimum jurisdictional limits of this Court and these damages will be proven at trial in an amount to sufficient to fully and adequately compensate Plaintiffs for all damages they sustained by reason of the Defendants' violation of KRS §512.020.

## COUNT X
## PUNITIVE DAMAGES

209.     Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-208 of this Complaint, as if fully rewritten herein.

210.     Defendants engaged in a fraudulent scheme involving an ultrahazardous activity that is highly regulated by state and federal law by excavating, transporting, dumping, and spreading contaminated sand and other contaminated materials on and about Plaintiffs' residential property.

211.     Defendants knowingly participated in this scheme fully aware they were dumping contaminated waste sand on a flood plain that was (and is) subject to erosion and stability issues from high river levels and regular flood events and cognizant of the likely consequences of their illegal and wrongful misconduct.

212.     While conducting this fraudulent scheme, Defendants falsely and deceptively lied to Plaintiffs about the composition and characteristics of the contaminated fill material and falsely misrepresented that all fill material transported, dumped, and spread onto Plaintiffs' property was free of any contaminants, as defined by federal and state law.

213.     Defendants' misconduct was intentional, utterly reckless, malicious, willful and wanton, and caused millions of dollars in damage to Plaintiffs' property and continues to pose

substantial danger to human health and the environment. Defendants' malicious and willful misconduct also caused injury to Plaintiffs.

214.    The fill material dumped and spread by Defendant Kokosing is eroding and falling into the Ohio River and allowing the contaminated black sand material to wash down into the river, which is the primary drinking water supply for many citizens and residents of the Commonwealth of Kentucky and other neighboring states. Defendants' misconduct is intentional, reckless, malicious, willful and wanton, and should be punished by this court.

215.    Under the factual circumstances of this case, as set out in this Complaint, Plaintiffs are entitled to an award of punitive damages against Defendants under Kentucky law.

**COUNT XI**
**VIOLATION OF RICO ACT**

216.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-215 of this Complaint, as if fully rewritten herein.

217.    Plaintiffs entered into a contract with Kokosing for the delivery of clean fill material without contamination to their property in Kenton County, Kentucky. Kokosing, in entering into the Waste Agreement with Plaintiffs, was acting as the actual or apparent agent of MSD and City of Cincinnati.

218.    Pursuant to Paragraph 4 of the contract, Kokosing agreed that it would *not* deliver fill material to Plaintiffs' property that contained any contaminants as defined by state and/or federal law.

219.    Kokosing, its employees, representatives and subcontractors -- acting for themselves and as actual or apparent agents of the City of Cincinnati and MSD -- breached this contract by excavating, transporting, dumping, and spreading contaminated black foundry sand

and other contamination on and about Plaintiffs' property in violation of the contract and Kentucky law.

220. Defendants, Kokosing, MSD, City of Cincinnati, ATC, and Ashcraft, individually, jointly, and severally conspired to violate state and federal environmental law and regulations by failing to transport and deposit contaminated fill material to a permitted waste facility. Instead, Defendants transported and deposited the contaminated material to and on Plaintiffs' residential property in violation of state and federal law and regulations.

221. Defendants defrauded Plaintiffs by lying and misrepresenting that the foundry sand contaminated with toxic industrial waste as safe, clean, "city dirt." Defendants made many such fraudulent misrepresentations to Plaintiffs during the period of the time that Defendants were illegally dumping toxic waste on Plaintiffs' residential property. Defendants made such misrepresentations to advance their fraudulent and illegal scheme.

222. Other times, Defendants stayed silent and kept material information away from Plaintiffs to continue and otherwise advance their fraudulent and illegal scheme.

223. Defendants knew that they were illegally dumping and spreading contaminated materials on a flood plain and that this property would have long-term stability issues associated with high river levels and flooding events, and therefore, it was likely that contaminated materials could and would wash down into the Ohio River.

224. Fraud is a racketeering activity as defined in 18 U.S.C. §1961(1). Plaintiffs were the intended victims of this fraudulent activity.

225. During August, September, October, and November 2017, Defendants transported more than 3,400 dump truck loads of contaminated fill material across state lines and illegally dumped the contaminants in these trucks onto Plaintiffs' residential property in violation of state and federal law.

226.     While conducting this fraudulent scheme, Defendants falsely, deceptively, and repeatedly lied to Plaintiffs and otherwise hid information about the composition and characteristics of the contaminated fill material. Throughout the period of racketing activity, Defendants falsely misrepresented to Plaintiffs that all fill material transported, dumped, and spread onto their property was free of any contaminants, as defined by federal and state law.

227.     By carrying out this fraudulent and illegal scheme, Defendants were able to avoid paying substantial tipping fees and transportation costs by dumping the contaminated sand and other material on Plaintiffs' residential property rather than at a permitted waste facility.

228.     Defendants' fraudulent and illegal scheme also has subjected Plaintiffs to a Notice of Violation issued by the Kentucky Division of Waste Management and subjected them to a potential assessment of civil penalties and joint and several liability (with Defendants) to clean up and remove thousands of tons of contaminated sand and other contaminated materials from their property and to restore the property to its prior environmental condition.

229.     Defendants' fraudulent scheme has caused Plaintiffs to engage legal counsel and incur legal fees and litigation expenses under a written fee contract with counsel and these fees and expenses are ongoing and increasing in amount.

230.     Plaintiffs have demanded that Defendants remove all of the contaminated materials that they have illegally dumped on Plaintiffs' residential property and replace it with clean, non-contaminated fill material, but Defendants have so far refused to do so.

231.     All of the contaminated materials outlined in this Complaint are still located on Plaintiffs' property in violation of state and federal law and such illegal activity will continue until Defendants clean up the contamination and restore Plaintiffs' property to its prior environmental condition.

## DECLARATORY AND INJUNCTIVE RELIEF

232.     Plaintiffs refer to and incorporate the preceding allegations set forth above in paragraphs 1-231, as if fully rewritten herein.

233.     Kokosing disposed of contaminated waste material on Plaintiffs' property in violation of the Waste Agreement and Kentucky law. As a result, the Kentucky Division of Waste Management, Superfund Branch, issued a Notice of Violation on January 22, 2018 for the illegal disposing and/or dumping of contaminated soil at an unpermitted facility, i.e., Plaintiffs' property.  (KRS §224.0-100(1)).

234.     Plaintiff requests that the Court find and declare by judgment that:

a. The contract between Kokosing and Plaintiffs is a valid and enforceable instrument, as modified by Plaintiff, David Bell, more fully described in paragraphs 50 and 53 of this Complaint, and that the Court strike the unilateral modifications to the contract added by Kokosing after Plaintiff, David Bell, signed the contract and submitted it to the company, as more fully described in paragraph 54 of this Complaint;

b. The law of Kentucky be applied to resolve the disputes described in this complaint, including finding that Kokosing is liable to Plaintiffs and obligated by the contract for damages to Plaintiffs, including paying all attorneys' fees and litigation expenses related to this action and/or to the events that led to the filing of this action and/or to the administrative action before the Kentucky Division of Waste Management;

c. Kokosing be required to pay for all costs to clean up and remove contaminated soil or other contaminated materials from Plaintiffs' real property; and

d.   Kokosing is required to backfill Plaintiffs' real property with clean, non-contaminated, proper fill materials sufficient to place Plaintiffs' property in the condition it

would have been in had Kokosing properly performed the promises and requirements set forth in the contract.

235.    Furthermore, Kokosing and ATC have misrepresented the terms of the contract between Kokosing and Plaintiffs in communications with the Kentucky Division of Waste Management in a self-serving effort to avoid or otherwise limit their responsibility to clean up the pollution that Kokosing created by illegally dumping contaminated material on Plaintiffs' property. Kokosing and ATC should, therefore, be enjoined from having any communication(s) with the Kentucky Division of Waste Management and any other employee of the Kentucky Energy and Environmental Protection Cabinet outside the presence and/or without the participation or advance consent of Plaintiffs' authorized representative(s) and agent(s).

236.    Kokosing and ATC have fraudulently and willfully violated Kentucky environmental laws and regulations by illegally dumping contaminated fill materials on Plaintiffs' property; lied about and misrepresented what they were doing; and caused millions of dollars in damage to Plaintiffs' property. Plaintiffs, therefore, respectfully assert that it would be unreasonable to entrust cleanup of Plaintiffs' property to Defendants, Kokosing, or ATC. Therefore, Plaintiffs requests that this Court find and declare by judgment that Plaintiffs are entitled to recover from the Defendants, jointly and severally, monetary damages in an amount sufficient to pay honest and independent environmental engineering contractor(s) to remove contaminated materials from Plaintiffs' real property and replace it with clean, non-contaminated fill. The cleanup activity should be done in strict compliance with the terms of the contract between Kokosing and Plaintiffs.

**WHEREFORE**, Plaintiffs demand:

1.  Trial to the Court;

2.  That Plaintiffs be awarded compensatory damages from Defendants, jointly and severally, in an amount that exceeds the minimum jurisdictional limits of this Court and in an amount that will fully and adequately compensate them for all of the damages, losses, and injuries they have and will continue to incur, including but not limited to the costs of having third-party, environmental contractors remove all contamination from Plaintiffs' property; the costs of refilling, compacting, and landscaping the property to the condition that was intended by the contract between Kokosing and Plaintiffs; and other compensatory damages.

3.  That Plaintiffs recover exemplary or punitive damages in an amount not to exceed ten times the compensatory damages awarded to Plaintiffs, from the Defendants, jointly and severally, to punish Defendants for their intentional misconduct and disregard for Plaintiffs' property and the environment in general and to dissuade the Defendants, and others similarly situated, from engaging in such misconduct in the future.

4.  That Plaintiffs recover from the Defendants, jointly and severally, pre-judgment and post-judgment interest; their court and litigation costs and attorneys fees, as provided for in the contract and under Kentucky law;

5.  Declaratory and injunctive relief requiring the Defendants to fully compensate responsible third-party environmental contractors to remove all contaminated, toxic, carcinogenic, or otherwise potentially harmful materials from the Plaintiffs' property; properly dispose of the contaminated materials; and replace clean fill on Plaintiffs' property, as contemplated and specified by in the Waste Agreement, all at Defendants' cost; and

6.  All other relief to which Plaintiffs may appear entitled entitled under law or in equity.

Respectfully submitted,

/s/*Jeffrey M. Sanders*

JEFFREY M. SANDERS (Ky Bar 82106)
LAW OFFICE OF JEFFREY M. SANDERS PLLC
34 GLENWAY AVENUE
FORT THOMAS, KENTUCKY 41075
Telephone: (859) 380-6867
Email: jms@sanderslaw.com


WALLACE BOGGS, PLLC

/s/ Jeffrey C. Shipp

JEFFREY C. SHIPP (81414)
SCOTT A. BEST (88844)
300 Buttermilk Pike, Suite 100
Ft. Mitchell, KY 41017
Telephone: (859) 578-5410
Facsimile: (859) 331-5337
Email: jshipp@wallaceboggs.com
        sbest@wallaceboggs.com


***Counsel for Plaintiff***


## VERIFICATION

I, David Bell, verify that I have read the foregoing Verified Complaint and believe it to be true and accurate to the best of my knowledge and belief.


/s/David Bell

David Bell

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON

Subscribed, acknowledged, and sworn to before me, a Notary Public, by David Bell, on this
26th day of April, 2019.

/s/ _(signature)_
NOTARY PUBLIC ID# 585293
My Commission Expires: 8/18/2021

I, Cindy Wilder, verify that I have read the foregoing Verified Complaint and believe it to be true
and accurate to the best of my knowledge and belief.

/s/Cindy Wilder Bell
Cindy Wilder Bell

COMMONWEALTH OF KENTUCKY
COUNTY OF KENTON

Subscribed, acknowledged, and sworn to before me, a Notary Public, by Cindy Wilder Bell,
on this 26th day of April, 2019.

_(signature)_
NOTARY PUBLIC ID#585293
My Commission Expires: 8/18/2021