**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**
**CIVIL ACTION NO.  2:19-cv-0053**

| | | |
|---|---|---|
| **DAVID BELL, ET Al.,** | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| | ) | |
| **KOKOSING INDUSTRIAL, INC.  ET AL.** | ) | |
| | ) | |
| **DEFENDANTS** | ) | |

Come the Plaintiffs, Cindy and David Bell, and for their Amended Complaint state as follows:

### I.  PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs are husband and wife and citizens of Commonwealth of Kentucky and at all times relevant herein resided at 486 River Road, Villa Hills, Kenton County, Kentucky.

2.      Defendant, Kokosing Industrial, Inc. (hereinafter "Kokosing"), is a foreign corporation, organized under the laws of the State of Ohio, with its principal place of business in Fredericktown, Ohio. Its principal corporate office is located at 6235 Westerville Road, Westerville, OH 43081. Kokosing is registered to do business in the Commonwealth of Kentucky with the Kentucky Secretary of State. Kokosing is and at all times relevant herein was a contractor for the City of Cincinnati and the Metropolitan Sewer District of Greater Cincinnati (hereinafter "MSD") on the Lick Run Valley Conveyance System Project (hereinafter, "sewer project").

3.       Defendant, City of Cincinnati, (hereinafter "the City" or "city") is a municipal corporation and is responsible for the operation and management of MSD pursuant to an

agreement between the City and the Hamilton County Board of Commissioners. At all times herein, the City has and continues to act as the principal and sole manager of MSD.

4.     Defendant, MSD, was formed in 1968 as a county sewer district under Ohio state law. MSD is governed by a 50-year agreement between the City and Hamilton County, known as the 1968 Agreement. As set forth in this Agreement, the City is responsible for the management and operation of the sewer district while the Board of County Commissioners of Hamilton County, Ohio, retains the authority to establish sewer service charges, adopt rules and regulations, and approve operating and capital improvement program budgets.

5.     Defendant, ATC Group Services LLC, is a foreign limited liability corporation registered to do business in Kentucky with the Kentucky Secretary of State and operates under the assumed name of ATC Associates Inc. (hereinafter jointly, severally, and individually referred to as "ATC").   ATC operates an office in Louisville, Kentucky. As a large, highly experienced environmental consulting firm, ATC was responsible for identifying and characterizing soil encountered during construction activities at the sewer project to ensure proper management, handling, and disposal of soil and other materials excavated or removed as part of the sewer project by Kokosing and its subcontractors.

6.     Defendant, Ashcraft Sand & Gravel Company, Inc. (hereinafter "Ashcraft"), is an Ohio corporation that is not registered with the Kentucky Secretary of State to do business in Kentucky. Ashcraft's principal place of business is 5850 Dry Fork Road, Cleves, Ohio 45002. Ashcraft transported contaminated black foundry sand and other fill materials from the sewer project in Ohio across state lines and dumped and spread the contaminated fill on Plaintiffs' residential property in Kentucky.

7.     This action arises under Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1961, *et seq.* Defendant, City, also violated Plaintiffs' U.S. and Kentucky

Constitutional rights by taking their property as a result of dumping thousands of ton of the City's contaminated waste material on it. The cost to clean up and restore Plaintiffs' property will cost millions of dollars – destroying their constitutionally protected property rights and far, far, far beyond Plaintiffs' financial means and ability to remedy the harm done to their property. This action is also brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. An actual controversy presently exists between Plaintiffs and Defendant, Kokosing, relating to the terms and conditions of a contract between them.   A judicial determination resolving this controversy is necessary and appropriate at this time.

8.      The district court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the complaint presents a claim under federal law, RICO 18 U.S. Code § 1961, *et seq*. The district court also has jurisdiction under 28 U.S.C. §1332 because complete diversity of citizenship exists between Plaintiffs and Defendants and the amount in controversy is more than $75,000. Plaintiffs further invoke supplemental jurisdiction of this district court pursuant to 28 U.S.C. §1367(a) to hear and decide any and all related state-law claims.

9.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in and the real property that is the subject of this action is situated in this judicial district. Moreover, the claims for violations of 18 U.S.C. § 1961, *et seq.*, arose in this district and these Defendants, among other things, conspired to act and did in fact take action in this district that caused injury to Plaintiffs.

## II.  <u>STATEMENT OF THE FACTS</u>

### A.      **Lick Run Valley Conveyance System Project**

10.      As part of an amended federal consent decree among the City, MSD, and U.S. EPA, (C-1-02-107, Judge Spiegel)(hereinafter, "the consent decree"), the City and MSD

accepted Kokosing's bid of $89,900,000 to serve as a general contractor on the sewer project on

or about May 23, 2017. MSD announced that Kokosing would be the general contractor on the

sewer project by letter dated June 5, 2017.

11.     The sewer project is located within the old industrial South Fairmount

neighborhood of Cincinnati, Ohio. Decades ago, the City replaced Lick Run Creek with a large

underground concrete sewer pipe and then filled in the area around the pipe and creek to allow

for commercial and industrial development. The old concrete sewer pipe was a combined sewer,

carrying both raw human waste, industrial waste water, and storm water.

12.     During rains, the combination of storm water and industrial and sanitary waste

overwhelmed the system's capacity. The combined sewer overflowed into the Mill Creek and

contaminated it with the industrial and sanitary waste.

13.     Contamination from the Mill Creek flows into the Ohio River, which presents a

serious risk of causing harm to the river and diseases that could harm not only the people of

Cincinnati, but those of every city that rely on the inland rivers for their drinking water supply.

14.     Addressing the public health issues, U.S. EPA initiated action against the City and

MSD that led to a consent decree between and among the City, MSD and U.S. EPA that required

that changes be made to eliminate the over-flow hazard. The sewer project was undertaken to

eliminate the combined system and its associated problems.

15.     During Cincinnati's earlier industrial days, South Fairmont was where many

foundries, manufacturing plants, and other heavy industrial factories were located. After many

decades of largely unregulated heavy industrial activity, South Fairmount became an

economically depressed area that contained many abandoned industrial factories, abandoned

underground storage tanks, and many polluted properties known as Brownfields.

16.     Because of the wide-spread extent of pollution in South Fairmont, the City's Office of Environmental Quality assisted MSD in identifying, investigating, and evaluating environmental conditions at and under every parcel of property along the length of the sewer project.[1]

17.     The City and MSD contracted with ATC to be their environmental consultant on the sewer project. ATC was tasked with the responsibility of locating, identifying, and determining the vertical and horizontal limits of contaminated soil along the length of the sewer project. ATC advertises itself to the public as having "comprehensive expertise in air, land, and water combined with full design, project management, and implementation services" sufficient to "handle any challenge from consulting to completion."

18.     During the sewer project, ATC was required to test suspect material encountered during construction activities even if the suspicious material was not previously identified by the City's and MSD's environmental investigations.

19.     ATC also had to classify suspect material encountered during excavation activities at the sewer project as either "contaminated" or "non-contaminated" soil so that Kokosing would properly handle, manage, transport, and dispose of material excavated from the ground.  Soil classified as contaminated excavated during the sewer project went to a landfill. If ATC classified the soil as non-contaminated, Kokosing hauled it to residential property.

20.     Under the arrangement with the City and MSD, ATC had the duty, *inter alia,* to identify and classify fill material that could or could not be used as fill material on residential

---

[1] About a year before beginning the sewer project, the City's Fire Department requested that U.S. EPA remove certain hazardous materials from the Lunkenheimer Valve Company's building at the corner of Beekman and Tremont Streets, including a large quantity of foundry sand. The letter from the fire department is dated March 27, 2016. U.S. EPA's contractor did so and disposed of the foundry sand as a hazardous waste because of its toxicity. The black foundry sand dumped on Plaintiffs' property was almost certainly from the Lunkenheimer foundry. Thus, the City knew or should have understood that waste foundry sand excavated from the ground was likely hazardous, i.e., toxic, to human health and the environment and illegal to dump on residential property in Kentucky.

property in the Commonwealth of Kentucky. ATC has an office in Kentucky and should be highly knowledgeable of the state's standards and restrictions related to fill material placed on residential property.

21. The City and MSD prepared 1,390 sheets of detailed construction and engineering drawings for the sewer project. The drawings specifically identify the geographical locations and physical boundaries of both "non-contaminated soil" and "contaminated soil" that Kokosing had to excavate and remove for the sewer project.

22. Kokosing used the geospatial information on the drawings to calculate the volume of soil needed to be removed during the sewer project. The City's contract required a lump sum bid for excavating, managing, hauling, and disposing soil classified as *non-contaminated*. The City would then pay that lump sum to the winning bidder to haul such soil to residential property for disposal.

23. The City and MSD paid Kokosing a lump sum in the amount of $14,858,742.40 to excavate and remove *non-contaminated* soil from the sewer project. Kokosing's bid for excavating and removing non-contaminated soil was a fixed cost for the City on the sewer project. Kokosing's lump sum bid was about $6,000,000 more than the other contractors' bid for digging up and removing the same volume of soil. Nothing in the contract explains what the rate payers of Hamilton County got in return for paying Kokosing almost $6 million more than the other bidders for excavating and removing non-contaminated soil from the sewer project. See EX 1, attached to this Amended Complaint, which is the first sheet of the City's itemization of the competing bids for the sewer project. Kokosing's bid amount for uncontaminated soil is in the category of "Unclassified Excavation, Hauling, and Disposal," as are the bids of its competitors.

24.     Under the City's contract with Kokosing, *contaminated* soil excavated during the sewer project had to be transported to and disposed in the Rumpke landfill in Colerain Township, all done at the City's expense per ton of material dumped in the landfill.

25.     For contaminated soil, the City paid ATC to prepare all documentation required to transport and dump the waste in the Rumpke landfill. The city also paid Kokosing a separate surcharge for handling each ton of contaminated soil under the contract with the City.[2]

26.     The City's construction and engineering drawings identified approximately 20 different large "Contaminated Soil Areas" ("CSA"). On these drawings, the City, MSD and ATC placed boundary lines for each CSA based upon their individual, joint, and collective investigations of environmental conditions at the sewer project.

27.     Kokosing, ATC, and Ashcraft have told Plaintiffs (and Kentucky Division of Waste Management) that the "black soil" dumped on their property was excavated from CSA 20. Sheet 289 of 1,390 of Drawing Series 300, identifies CSA 20 as having "non-contaminated soil." Thus, Kokosing hauled soil from CSA 20 to Plaintiffs' residential property.

28.     The City, MSD, and ATC also prepared separate narrative documents setting forth a summary of environmental conditions in those "areas and sites with known or likely soil contamination." CSA 20, including the former McDonalds site, were identified in the January 2017 and June 2017 versions of the narrative document. Both versions of the document caution that "concentrations of arsenic and PAHs[3] in CSA 20 exceeded residential soil standards."

29.     MSD and the City provided copies of these engineering drawings and documents to Kokosing for its use and guidance to perform excavation work at the sewer project. Kokosing

---

[2] Separate copies of all documents related to contaminated soil dumped in the landfill are likely kept by the City, MSD, Kokosing, ATC, the Rumpke landfill, and the trucking company. In the bidding documents for the sewer project, the City and MSD estimated exactly 189,002 tons of contaminated waste had to be hauled to the Rumpke landfill. Kokosing was the lowest bidder for handling contaminated soil at the sewer project. See EXHIBIT1, *supra*.
[3] PAHs are polyaromatic hydrocarbons. According to U.S. EPA, "Several of the PAHs and some specific mixtures of PAHs are considered to be cancer-causing chemicals."

began excavation work at the eastern end of the sewer project near the Mill Creek in or around July 2017. Kokosing then began excavating its way uphill to the west, along the path of the sewer line. The sewer project is still an ongoing project.

30.     At all times relevant herein, both MSD and the City had their own engineers and employees to supervise, oversee, manage, coordinate, control, and document the activities of all contractors and subcontractors working at the sewer project. Such logs were completed daily and work on the sewer project can be traced back to the individual contractor or contractors by date and time. The City's contract with Kokosing makes perfectly clear that the City was in control of the sewer project.

31.     If Kokosing excavated soil from an area that the City and MSD classified as "non-contaminated," Kokosing could dump the soil on residential property so long as Kokosing had a contractual agreement with the residential landowner and the landowner had a permit to place fill material on their property.

32.     The City, ATC, and MSD received and reviewed a copy of the signed contractual agreement between Kokosing and the residential property owner where the City's "non-contaminated" soil would be dumped, as well as a copy of the landowners' permit authorizing placement of the fill material on their residential property. Copies of all of these documents are maintained in the internal files of the City, MSD, ATC, and Kokosing.

33.     ATC, the City, and MSD reviewed the landowner's signed contract with Kokosing and any related authorizations to ensure that landowner had a valid fill permit to accept the City's soil dug from the sewer project.

34.     Copies of the contracts between Kokosing and each residential landowner where non-contaminated soil from the sewer project was dumped are maintained in the records of the City, MSD, ATC, and Kokosing.

35.     Kokosing and its agents hauled, dumped and spread fill material classified by the City, MSD and ATC as "non-contaminated" soil on private residential property in Kentucky and on other residential property in and around the Greater Cincinnati area. There are no analytical test results, waste manifests, or waste characterization profiles of non-contaminated soil that would verify or otherwise confirm that the soil Kokosing dumped on residential property was actually clean and uncontaminated.

36.      Kokosing did not independently test or otherwise confirm that "non-contaminated" soil from the sewer project was truly free of contaminants before offering a contract to dump "clean fill" to residential-property owners.

37.     If Kokosing's workers did not complain about staining or odors in the soil marked by the City, MSD and ATC as *non-contaminated*, Kokosing or its agents simply dug up the soil and transported it to the residential property where the material was dumped and spread.

38.     Because environmental conditions encountered at the sewer project could vary from those identified on the engineering/construction drawings, the City had a procedure in place for Kokosing to follow if its workers smelled or saw "suspect" material in an area that the City and MSD had previously classified as "non-contaminated."

39.     Kokosing would have to stop work and call ATC to take samples of the suspect soil. ATC then sent the samples to an off-site laboratory for analysis. ATC would then report the results to the City, MSD and Kokosing, usually after several days, but the delay could be much longer.

40.     For all suspect soil reported by Kokosing at the sewer project, ATC: (a) selected the particular soil to be tested; (b) determined how many samples would be taken and tested; (c) selected the laboratory testing the samples; and, (d) made all other decisions related to testing

the soil. Once the results were back, ATC then classified the soil as contaminated or non-contaminated. The City paid all costs associated with ATC's work.

41.    ATC used composite samples to reduce the number of samples taken and the City's laboratory costs. The principal limitation of composite sampling is the potential for hotspots to remain undiscovered due to the inherent characteristics of the process. For example, a discrete subsample may contain a high concentration of contaminant that may be masked due to the dilution effect in the composite sampling procedure.[4]

42.    If the soil previously classified as non-contaminated was found to be polluted, Kokosing had to ship the contaminated soil to the Rumpke landfill. Under the City's contract with Kokosing, the City paid: (a) Kokosing a monetary surcharge for handling such newly classified soil; (b) all additional costs to collect and test the waste; (c) costs related to preparing waste manifests; (d) cost to transport the waste soil to the landfill; and (e) the cost to dump the waste in the landfill. In practical terms, the City was paying Kokosing or its agents twice to excavate, manage, remove and dispose of all misclassified soil from the sewer project because the City had already paid Kokosing a lump sum dollar amount for excavating and removing the same soil.

43.    If the results of the suspect soil confirmed that the soil was "non-contaminated," Kokosing was solely responsible for all costs associated with lost time and delay on the sewer project. Kokosing then excavated the soil and its agent hauled the soil to a residential property for disposal as part of its lump sum bid.

44    Time was of the essence on the sewer project. The consent decree filed in the Southern District of Ohio has firm time deadlines by which certain portions of the sewer project must be completed. Under Section 3.5, Liquidated Damages, of the contract between and among

---

[4] This technique is often referred to in the business as "dilution is the solution to pollution."

Kokosing, MSD, and the City, Kokosing agreed to pay $5,000 per diem for missing deadlines for the sewer project set out in the consent decree. Under Section 3.6 of the contract, Kokosing also agreed to pay any civil penalties, stipulated penalties, and all other damages assessed by U.S. EPA against the City and MSD for missing deadlines set forth in the consent decree.

### B.      Plaintiffs live in Villa Hills, Kenton County, Kentucky

45.      Plaintiffs live in a small house located on about a one-acre tract of land on Route 8 in a residential zone in the City of Villa Hills, Kenton County, Kentucky. Plaintiffs' property is contiguous on its northern boundary with the Ohio River. The small, single-family home contains about 1,105 square feet and was built in 1952. It is Plaintiffs' single largest and perhaps their only tangible asset.

46.      The front of Plaintiffs' residence faces south, fronting on Route 8. Plaintiffs' back yard and side yards are contiguous with a wide bend in the Ohio River. At its original elevation, a portion of Plaintiffs' backyard and side yard was located within the floodplain of the Ohio River. Thus, Plaintiffs had to apply and receive a floodplain fill permit to place fill material on their property. The floodplain permit contains terms and conditions that Plaintiffs had to strictly honor.

47.      Under their floodplain permit, Plaintiffs could place only inert, non-contaminated fill material on their property. Such material could only be placed not farther than 250 feet from the edge of Route 8.

48.      Plaintiff, Mrs. Bell, holds fee simple title to the approximately one-acre tract of residential property and improvements. Mrs. Bell (nee Cindy Wilder) inherited the property from her mother's estate in 2003.

49.      Under current Villa Hills zoning regulations, the tract is too small in acreage to be subdivided. No additional residential dwellings can be placed on the property. The City of Villa

Hills may amend its zoning regulations in the future. If zoning regulations are amended, Plaintiffs' property could probably be divided into as many as five small residential building lots.[5]

50.     Plaintiffs wanted to fill in and elevate their yard, which naturally sloped steeply downward toward the river on its east, west, and north sides, to have a large level side yard. Raising the elevation of the property would also reduce the potential for damaging flood events in the future.

51.     In a more realistic scenario, Plaintiffs intend to create a small campground overlooking a scenic bend in the Ohio River and an organic garden for the use and benefit of their family and members of their church. Plaintiffs do not intend to create a commercial campground in an area zoned as residential.

52.     Plaintiffs' plans also included building a boat ramp down to the Ohio River to serve people using the proposed campground. Plaintiffs applied for and obtained a permit from the Kentucky Department of Transportation to construct the boat ramp on the east side of their property. Plaintiffs do not own the land where the boat dock would be potentially located, if it is ever built.

53.     Prior to the events giving rise to this lawsuit, Plaintiffs applied for and received  a floodplain permit to fill in and raise the elevation of their residential property.

54.     Plaintiff, Cindy Bell, received title to the property from her mother's estate on May 16, 2003. Prior to that date, local municipalities and other entities placed clean fill material on a portion of Plaintiffs' property. Defendants have possession of multiple aerial maps showing

---

[5] If the City of Villa Hills ever amends its zoning code to permit Plaintiffs' land to be subdivided into five residential building lots, there is still a question of whether a house could be legally placed on top of an uncompacted  fill area next to the Ohio River.

that the lot had uncompacted fill material placed on it over several decades prior to Plaintiffs owning the property.

> **C.     Kokosing contracts with Plaintiffs to bring clean, non-contaminated fill material to their property after Kokosing's deal to dump this same material in Campbell County collapses.**

55.     On or about July 6, 2017, Kokosing negotiated a contractual agreement to transport non-contaminated fill material from the sewer project and dump it at various residential parcels situated on Vogel Road, Sheppard Road, Hale Avenue and Alexandria Pike in Highland Heights, Campbell County, Kentucky. The landowner, who was represented by counsel, was fortunate to insist on adding a clause into Kokosing's form contract that allowed him to terminate the contract at any time.

56.     The contractual agreement with the Campbell County landowner was Kokosing's form contract and its wording is the same as all other Kokosing contracts with residential landowners to dump fill material. Under the terms of Kokosing's form contract, Kokosing promises the landowner that the fill material "shall not contain any contaminants as defined by state and/or federal law."

57.     Upon information and belief, Kokosing's potential deal to dump fill material at these four residential locations in Campbell County fell through due to an unexpected purchase contract on the property. But for that event, Kokosing would have dumped the same material from the sewer project on these four residential parcels in Campbell County that ultimately went to Plaintiffs' property in Kenton County, Kentucky.

58.     As a result of the contract being terminated, Kokosing needed to immediately find another location to transport and dump fill material from the sewer project to meet the deadlines in the contract between Kokosing and the City, and the deadlines in the federal consent decree between U.S. EPA and the City and MSD.

59.     In or around the middle of July 2017, one or more authorized representatives of Kokosing approached Plaintiffs at their home and offered to transport and deliver as much as 100,000 cubic yards of clean, inert, and non-contaminated fill material to their residential property at no cost to Plaintiffs.  Plaintiffs told Kokosing that their property would not hold that much fill, but they would take as much clean, non-contaminated fill, as needed to raise their property out of the floodplain.

60.     Access to Plaintiffs' residential property is restricted by a single entrance. Plaintiffs have two large dogs and a video camera system to monitor and control access to their property. Access to their property is limited as much as reasonably possible and their property is not an uncontrolled dump site.

61.     During the visit, a Kokosing representative and its agents walked around and inspected Plaintiffs' property. They walked above the bank of the Ohio River and observed that the lot sloped sharply down to the riverbank on its north and east sides. Kokosing was also aware that the lot contained uncompacted fill material, including concrete chunks or pieces.

62.     Kokosing knew or should have known that compaction, settlement, and stability issues associated with placing fill material on the property would be complicated by potential river flooding events and groundwater flowing underneath the property to and from the river.

63.     Apparently satisfied with the property, Kokosing inquired as to whether Plaintiffs held the necessary permits to dump clean fill material within the floodplain. When Plaintiffs replied that they did, Kokosing requested copies of all of their permits for Kokosing's, the City's MSD's and ATC's inspection, review, and approval of their residential property as a dump site for clean, inert fill material

64.     Kokosing told Plaintiffs that each of these entities would independently examine their floodplain permit, KDOT permit, and that all three entities had to approve this potential

dumping site before Kokosing could sign a contract with Plaintiffs and begin to place clean fill material on their property.

65.     Plaintiffs' floodplain permit prohibited Kokosing from dumping contaminated fill and reactive material on their property. Plaintiffs' floodplain permit also prohibited placing fill material in any location more than 250 feet from Route 8 pursuant to 401 KAR 4:060 Section 5.

66.     KRS 224.01-400, KRS 224.40-100, and 401 KAR 30:031 prohibit dumping of contaminated soil on residential property.

67.     KRS 224.40-100 explicitly requires that contaminated soil be dumped at a permitted landfill, such as Rumpke. Plaintiffs did not hold (and have never held) a permit allowing disposal of contaminated soil on their property.

68      Kokosing was required to provide copies of Plaintiffs' floodplain permit, commercial driveway permit, and its contractual agreement with Plaintiffs to the City, ATC, and MSD for a separate review and approval before Kokosing was authorized by MSD and the City to transport and/or dump the City's soil excavated from the sewer project onto Plaintiffs' property.

69.     Based upon a reasonable review of Plaintiffs' fill permits and a very simple knowledge of black-letter environmental law, Kokosing, the City, and MSD all knew, or should have known, that dumping contaminated soil on Plaintiffs' residential property was illegal under KRS 224.01-400, KRS 224.40-100, 401 KAR 30.031, and a flagrant violation of Plaintiffs' floodplain permit.

70.     The City, ATC, and MSD each reviewed Kokosing's contract with Plaintiffs, the Plaintiff's floodplain permit, and the commercial driveway permit for Plaintiffs' property issued by the Kentucky Division of Transportation.

71.     As part of that approval process, a MSD document dated October 19, 2017, discloses that "soil from Area 20 are Type I as per ATC. The undercut area it (sic) going to be further tested by ATC this could fall into the Type II category.[6] Also, I reminded Kokosing that they must submit fill sites as per the specification. For this site 30k cy of soil was trucked to the site before submitting the paperwork. Ludlow Bromley site is acceptable for Type 1 soils"  MSD used the term "Type 1" soil in this memo to mean non-contaminated soil.

72.     Defendants, Kokosing, ATC, Ashcraft, the City, and MSD, all knew or should have known that only inert, clean, non-contaminated materials excavated from the sewer project could legally be deposited on Plaintiffs' property. They also knew or should have known that contaminated soil could *not* be legally dumped on Plaintiffs' property under KRS 224.01-400, KRS 224.40-100, 401 KAR 30.031, and Plaintiffs' floodplain permit.

73.     Plaintiffs, who are both lay individuals, did not have representation of legal counsel during the negotiation of the contract. Kokosing representatives told Plaintiffs that they did not need to retain an attorney in dealing with the company. Plaintiffs trusted Kokosing and accepted its word and proceeded without legal representation in dealing with the company. Upon information and belief, Kokosing *did* have representation and its lawyers were involved in drafting the contract that Kokosing induced Plaintiffs to sign.

74.     As an inducement to get Plaintiffs to sign the contract, Kokosing's representatives and agents, including Ashcraft employees, promised Plaintiffs that once the work was done, the elevated yard would be out of the floodplain, level, stable, and in compliance with their floodplain permit. Kokosing made these representations in mid-July 2017.

75.     Kokosing's representatives promised Plaintiffs that it would transport inert, clean fill material across state lines, deliver it to their property, and spread it out and compact it with

---

[6] Type II soil is contaminated soil that must be hauled to a landfill for disposal.

heavy equipment without any cost to Plaintiffs in exchange for them giving Kokosing a contractual right to dump clean, non-contaminated fill material from the sewer project on their residential property.   Kokosing made these representations in mid-July 2017.

76.     Kokosing's representatives promised Plaintiffs that once the lot was level and compacted, the fill area would be suitable for use by their family and members of their church as a camp site. Kokosing made these representations in mid-July 2017.

77.     Kokosing's representatives and agents, including Ashcraft employees, traded on the "good will" associated with the City and MSD in promising Plaintiffs that the fill material would not contain any contaminants and warranting Plaintiffs that MSD had tested the purity of the soil being hauled to their residential property. Kokosing's representatives and agents made these representations in mid-July 2017.

78.     In reliance on promises of Kokosing's representatives and agents, including Ashcraft employees, Plaintiffs agreed to allow clean, non-contaminated fill from the sewer project to be placed on Plaintiffs' land in the manner and under the conditions that Kokosing had described. Kokosing gave a pre-printed form contract to Plaintiffs to sign in or around mid-July 2017.

79.     Plaintiffs entered into a written form contract created by Kokosing to accept clean non-contaminated fill material from the sewer project on their residential property in or around mid-July 2017.

80.     Under the terms of the contract, Kokosing explicitly promised that the fill material hauled to Plaintiffs' residential property "shall not contain any contaminants as defined by state and/or federal law."

81.     The form contract does not have a provision that allows residential landowners – like the Plaintiffs -- to charge Kokosing a tipping fee to dump soil on their property.

82.     For reasons that are unknown to Plaintiffs, as to numerical order, Kokosing's form contract presented to David Bell did not contain a paragraph numbered 8 or a paragraph numbered 9. A copy of the signed contract is attached hereto as Exhibit 2 to this Amended Complaint, and incorporated by reference ("contract" or "Waste Agreement").

83.     Plaintiff, Cindy Bell, was not home when Kokosing's representative came to the house to have Plaintiffs sign the form contract.

84.     Kokosing's representative told David Bell: (a) his wife did not have to sign the contract; (b) David Bell should go ahead and sign it: (c) the representative would send the signed contract to Kokosing's corporate headquarters; and (d) an authorized representative of Kokosing would sign the contract. Kokosing's representative also told Bell that after Kokosing signed it, the company would return a fully executed copy to Mr. Bell.

85.     Kokosing's pre-printed form contract presented to Plaintiffs was styled a "Waste Agreement." Before signing it, David Bell struck the phrase "other material ("waste material")" from numbered paragraph. 1.  As amended by David Bell, paragraph 1 and paragraph 4 of the Waste Agreement read:

> 1.     **DEFINITION OF WASTE**:  The term "waste material," as used in this Agreement is a common term used in the construction industry and it is defined as the removing of *dirt, earth, rock, concrete subsurface* and ~~other material ("waste material")~~ from a construction project and depositing the waste materials at another location. Subject waste material is not the property of the Metropolitan Sewer District of Cincinnati. (Emphasis added.)

> 4.     **TYPE OF WASTE MATERIAL TO BE DEPOSITED:**   Contractor shall have the right to deposit any and all waste material except: ASPHALT on the property in the Location specified, but *the waste material shall not contain any contaminants as defined by state and/or federal law*." (Emphasis added.)

86.     Sand was not included in the definition of "waste material," in the contract between Plaintiffs and Kokosing. Plaintiffs did not want sand dumped on their property next to

the Ohio River because sand could not be compacted, sand might be unstable as a fill material, and sand would wash or float away, if the river flooded the property.

87.     The contract between Plaintiffs and Kokosing did *not* authorize or permit the dumping of any fill material onto Plaintiffs' property that contained *any contaminants,* as state and/or federal law define that term. That provision in the contract meant Plaintiffs would receive only pure, clean, unadulterated fill material from the sewer project.

88.     Before signing it, Plaintiff David Bell modified Kokosing's form contract by striking out certain language in Section 1, 2, 5, 7, and 17. Plaintiff David Bell placed an "X" through Sections 10, 11, and 12 to strike them from the contract. Plaintiff David Bell also struck language written on a separate page that held MSD harmless for claims that may arise from the contract.  Plaintiff David Bell also wrote the phrase "No contaminated material of any type" to the bottom of Section 5 and "Kenton" to Section 17 of the form contract to reflect the proper county in which his property was located.

89.     Plaintiff David Bell then signed the contract on page 6 and hand-delivered the document to a Kokosing agent or representative, who represented that the document -- as modified and signed by Plaintiff David Bell -- would be reviewed by Kokosing management and signed by an authorized representative of the corporation and returned to Plaintiffs. Plaintiffs did not keep a copy of the contract signed by Plaintiff David Bell in reliance on the promise of the Kokosing agent to return a fully signed document.

90.     Despite being repeatedly promised and frequently requesting a copy of the fully signed contract, Kokosing did not provide Plaintiffs with a copy of the fully executed contract before or during the time Kokosing dumped and spread thousands of tons of contaminated fill material from the sewer project on their property.

91.     On or about July 27, 2018, long after the events giving rise to this legal dispute occurred, Kokosing's counsel emailed an altered "contract" to Plaintiffs' counsel. Without Plaintiffs' knowledge, permission, or consent, Kokosing added paragraph numbered 23 titled "MSD HELD HARMLESS" to the contract and struck his hand-written modification that read "No contaminated material of any type" at the bottom of paragraph number 5.

92.     Jonathon A. Turton, an authorized agent for Kokosing, signed the same signature page that Plaintiff, David Bell, had signed, but attached that signature page to a copy of Kokosing's "Waste Agreement" that did not include Plaintiffs' hand-written modifications to paragraph 5.

93.     In the altered contract, Kokosing also added a paragraph numbered 23 to the contract, a hold harmless clause in favor of MSD, which David Bell had previously rejected by drawing an "X" through the language. Plaintiff, David Bell, never agreed to the changes that Kokosing unilaterally made to paragraph numbers 5 and 23 of the contract and neither Bell nor his wife ever saw these changes until Kokosing's attorney provided the contract to Plaintiffs' counsel on July 27, 2018.

94.     The actions of Kokosing in taking the signature page from the proposed contract signed by Plaintiffs and attaching it to a contract that Plaintiffs never agreed to constitutes fraud, for which Plaintiffs are entitled to exemplary or punitive damages as well as compensatory damages.

95.     The contract, even in the form signed by Jonathan A. Turton, as the agent of Kokosing, did *not* grant Kokosing a right to dump black foundry "sand" or any other contaminated material on Plaintiffs' property. Paragraph numbered 1 of the contract limited Kokosing to transporting and dumping "dirt, earth, rock and concrete subsurface" from the sewer project. Sand is not mentioned in the form contract.

96.     Paragraph numbered 4 of the contract states that all fill material transported to Plaintiffs' property "shall not contain any contaminants as defined by state and/or federal law." That provision in the contract was essential to the agreement because dumping contaminated material on Plaintiffs' residential property violated KRS 224.40-100, KRS 224.01-400, and 401 KAR 30:031 and the terms and conditions of Plaintiffs' floodplain permit.

97.     Under the terms of the Waste Agreement, Kokosing agreed to indemnify and hold Plaintiffs harmless for any losses, liabilities, suits, costs, or expense whatsoever arising from Kokosing's dumping of fill material on their property.

98.     Further, Kokosing agreed to indemnify Plaintiffs for attorney fees and legal expenses incurred as a result of legal disputes arising from Kokosing's dumping of fill material on their property.

99.     An internal document from MSD and the City dated on or about October 19, 2017, discloses that MSD contacted authorities from Kenton County, Kentucky, to inquire about Plaintiffs' floodplain permit because material from the sewer project would be placed in the floodplain. In the memo, the City and MSD recognized and acknowledged that only non-contaminated fill material could be dumped on Plaintiffs' residential property situated in the floodplain.

100.    Internal documents from MSD and the City show that ATC also obtained, reviewed, and approved Kokosing's contract with Plaintiffs, Plaintiffs' floodplain permit, and Plaintiffs' commercial driveway permit from the Kentucky Department of Transportation Cabinet.

101.    MSD's project engineer wrote in the document that review of Kokosing's contract with Plaintiffs was a "low priority." The City had "no exceptions" to Kokosing's contract with Plaintiffs.

102.    All Defendants named in this lawsuit knew or should have known that they could not legally excavate, transport, dump, and spread contaminated materials on Plaintiffs' residential property located in the floodplain without violating KRS 224.01-400, KRS 224.40-100, 401 KAR 30-031, the terms and conditions of Plaintiffs' floodplain permit, and the contract between Kokosing and Plaintiffs.

103.    Beginning in August 2017, Kokosing excavated, transported, and began to dump fill material on Plaintiffs' property from the sewer project. Because of the large number of dump trucks that Kokosing was going to send to the Bell property to dump fill material, Kokosing rented a street sweeper from Arts Rental Equipment in Louisville, Kentucky, to clean Route 8 near the Bell property. Kokosing also arranged for porta-potties to be located at Plaintiffs' property for Ashcraft's truck drivers to use. Kokosing also brought and parked other pieces of its construction equipment to the Bell property to spread the fill material from the sewer project.

104.    Between the beginning date in August 2017 and until September 29, 2017, Defendant Ashcraft, acting for and as the actual or ostensible agent of all the named Defendants, transported approximately 1,393 loads of fill material to Plaintiffs' property.

105.    According to an email from Ashcraft to Plaintiff, the trucking company transported and dumped 237 loads of dirt on August 14, 2017, 173 loads of dirt on August 15th, 204 loads of dirt on August 16th, 204 loads of dirt on August 17th, 180 loads of dirt and 30 loads of concrete on August 18th, 198 loads of dirt on August 21st, and 167 loads of dirt on August 22nd.

106.    Despite being asked on several occasions, Kokosing would not or could not provide Plaintiffs with any type of proof showing that the fill material dumped and spread on their property in August and September 2017 was actually free of contaminants. Defendants never told Plaintiffs that no such document existed. The fill material dumped on Plaintiffs'

property was not sampled or tested by Kokosing, the City, MSD, ATC, or Ashcraft before being dumped and spread on Plaintiffs' property.

107.    Kokosing also refused to disclose the location(s) where Kokosing dug up this fill material at the sewer project. However, there is documentation within the files Kokosing, the City, MSD, and ATC identifying the location or locations where the fill material was excavated at the sewer project on those dates. Kokosing and Ashcraft also have truck tickets identifying each truck load that went to Plaintiffs' property.

108.    Kokosing never tested the composition of the soil to confirm that it contained "no contaminants as defined by state or federal law" as the contract warrants. Instead, Kokosing and Ashcraft hauled the material to Plaintiffs residential property dug up from areas marked on the City's engineering drawings for the sewer project as "non-contaminated."

109.    Instead of providing any answers or documentation, Kokosing's representatives and agents repeatedly assured Plaintiffs in August and September 2017 that all fill material dumped on Plaintiffs' was "completely free of contaminants, safe, and that the fill material fully complied with the terms of their contract."

110.    An email from Ashcraft to Plaintiffs, dated January 9, 2018, states, "All dirt hauled to Route 8, 486 River Road was black in color and questioned about color of it."

### D.    Beginning in or around October 2017, Kokosing begins to excavate contaminated fill material from Contaminated Soil Area 20

111.    Unknown to Plaintiffs, the fill material that Kokosing dumped on their residential property beginning in October 2017 was excavated from a location known as "CSA 20" on Sheet 289 of 1,390, Drawing Series 300, of the City's engineering drawings. A copy of the City's construction drawing is attached hereto as EXHIBIT 3 to this Amended Complaint.

112.    Within CSA 20 was a former McDonalds restaurant that was located at 2321 Beekman Street, Cincinnati, Ohio. The City purchased the McDonalds property for several million dollars in the spring of 2015 -- after City and/or MSD and its contractors conducted several environmental assessments on the property.

113.    Based on the findings of the environmental assessments, the City, MSD and ATC knew or should have known that the McDonalds sat on a thick layer of fill material consisting of black foundry sand contaminated with heavy metals and polyaromatic hydrocarbons[7] ("PAHs.")

114.    In purchasing the McDonalds' site, the City apparently neither sought nor received a discount or reduction in the sale price of the property because of the thick layer of contamination sitting underneath the property.

115.    All soil excavated by Kokosing during the sewer project belonged to the City because the City purchased all the private property in the South Fairmount neighborhood encompassed by the sewer project through eminent domain or in negotiated sales.

116.    The City took title to all property needed for the sewer project with prior knowledge of environmental conditions existing at each parcel gained by conducting one or more environmental assessments on every single parcel of property purchased for the sewer project.

E.      **CSA 20 was identified on the engineering drawings for sewer project.**

117.    On Sheet 289 of 1,390 of Drawing Series 300, CSA 20 was inexplicably marked as "not contaminated soil." Sheet 289 also shows neither the City, nor MSD, nor ATC took soil

---

[7] PAHs are a class of organic compounds produced by incomplete combustion or high-pressure processes. PAHs form when complex organic substances are exposed to high temperatures or pressures. Certain PAHs are classified by various government health and environmental agencies as possible or probable human carcinogens. They are linked to skin, lung, bladder, liver, and stomach cancer.

borings or made any other environmental investigation in subsurface conditions in and under CSA 20. See EXHIBIT 3, *supra*.

118.    Sheet 480 of 1,390, Drawing Series 300, showed that Kokosing had to excavate down about 40 feet in CSA 20. The City, ATC, and MSD knew (or should have known) that the parcel at 2321 Beekman Street was back filled with a thick layer of contaminated foundry sand. At the sewer project, the black sand layer was patently obvious to Defendants. See EXHIBIT 4 to this Amended Complaint, which is a digital photograph of a Kokosing track hoe in CSA 20. Ashcraft sent the picture to David Bell when he asked where the black sand material was dug up at the sewer project. No reasonably competent person could have possibly mistaken the environmental conditions in CSA 20 for non-contaminated soil.

119.    The fine-grained, black sand in CSA 20 had a petroleum odor that should have alerted the Defendants that the foundry sand was contaminated and not suitable for use on residential property. Defendants knew or should have known that the PAHs in the black foundry sand were potentially carcinogenic and posed a substantial risk of harm to human health and the environment, if mismanaged.

120.    CSA 20 was on the Series 300 drawings for the sewer project because the City, ATC, and MSD had knowledge of a Recognized Environmental Concern[8] underneath the McDonalds Restaurant at 2321 Beekman Street from five prior events set out in the public records of MSD and the City.

F.        **The City first had knowledge in 2002.**

---

[8] Recognized Environmental Concern ("REC") is one of the terms used to identify environmental liability within the context of a Phase I Environmental Site Assessment. American Standard for Testing and Materials defines the recognized environmental condition in the E1527-13 standard as "the presence or likely presence of any hazardous substances or petroleum products in, on, or at a property: (1) due to release to the environment; (2) under conditions indicative of a release to the environment; or (3) under conditions that pose a material threat of a future release to the environment. . ."

121.    First, in 2002, ATC informed the City of Cincinnati and MSD that the parcel at 2321 Beekman Avenue was reported to have been backfilled with waste foundry sand from the former Lunkenheimer Valve Company, ("Lunkenheimer") located at 1519 Tremont Avenue, Cincinnati, Ohio. The large Lunkenheimer foundry building still stands at the corner of Beekman and Tremont Avenues in Cincinnati.

122.    Lunkenheimer used foundry sand as a mold in the casting of valves. Molten metal was poured into sand molds. After the metal cooled, the sand molds were broken and the metallic casting removed.

123.    After one or more casts of molten metal, the foundry sand became fouled and was discarded. Lunkenheimer generated huge amounts of waste foundry waste sand that was dumped in and around the Lick Run Creek. The foundry sand accumulated into a thick layer that was buried when the City replaced the creek with a large underground concrete sewer pipe and filled in the area many decades ago.

124.    Waste foundry sand contains heavy metals and PAHs that are picked up in the casting of molten metals and exceed modern environmental regulatory performance standards.[9] Heavy metals are human neurotoxins and PAHs are toxic and potentially cancerogenic. The heavy metals and PAHs in the black sand are listed by state and federal law as contaminants.

125.    Once informed that the parcel at 2321 Beekman Street was backfilled with waste foundry sand, the City, ATC, and MSD knew or should have known that the fine-grained, black sand underneath the parcel was almost certainly contaminated.

### G.    City was told a second time in 2010.

126.    Second, in January 2010, the City and MSD hired Weston Solutions, a different environmental consulting firm, to review environmental conditions at 2321 Beekman Street.

---

[9]  See, e.g., 401 KAR 30.031 for Kentucky's environmental performance standards.

Weston Solutions recommended that a Phase II Environmental Site Assessment ("ESA") be conducted because of the heavy metals and PAHs in the backfill underneath the parcel.

127.    A Phase II ESA would require Weston Solutions to take samples of the black foundry sand to determine the concentration of heavy metals and PAHs in the sand. The City and MSD apparently ignored Weston Solutions' recommendation because MSD did not produce any public document showing that such testing was done.

### H.    City told a third time in 2015.

128.    Third, in 2014 and continuing into the spring of 2015, the City and MSD negotiated with the McDonalds Corporation to purchase the property at 2321 Beekman Street in Cincinnati for the sewer project. Authorization for a Phase II ESA was pending at the time of the sale. The City and MSD produced no documentation evidencing that such testing was done.

### I.    Fourth, the City wrote to U.S. EPA to request removal of foundry sand in 2016.

129.    On March 27, 2016, the Cincinnati Fire Department wrote to U.S. EPA and requested the federal agency conduct an emergency removal action of hazardous materials sitting in the Lunkenheimer building, including foundry sand. The U.S. EPA conducted the removal action and disposed of the foundry sand as a listed hazardous waste. Thus, the City and MSD knew or should have known the foundry sand underneath the former restaurant was contaminated because the sand was almost certainly from the same Lunkenheimer foundry.

### J.    Fifth, the City, MSD and ATC warned Kokosing of the foundry sand in narrative documents drafted for the sewer project in January 2017 and June 2017 in CSA 20.

130.    Two narrative documents for the sewer project provided to Kokosing by ATC, MSD and the City confirm the presence of the "McDonalds site." The documents warn,

"Contamination at this site appears to be related to placement of historic fill. Soil samples . . . concentrations of arsenic and PAHs exceed residential soil standards…"

131.   The black foundry sand that Kokosing dug up from CSA 20 should have been hauled to Rumpke's landfill for safe disposal rather than to Plaintiffs' residential property in Kentucky.

**K.**  **Kokosing begins transporting and dumping contaminated fill material from CSA  20 onto Plaintiffs' property**

132.   Unknown to Plaintiffs, in or around September 29, 2017, Kokosing began excavating black foundry sand from CSA 20. Despite their knowledge (or what they should have known), the City, MSD, and ATC had classified the black foundry sand as "non-contaminated soil" on the construction drawings and therefore safe for Kokosing to transport and dump on residential property as fill material without any restriction.

133.   After Kokosing dug up the black contaminated sand from CSA 20 and loaded it into dump trucks, Ashcraft hauled the contaminated material from Cincinnati, Ohio to Plaintiffs' property in Kentucky in breach of the contract between Plaintiffs and Kokosing; in violation of Plaintiffs' floodplain permit; and, in violation of KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.013.

134.   Defendants, acting together in a conspiracy, intentionally and illegally dumped tens of thousands of tons of contaminated foundry sand and other contaminated materials onto Plaintiffs' property. Each Defendant aided and abetted the other Defendants' fraud, and each Defendant advanced, furthered, and financially benefited from these fraudulent acts and misrepresentations set out in the allegations in this Amended Complaint.

135.   According to an email from Ashcraft to Plaintiffs dated January 9, 2018, Ashcraft brought 135 loads of soil on September 29th, 222 loads of soil on October 2, 180 loads of soil on

October 3rd, 194 loads of soil on October 4th, 183 loads of soil on October 6th, 218 loads of soil on October 10th, 202 loads of soil on October 11th, 207 loads of soil on October 12, 176 loads of soil on October 13th, 268 loads of soil on October 16th. "ALL SOIL HAULED TO ROUTE 8, 486 RIVER ROAD WAS BLACK IN COLOR AND QUESTIONED ABOUT COLOR OF IT."

136.    According to a separate email from Kokosing's counsel to Plaintiffs' counsel, the "black soil" hauling period dated between October 2-18. Kokosing admits approximately 18,000 cubic yards of "black soil" was hauled to the Bell property.'"[10]

137.    Because of the sand's color and petroleum odor, Kokosing met on October 2, 2017, with the City, MSD and ATC. At the meeting, the City, MSD and ATC told Kokosing that the "specifications prevail" and Kokosing should handle the black foundry sand as non-contaminated fill for use on residential property.

138.    On or about October 12, 2017, Kokosing requested ATC test the black foundry sand in CSA 20 because its workers complained that the black foundry sand emitted a strong petroleum odor.

139.    All the while, Kokosing continued to excavate the black foundry sand and load it into Ashcraft's trucks. Ashcraft continued to haul it across state lines to Plaintiffs' property where it was dumped and spread.

140.    On October 12, 2017, Kokosing wrote to MSD and requested the City and MSD issue a Work Directive Change so that Kokosing could respond to different environmental conditions at CSA 20 that "impact crew production, adds equipment cost and material cost." Kokosing added, "It is imperative that quick direction of handling these soils be expedited to

---

[10] Kokosing's attorney attached an electronic copy of the truck tickets for the loads of contaminated material allegedly taken to the Bell property by Ashcraft. Later, a paper copy of these documents were also provided to Plaintiffs. This estimate is at least 12,000 cubic yards less than the amount disclosed in the internal documents of the City, MSD and ATC. No one will know the true tonnage of contaminated waste dumped on Plaintiffs' property until it is removed by Defendants. Once removed, the contamination will be hauled to Rumpke landfill and weighed. Defendants will then be charged per ton of waste placed in the landfill.

avoid additional costs." Nothing was mentioned about dumping the black contaminated sand on Plaintiffs' residential property. A copy of Kokosing's letter dated October 12, 2017 is attached hereto as EXHIBIT 5.

141.    On October 14, 2017, Kokosing's internal weekly log entry reported CSA 20 "had soils that had a petroleum odor. ATC took samples."

142.    On October 16, 2017, Kokosing wrote to the City and MSD and requested they verify a document prepared by ATC showing new boundary lines for contaminated foundry sand in CSA 20. Kokosing also wanted to know the depth of contamination.

143.    On October 17, 2017, ATC wrote back to Kokosing and admitted that it did not test or have analytical data of the sand situated below 4 to 6 feet. Kokosing was excavating deeper than 6 feet and hauling the black sand from the sewer project to Plaintiffs' property.

144.    Despite not doing any testing and not having analytical data for the black sand, ATC told Kokosing, "we are confident that the data is representative of the nature of materials present at the foundry site." Without investigating further, ATC continued to classify the material as "Clean/Type 1 material." Kokosing continued to dig down and ship the black odiferous sand to Plaintiffs' property.

145.    On October 19, 2017, Kokosing wrote to the City, MSD and ATC and requested that they "verify" ATC's "new foundry site drawing" is "now the current contract drawing to adhere too. Also, please confirm the depths in the contaminated areas."

146.    On October 31, 2017, the City, MSD and ATC again told Kokosing, "Analytical data is not available beyond the 4-6' depth for this site. The maximum depth of fill material is 11.5' beneath the foundry property."  It is unclear how ATC came to such a conclusion, if it did not physically measure the depth of the sand layer.

**L.** **Kokosing continues to falsely tell Plaintiffs the fill material did not contain contaminants.**

147.    During this time period, not one Defendant told Plaintiffs that the materials being dumped on their property was suspected to be contaminated foundry sand or that Kokosing's workers reported petroleum odors when digging up the sand and loading it into Ashcraft's trucks for transit to Plaintiffs' property.

148.    Beginning on or around October 2, 2017 and continuing through December 2017, Plaintiffs communicated with representatives of both Kokosing and Ashcraft -- in person, through text messages and emails, and by multiple cellphone calls -- regarding the safety of the black sand and the petroleum odors emanating from the sand. When Plaintiffs began to smell petroleum odors and questioned the composition and safety of the black sand, Kokosing's representatives and agents, including Ashcraft, continued to falsely assure Plaintiffs that the black sandy material was "clean," totally harmless, "inert," and "contained no contaminants," and was "perfectly safe."

149.    Kokosing's representatives repeatedly assured Plaintiffs that the black foundry sand was just "city dirt" from Cincinnati and its chemical composition complied with the terms and conditions in its contract with the Plaintiffs. Plaintiffs also talked to Ashcraft's truck drivers about the black sand material being dumped on their property beginning on or about October 2, 2017. Plaintiffs were told the material was just old "city dirt" from the westside of Cincinnati. Plaintiffs reasonably relied on these assurances, thereby foregoing any further action.

**M.** **God bless the U.S. Coast Guard and Kentucky Division of Water.**

150.    On or about October 13, 2017, a U.S. Coast Guard crew traveling along the Ohio River took 15 digital photographs of Plaintiffs' property from their boat.  A copy of the 15 digital photographs is attached hereto as EX 6.

151.    The pictures taken by the U.S. Coast Guard memorialized a Kokosing contractor using a bulldozer to push black fill material down the hillside towards the Ohio River in violation of Plaintiffs' floodplain permit. That same day, Mark Jones of the Kentucky Division of Water ("KDOW") met with Mike Luessen of ATC about the black fill material dumped on Plaintiffs' property.[11] After the meeting, Mr. Luessen emailed Jones on October 13, 2017, and asked Jones to have the U.S. Army Corps of Engineers contact Luessen directly regarding fill material dumped in the floodplain. Luessen copied Plaintiffs on the email to Mark Jones, who works in the Florence Regional Office of KDOW.

152.    On or about October 16, 2017, a KDOW officer visited Plaintiffs' property and took pictures of an Ashcraft truck dumping black foundry sand near the bank of the Ohio River and a bulldozer spreading out the black foundry sand on Plaintiffs property. KDOW inspected Plaintiffs' property because of Plaintiffs' floodplain permit. A picture of the piles of black sand and equipment on Plaintiffs' residential property are attached hereto as EX 7.

153.    On or about October 16, 2017, ATC verbally told Kokosing that "preliminary tests" of the samples taken in CSA 20 were *clear of contaminants*.[12]

154.    On or about October 17, 2107, Kokosing temporarily stopped transporting material to Plaintiffs' property because ATC gave Kokosing additional information about the composition of the black foundry sand that contradicted what ATC had told Kokosing the day before.

---

[11] The Division of Water is authorized through KRS 151 to manage development in floodplains.  Any type of development in, along, or across a stream requires a floodplain permit from the Division. Typical activities requiring a permit include, but are not limited to, residential & commercial structures, stream crossings, fill, stream alterations & relocations, and small stream impoundments.  State floodplain development requirements are outlined in 401 KAR 4:060 of the Kentucky Administrative Regulations.
[12] In October - December 2017, no Defendant ever took a sample of any black fill material sitting on Plaintiffs' property from the sewer project that Kokosing and Ashcraft had excavated, transported, dumped, and spread on it.

155.    By October 17, 2017, Kokosing had excavated and Ashcraft had transported black foundry sand to Plaintiffs' property for about three to four weeks. Kokosing requested that MSD, the City, and ATC confirm that the black foundry sand transported to Plaintiffs' property was "Type 1 Soil" and could be dumped on residential property without limitation.

156.     During this time period, Kokosing's representatives and agents continued to maliciously, wantonly, falsely, and intentionally tell Plaintiffs that the black sand on their property was "perfectly safe," "the material was black in color because it came from the westside of City of Cincinnati," and the "material contained no contaminants." Plaintiffs reasonably relied on these representations in October 2017.

157.    When questioned about whether the black odiferous foundry sand was safe to be placed on their property, Kokosing's representatives and its agents knowingly, wantonly, falsely, repeatedly, and intentionally told Plaintiffs that foundry sand was "perfectly safe" and that "it did not have any contaminants as defined by federal or state law" because the City, MSD and ATC tested the material. Plaintiffs reasonably relied on these representations in October 2017.

158.     Kokosing and its agents told Plaintiffs that the companies were dumping and spreading the black foundry sand in full compliance with their floodplain permit. Kokosing and its agents made these false statements to Plaintiffs in October and November 2017.

159.    The U.S. Coast Guard photographed Kokosing and its agents running a dozer to push black fill over the bank and down towards the river on October 13, 2017. See EXHIBIT 6, *id*.

160.    On or about October 20, 2017, ATC, the City, and MSD notified Kokosing, in writing, that the soils taken to Plaintiffs' property were "classified as Type 1 but restricted to commercial/industrial use." Just as the City, MSD and ATC already knew, the black foundry

sand was, in fact, contaminated and could not lawfully be dumped onto residential property under KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.031.

161.    In the same correspondence, ATC, the City, and MSD warned Kokosing that because the black foundry sand was contaminated with PAHs and heavy metals, it presented "a potential future liability if disposed at a residential property." See EX 4, *id*., to see the source of this toxic material at the sewer project that was dumped and spread on Plaintiffs' property.

162.    By October 20, 2017, all Defendants knew that thousands of tons of contaminated foundry sand had been dumped and spread on Plaintiffs' residential property. Yet, not one of Defendants ever told Plaintiffs what had happened at their property.[13]

163.    A MSD internal document dated October 20, 2017, claims that neither MSD nor the City had representatives or agents at the sewer project during the excavation, nor had MSD or the City approved the soil for use at Plaintiffs' residential property when the first 30,000 cubic yards of foundry sand from CSA 20 was dug up, transported, dumped, and spread on Plaintiffs' property. Defendants Kokosing and Ashcraft were acting as actual or apparent agents and contractors for MSD and the City when they dug up the contaminated material, transported it, and dumped it on Plaintiffs' residential property.

164.    On October 27, 2017, Kokosing wrote to MSD and demanded confirmation that the material at CSA 20 is "Type 1 Soil - Non-Contaminated Soil" and "can be used in fills with no restriction on land use and that this material does not have any special handling requirements." A copy of the letter is attached hereto as EXHIBIT 8 to this Amended Complaint.

165.    In the same letter, Kokosing sought confirmation from MSD "that all material hauled from Site 20 to our 'Ludlow Bromley fill site' over the past 3 to 4 weeks is 'Type 1'

---

[13] To date, not one defendant has apologized for their intentional misconduct in dumping contaminated foundry sand on their property, much less admit that they are responsible for what they did to Plaintiffs' residential property.

material which does not contain chemicals of concern in excess of Applicable or Relevant and Appropriate Requirements for unrestricted land use." Kokosing's use of the phrase "Ludlow Bromley fill site" in the communication is an apparent reference to Plaintiffs' property, which is actually located in Villa Hills, just west of the cities of Ludlow and Bromley.

166.    In the October 27 letter, Kokosing asked MSD and ATC, "How is Site 20 material residing at the Ludlow Bromley fill site to be handled?"

167.    Despite having knowledge of the facts described in paragraphs 160-161 above, on November 2, 2017, Kokosing wrote to MSD that "Kokosing will resume hauling Site 20 soils to the Ludlow Bromley offsite fill (David Bell property) based exclusively on MSD's Type 1 soil designation for the Site 20 soils. We also need to clarify … City representatives were on site for the removal of Type 1 material and approved the Type 1 designation. No material left the site without the City's knowledge and approval."  A copy of the letter is attached hereto as EXHIBIT 9.

168.    On or about November 3, 2017, Kokosing told Ashcraft to put brown soil overtop the black material to "cover it up." Ashcraft did so. Then, Kokosing and Ashcraft removed their heavy equipment and porta-potties from Plaintiffs' property. As a result, there was almost no visible sign that Kokosing and Ashcraft had dumped and spread thousands of tons of contaminated foundry sand on Plaintiffs' residential property.

169.    On November 4, 2017, Raymond Schork and Donald Lythberg, senior engineers for MSD and the City, drove from Ohio to Plaintiffs property in Kentucky. At the same time, representatives of Ashcraft also drove to the Plaintiffs' property to meet the city engineers. According to a later email to Plaintiffs, the city's senior engineers took videos and photographs of Plaintiffs' property during their inspection.

170.    On November 20, 2017, Kokosing wrote to the City and MSD: "As with all of the soil on the Lick Run Project, the soil residing at the Ludlow Bromley and Edgewater offsite fills is the City's responsibility to classify. If the City changes the classification of the soil, after loading and hauling to an offsite fill, regardless of the location, it is the City's responsibility to resolve." A copy of the letter is attached hereto as EXHIBIT 10.

171.    In the same letter, Kokosing also informed MSD that Kokosing "will immediately resume hauling and placing Type 1 soil at any of our permitted offsite fill areas, specifically the Ludlow Bromley site. Should the City change, at any time, the designation of the soil already hauled offsite, the City is responsible for any and all costs to resolve. Kokosing will not incur any additional testing, analyses, excavation, hauling, or tipping fees without a prior approved Work Directive Change."

172.    The City, MSD, and ATC did nothing in response to Kokosing's letter of November 20, 2017, to inform, offer assistance, or otherwise help Plaintiffs remove or otherwise address the City's contaminated sand dumped on their residential property.

173.    Because the fill material on Plaintiffs' property still smelled of petroleum odors and sensing that the Defendants were not telling them the truth about the black sand, Plaintiffs took several samples of the fill and personally drove them to Waters Agricultural Laboratories located in Owensboro, Kentucky. The lab's analytical results dated November 21, 2017 found that the black fill material was high in heavy metals.

174.    As soon as they received the test results, Plaintiffs told representatives of Kokosing, Ashcraft, MSD and the City about their test results of the black sand material and asked for an explanation.

175.    In response, Kokosing continued to falsely insist that the material was perfectly safe; it was black only because it was "city dirt" from the westside of Cincinnati; and its physical

and chemical composition complied with the terms of the contract between Kokosing and Plaintiffs. Very soon thereafter, Kokosing's agent presented an entirely new contract to Plaintiffs and asked them to sign it, which Plaintiffs refused to do.

176.    Ashcraft did nothing to address the contamination nor answer Plaintiffs' questions about the foundry sand dumped and spread on their property.

177.    Both Kokosing and Ashcraft denied responsibility for the contamination to Plaintiffs and instead pointed their fingers at the City as being the guilty party in the scheme.

178.    Representatives of Kokosing and Ashcraft told Plaintiffs that the City's senior engineer Schork was "in charge" of the sewer project and that Donald Lythberg was Schork's boss at the City. The two defendants told Plaintiffs to call engineer Schork and complain to him about Plaintiffs' test results of the fill material.

179.    On or around November 24th, Plaintiff, David Bell, called city engineer Schork and told him about the lab results and asked for an explanation. Engineer Schork assured Plaintiff that he would look into the matter and get back to him. By this date, city engineer Schork knew or should have known from multiple communications that Kokosing and Ashcraft had pointed their fingers at the City, as being the responsible party.

180.    On November 27, 2017, city engineer Schork wrote an email to Plaintiffs and falsely, maliciously, wantonly, and intentionally told Mr. Bell that "the dark dirt" did not come from the City's sewer project. This falsehood is memorialized in an email to Plaintiffs.

181.    When city engineer Schork wrote his email, he knew or should have known that the "black dirt" was waste foundry sand excavated from CSA 20 and transported and spread on Plaintiffs' property based upon: (a) Kokosing submittals to the City and MSD; (b) city and MSD's records related to work done on the sewer project in October 2017; (c) internal communications within MSD; (d) information from multiple environmental consultants related

soils underneath the former McDonalds Restaurant, and, (e) internal correspondence, information communications and meetings exchanged by, between, and among the City, MSD, Kokosing, ATC, and Ashcraft.

182.    In his email dated November 27, 2017, city engineer Schork told Mr. Bell to ask "John," an employee of Ashcraft, "where the dirt came from." In this email, City engineer Schork also suggested that Plaintiffs place a two-foot thick cap of clean soil over the dark dirt – at Plaintiffs' expense – because of the high levels of heavy metals in this dirt.

183.    City engineer Schork provided this "suggestion" to cap the contamination in place because he knew the "dark dirt" actually came from the sewer project and was contaminated with PAHs and heavy metals. Engineer Schork explained in his email, "I know in Ohio we can put a 2' cap on these soils." In Ohio, a two-foot layer of clean soil would help prevent human exposure to the contaminated foundry sand. Engineer Schork also knew that the foundry sand was hauled to and dumped on Plaintiffs' property in Kentucky, not Ohio. Engineer Schork also wrote in his email to Plaintiff, "Considering your site will be a campground this might be an option" to address the contamination at the property.

184.    Schork told Bell that he would talk to ATC about the black material because "the contaminant levels are high." City engineer Schork offered no other help, advice, or assistance to Plaintiffs to address the contamination dumped and spread on Plaintiffs' property from the sewer project.

185.    Even though all the Defendants knew the fill material contained heavy metals and PAHs, no one ever mentioned or told Plaintiffs anything about the composition of the material, or about the then-ongoing discussions and finger-pointing among Kokosing, ATC, MSD, Ashcraft, and the City.

186.    All of the Defendants also knew or should have known that it was illegal to dump the black foundry sand on residential property in Kentucky under KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.0131. All of the defendants also knew that the black foundry sand violated Plaintiffs' floodplain permit.

187.    All of the Defendants also knew that Kokosing and Ashcraft had dumped and pushed contaminated sand more than 250 feet from Route 8 and down to the banks of the Ohio River in violation of Plaintiffs' floodplain permit. They likely did so to create additional space to dump more contaminated materials on the property.

188.    All of the Defendants conspired and acted to willfully, wantonly, knowingly, maliciously, and fraudulently concealed information concerning the composition of the contaminated fill and to hide the fact that Defendants' activities at Plaintiffs' property violated Plaintiffs' floodplain permit, and KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.0131.

189.    The actions of Kokosing and its agents in hiding the contaminated black foundry sand underneath a thin layer of brown fill soil was an attempt to fraudulently conceal the fact that all of the defendants had conspired to knowingly, illegally, wanton, and intentionally dumped tens of thousands of tons of contaminated fill material onto Plaintiffs' property in violation of Plaintiffs' floodplain permit, KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.0131 and the contract between Kokosing and Plaintiffs.

**N.      KDWM's Superfund Branch takes charge of regulatory issues.**

190.    On December 4, 2017, KDOW notified the Superfund Branch of Kentucky Division of Waste Management ("KDWM") about Kokosing's dumping of contaminated material from the sewer project onto Plaintiffs' residential property and spreading it towards the river bank.

191.   On or about December 18, 2017, KDWM inspectors entered upon Plaintiffs' property and took 16 separate samples of the black fill material for analytical testing at the state laboratory.

192.   The state laboratory test results were completed on January 4, 2018. All 16 samples contained PAH constituents above the EPA Region 3 Regional Screening levels. The test results proved that the black foundry sand on Plaintiffs' residential property was contaminated and its disposal on the residential property was a gross breach of the contract between Kokosing and Plaintiffs, Plaintiffs' floodplain permit, KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.0131.

193.   On or about January 22, 2018, KDWM issued Plaintiffs, MSD, and Kokosing a Notice of Violation ("NOV") because the black foundry sand contained PAHs in excess of Kentucky state law and the contaminated material was dumped on residential property rather than in a licensed landfill.

194.   In an undated letter contained in KDWM's public records, Vince Martini of Kokosing wrote to KDWM to "object to the NOV" (dated January 22, 2018) and demanded that KDWM withdraw the NOV.

195.   The reasons that Mr. Martini of Kokosing gave KDWM to withdraw its NOV included: (a) Kokosing did not generate the waste soil; (b) Kokosing did not transport it to Plaintiffs' property; (c) Kokosing did not classify the soil as uncontaminated; (d) MSD generated the waste soil; (e) MSD classified the waste soil as safe for residential use; (f) David Bell's property was an uncontrolled dumpsite and not exclusive to Kokosing; (g) Ashcraft Sand & Gravel hauled other fill material to the Bell property; (h) there was no evidence that the black foundry sand came from the sewer project; (i) Kokosing had no knowledge or control of fill

dumped in the floodplain; and (j) Kokosing never applied for or held any permits to dump the waste material on the Bell property. KDWM did not act on Kokosing's demand letter.

196.    On January 31, 2018, KDWM held a meeting with the City, MSD, Kokosing, Ashcraft, and Plaintiffs at its Florence Regional Office to discuss the dumping of contaminated fill material on the Bell property in the floodplain. Senior city engineer Schork and Lythberg attended on behalf of the City and MSD.

197.    Prior to the start of the meeting, the defendants insisted that the Bells attend the meeting without their attorney present, and the agency told the Bells they could not have an attorney present to represent their interests at the meeting.

198.    On February 12, 2018, KDWM wrote to Plaintiffs, Kokosing, MSD, Ashcraft, and ATC and told them that the contaminated material had to be addressed through either a removal action or it had to be managed in place in perpetuity.

199.    Plaintiffs want the Defendants to remove all contaminated fill that Kokosing and Ashcraft hauled from the sewer project and dumped on Plaintiffs property. That is, Plaintiffs want to enforce the terms and conditions of the contract between Kokosing and Plaintiffs.

200.    On March 9, 2018, KDWM wrote to Plaintiffs, Kokosing, MSD, Ashcraft, and ATC and told them that the agency determined that the "onsite contamination" at Plaintiffs' property posed an "*imminent threat to human health and the environment*" and needed to be removed or otherwise cleaned to a level that did not pose a threat to humans or the environment.

201.    On May 24, 2018, KDWM wrote to Plaintiffs and told them that they were a potential responsible party ("PRP") and legally liable to characterize the nature and extent of the release of contamination on their property and demanded that they take all action necessary to assist to remediate their property.  KDMW also sent letters to Kokosing, MSD, Ashcraft, and

ATC announcing that they were also named as PRPs for the release of contamination on Plaintiffs' property.

202.    On May 24, 2018, the general counsel for MSD requested a 90-day extension of time to submit a site characterization plan. Although she was MSD's general counsel, Ms. Christy was writing KDWM "on behalf of the City, sole management agency for MSD."

203.    In September 2018, KDWM ordered Kokosing, ATC, MSD and Plaintiffs to submit a site characterization plan so that the lateral and vertical boundaries of the contamination on Plaintiffs' property could be estimated. The site characterization plan also required additional samplings be conducted to determine whether the black foundry sand was contaminated.

204.    ATC submitted the site characterization plan to KDWM and Plaintiffs submitted comments objecting to the veracity of many false and misleading statements in the plan.

205.    On or about September 4, 2018, ATC began working at Plaintiffs' property under a state-approved site characterization plan. This work included using a drilling rig to take samples of the black foundry sand down to the depth of native soils for analytical analysis.

206.    ATC's drilling logs show that the layer of contaminated black foundry sand dumped on Plaintiffs' property is approximately 26-feet thick along the three sampling locations closest in proximity to the Ohio River.[14] A photograph of the drilling rig sitting atop the 26-foot layer of black foundry sand is attached hereto as EXHIBIT 11.

207.    In late November and early December, 2018, ATC and Kokosing requested authority from the state to do background samplings to show KDWM that the properties adjacent to Plaintiffs' property were also naturally contaminated with PAHs.[15] KDWM allowed ATC and

---

[14] To no one's surprise, the concentration of PAHs in the foundry sand samples taken by ATC were substantially higher with KDWM's oversight than when MSD and the City oversaw ATC's work.
[15] If this were true, the Defendants would likely argue to KDWM that they did not have to clean up Plaintiffs' property because all the adjacent property in Kentucky along the Ohio River was similarly polluted.

Kokosing to do such sampling. To no surprise, the analytical results showed that the adjacent properties were not contaminated with PAHs.

208.    On June 14, 2019, ATC submitted a Corrective Action Plan ("CAP") on behalf of Kokosing, MSD and the City to address removal of the black foundry sand dumped on Plaintiffs' property. ATC also submitted a final grading plan for Plaintiffs' property on behalf of the City, MSD and Kokosing.

209.    Plaintiffs submitted comments objecting to the 2:1 slopes in the grading plan as too steep to mow. Plaintiffs also objected to placing only a six-inch cover of clean soil on Plaintiffs' property, which is not deep enough to grow trees and shrubs.

210.    Plaintiffs also objected to Kokosing not cleaning up all contaminated fill material dumped on Plaintiffs' property from the sewer project because the contract between Kokosing and Plaintiffs promised that the fill material would not contain any contaminants defined by state or federal law. Plaintiffs also objected to potentially placing an environmental (or restrictive) covenant on Plaintiffs' property in perpetuity.

211.    As of the filing date of this Amended Complaint, not one scoop of contaminated material has been removed from Plaintiffs' property by any Defendant.

212.    Because Plaintiffs' property is next to the Ohio River, removing the black foundry sand from the ground and replacing it with clean fill will cost several millions of dollars and take substantial environmental and geotechnical engineering expertise.

213.    The only other remedial option under state law is to leave the contaminated material in place and place an engineered cap overtop the contamination to hold it in place forever. To do so, Plaintiffs would have to record an environmental covenant in the chain of title of their property forever restricting the use of their property, maintain the integrity of the cap in perpetuity, perform other maintenance and repair work to the area encumbered by the

environmental covenant, and file annual reports to the state agency until the end of time. That option would destroy the value and utility of Plaintiffs' land—turning it from an asset to a liability-- and is, therefore, unacceptable to them.

214.    The remedial option of capping the contamination in place on Plaintiffs' land likely would also likely cost millions of dollars to do and require the annual expenditures of large sums of money over time to repair and maintain the integrity of the cap in perpetuity.[16]

### III.  CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT CLAIM AGAINST KOKOSING

215.    Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 214 of this Amended Complaint, as if fully rewritten herein.

216.    Plaintiffs entered into a contract with Kokosing for the delivery of clean fill material without contamination to their property in Kenton County, Kentucky. To induce them into signing the contract, Kokosing promised that the clean fill material would be placed on the property in manner that fully complied with the terms and conditions in their floodplain permit.

217.    Pursuant to Paragraph 4 of the contract, Kokosing promised it would deliver fill material to Plaintiffs' property that contained no contaminants, as defined by state and/or federal law. Kokosing willfully, intentionally, and maliciously breached this contract by excavating, transporting, dumping, and spreading contaminated black foundry sand and other contaminated materials on Plaintiffs' property.

218.    Kokosing hired and paid Ashcraft, as its agent, to haul contaminated fill materials excavated from the sewer project and dump and spread them on Plaintiffs' property. Kokosing's

---

[16] Such tasks would be complicated by naturally occurring events, such as floods, slippage, erosion, and underground migration of water flowing to and from the river on a continuous basis through the fill material placed on the property. Capping the contamination in place would also create a substantial and unreasonable threat to public health by the potential release of the contamination materials into the Ohio River, from which many municipalities obtain their public drinking water supply.

agent, Ashcraft, crossed into Kentucky from Ohio more than 3,400 times to dump contaminated waste material on Plaintiffs' property.

219.   Kokosing's breach of the contract has so contaminated Plaintiffs' property that it will require millions of dollars to clean up and may result in regulatory liability, civil penalties, and other costs being assessed against Plaintiffs and their property by the Kentucky Environmental Protection Cabinet. The state agency may also require Plaintiffs to place a restrictive environmental covenant on their property in perpetuity. Today, Plaintiffs' property remains contaminated and in violation of KRS 224.40-100, KRS 224.01-400, and 401 KAR 30.031 all of which is because Kokosing willfully and maliciously breached the contract with the plaintiffs.

220.   Kentucky case law implies a covenant of good faith and fair dealing in all contracts. Kokosing breached the covenant of good faith and fair dealing by knowingly, maliciously, and wantonly excavating and causing such contaminated materials to be transported, dumped and spread on Plaintiffs property and causing substantial harm and injury to Plaintiffs and their property.

221.   Kokosing breached the contract with Plaintiffs by causing, directing, or allowing its agent to dump and spread contaminated fill material closer to the river than allowed under Plaintiffs' floodplain permit and dumping non-inert fill material in the floodplain of the Ohio River in violation of their floodplain permit.

222.   Plaintiffs are entitled to recover from Kokosing monetary damages in an amount sufficient to clean up contamination on their property, pay all civil fines, penalties, and other costs, and to put Plaintiffs' property in the condition it would have been in but for Kokosing's breach of contract.

223.    Defendant Kokosing's breach of the contract has made it necessary for Plaintiffs to engage legal counsel and incur substantial legal fees and litigation expenses that are ongoing and increasing in amount in accordance with a written fee agreement between Plaintiffs and their counsel. Under the terms of the contract between Plaintiffs and Kokosing, Plaintiffs are entitled to recover these fees and expenses from Kokosing as damages.

224.    Defendant Kokosing's breach of the contract has made it necessary for Plaintiffs to retain experts and incur fees and expenses that are ongoing and increasing in amount. Under the terms of the contract between Plaintiffs and Kokosing, Plaintiffs are entitled to recover these fees and expenses from Kokosing as damages.

225.    Pursuant to Paragraph 13 of the contract, Kokosing was required to indemnify, save harmless, and defend Plaintiffs against any losses, liabilities, costs, expenses, suits, actions, claims, and all other obligations and proceedings whatsoever, including without limitations, all judgments rendered against and all fines and penalties imposed upon Plaintiffs, and any reasonable attorneys' fees and any other costs of litigation arising out of injuries to persons, including disease or death, or damage to property caused by Kokosing, its employees, agents, subcontractor, or in any way attributable to the performance or breach of the contract.

226.    Plaintiffs' property has been damaged by the illegal dumping of contaminated foundry sand and other contaminated materials on this property by Kokosing and its agents. As a result, KDWM classified Plaintiffs as PRPs, who are responsible to remove the contamination from their property, at the cost of millions of dollars -- all of which Plaintiffs are entitled to indemnification or recover as damages from Kokosing.

227.    As a result of Kokosing's breach of the contract, Plaintiffs' property has been damaged with contaminated material that has caused the fair market value of their property to

diminish and be burdened with future expenses, for all of which Plaintiffs are entitled to recover as damages from Kokosing.

228.    As a result of Kokosing's breach of the contract, Plaintiffs have been served with a NOV from the KDWM requiring them to incur costs and potential civil penalties if the contamination is not addressed according to Kentucky law. Under the terms of the contract, Plaintiffs are entitled to indemnification or recover all such costs and penalties from Kokosing as damages.

229.    As a result of Kokosing's breach of the contract, Plaintiffs' property is not suitable for its intended use and will not be so suited until the contamination is removed and replaced with clean, non-contaminated fill materials.  The presence of tons of black foundry sand contaminated with PAHs on Plaintiffs' property has substantially and materially interfered with Plaintiffs use and enjoyment of their property.

230    Kokosing has so far refused to discuss replacing contaminated fill material with clean fill that Kokosing contractually promised Plaintiffs and what Plaintiffs reasonably expected under the contract.[17]

231.    Because Defendant Kokosing materially breached the contract, Plaintiffs are entitled to recover the cost to fill, level and stabilize Plaintiffs' property with non-contaminated fill as damages because Plaintiffs expected that Kokosing would deliver fill material to their property without any contaminants in an amount sufficient to level, stabilize, secure, and preserve Plaintiffs' property above the 100-year floodplain.

## COUNT II
## PROMISSORY ESTOPPEL CLAIM AGAINST KOKOSING

---

[17] Likewise ATC, Ashcraft, MSD, and the City are adamant that they will not replace any contaminated fill material removed from Plaintiffs' property with clean, non-contaminated fill.

232.    Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 231 of this Amended Complaint, as if fully rewritten herein.

233.    In the alternative -- if Defendant Kokosing alleges in its defense that there was no valid contract with Plaintiffs -- Kokosing repeatedly made multiple statements and representations to Plaintiffs to induce them to unknowingly accept contaminated fill material from the sewer project and to allow Kokosing and its agent to dump and spread this fill material on Plaintiffs' property.

234.    Defendant Kokosing promised Plaintiffs that all of the fill material delivered to Plaintiffs' property would be without any contaminants and repeatedly assured them during the dumping and spreading of this material on their property that it was clean, unadulterated, and safe.

235.    Kokosing promised Plaintiffs the clean fill material would be delivered to Plaintiffs' property in an amount necessary to elevate their property out of and above the river's 100-year floodplain and the work would be done in full compliance with the terms and conditions in their floodplain permit.

236.    Kokosing promised Plaintiffs that the company would use its contractors, equipment, and expertise to push, compact, and work the fill material into a stable, level, permanent, and usable yard.

237.    Defendant Kokosing also promised to indemnify and hold Plaintiffs harmless from all costs and expenses arising from and/or related to dumping and spreading fill material on Plaintiffs' property, including attorney fees, litigation expenses (incurred in the pending matter before KDWM and this district court), and other related costs.

238.    Defendant Kokosing's dumping of contaminated fill material on Plaintiffs' property has resulted in millions of dollars in cleanup costs, real property damage, substantial

and ongoing legal fees and litigation expenses, as well as actual personal injury, mental anxiety, mental suffering, and substantial damages to Plaintiffs, which can only be avoided by the court's enforcement of Kokosing's promises made to Plaintiffs.

## COUNT III
## EQUITABLE ESTOPPEL CLAIM AGAINST KOKOSING

239.    Plaintiffs incorporate the preceding allegations in Paragraphs 1 to 238 of this Complaint, as if fully rewritten herein.

240.    In the alternative -- if Defendant Kokosing alleges in its defense that there was no contract with Plaintiffs -- Kokosing repeatedly made multiple false and misleading statements and representations to Plaintiffs to induce them to unknowingly accept contaminated fill material from the sewer project and to allow Kokosing to dump and spread this fill material on Plaintiffs' property.

241.    Defendant Kokosing falsely promised Plaintiffs that all of the fill material delivered to Plaintiffs' property would be clean, unadulterated, and without contaminants and repeatedly assured them during the dumping of this material on their property that it was clean fill.

242.    Kokosing falsely promised Plaintiffs the clean fill material would be delivered to Plaintiffs' property in an amount necessary to elevate their property out of and above the Ohio River's 100-year floodplain and Kokosing and its agent's work would be done in a workman like manner that complied with the terms and conditions in Plaintiffs' floodplain permit and result in a stable, compacted, and permanently stable yard.

243.    Kokosing falsely promised Plaintiffs that the company would use its contractors, equipment, and expertise to push and work the fill material into a stable, level, permanent, and usable yard elevated above the floodplain of the Oho River and the work would be done in a

workman like manner that complied with the terms and conditions in Plaintiffs' floodplain permit.

244.    Defendant Kokosing also promised to indemnify and hold Plaintiffs harmless from all costs and expenses arising from and/or related to dumping and spreading fill material on Plaintiffs' property, including attorney fees, litigation expenses, expert fees, civil penalties, and other related costs and expenses.

245.    Plaintiffs relied upon Defendant Kokosing's false promises and inducements, lies, and concealment of material facts to their grave detriment and substantial damage and injury. Defendant Kokosing's dumping of contaminated fill material on Plaintiffs' property has resulted in millions of dollars in cleanup costs, real property damage, substantial legal fees, expert fees, and litigation expenses, as well as personal injury and substantial damages to Plaintiffs.

246.    Plaintiffs may also be subject to civil penalties and other legal relief sought by KDWM or KDOW as a result of Kokosing's fraudulent and wanton misconduct in this matter arising from dumping contaminated materials on Plaintiffs' property in violation of KRS 224.40-100, KRS 224.01-400 and 401 KAR30.031 and Plaintiffs' floodplain permit.

## <u>COUNT IV</u>
## <u>FRAUDULENT MISREPRESENTATION CLAIM AGAINST ALL DEFENDANTS</u>

247.    Plaintiffs refer to and incorporate the preceding allegations in paragraphs 1-246 in this Amended Complaint, as if fully rewritten herein.

248.    Kokosing entered into a written contract with Plaintiffs to excavate and transport clean, non-contaminated fill material from the sewer project and dump and spread this untainted fill material onto Plaintiffs' property in compliance with Plaintiffs' floodplain permit. In proposing and entering into the contract with Plaintiffs, Kokosing was acting as the actual or apparent agent of the City and MSD.

249.    Defendants, Kokosing, City of Cincinnati, MSD, ATC, and Ashcraft each advanced and furthered a civil conspiracy[18] or scheme to defraud Plaintiffs, each Defendant aided and abetted the other Defendants' fraud, and each Defendant advanced, furthered, and financially benefited from these fraudulent acts and misrepresentations set out in this Amended Complaint.

250.    In verbal communications prior to offering Plaintiffs a written contact and in the written contract itself, Kokosing represented to Plaintiffs that it would transport, dump, and spread clean, unadulterated fill material onto their property and that the chemical composition of the fill material was tested and confirmed by the City and MSD. The City, MSD, and ATC all knew or should have known that Kokosing's misrepresentations would be passed on to, and relied on by, Plaintiffs.

251.    Kokosing explicitly represented in the written contract between Plaintiffs and the company that such fill material "shall not contain any contaminants as defined by state and/or federal law." Kokosing made this misrepresentation to Plaintiffs knowing that it was patently and maliciously false and that it would be relied upon by Plaintiffs.

252.    The City, MSD and ATC all misrepresented, lied, manipulated, and concealed environmental conditions in CSA 20, as being clean, safe and uncontaminated, knowing their misrepresentations would be passed on to, and relied on by, Plaintiffs to allow Kokosing and Ashcraft to dump contaminated sand and other materials on Plaintiffs' property.

253.    Kokosing violated and breached its contract with Plaintiffs by illegally, intentionally, and knowingly dumping fill material contaminated with toxic and carcinogenic contaminants on Plaintiffs' property.

---

[18] Civil conspiracy is "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means."

254.     When Plaintiffs questioned Kokosing agents and representatives about petroleum-like odors coming from the materials Kokosing was dumping on Plaintiffs' property, the representatives and agents lied and fraudulently misrepresented to Plaintiffs that fill material dumped on their residential property were harmless, non-toxic, non-hazardous "city dirt" that conformed to the limitations set forth in the Waste Agreement and state environmental law.  The City, MSD, and ATC all knew or should have known that their misrepresentations to Kokosing would be passed on to, and relied on by, Plaintiffs.

255.     Defendants made these material false misrepresentations, directly and indirectly, to Plaintiffs with the intention of inducing Plaintiffs to enter into a written contract to accept waste material from the sewer project, and thereafter, to induce Plaintiffs to continue to accept dumping of contaminated and toxic industrial waste on their residential property.

256.     In the alternative, Defendants recklessly made such misrepresentations without any knowledge of the truth of the statements and as a positive assertion with the intention of inducing Plaintiffs to sign the contract that allowed Kokosing and its co-conspirators to transport, dump, and spread contaminated fill materials on their residential property.

257.     After Plaintiffs signed a contract with Kokosing, Defendants willfully and wantonly continued to make false and misleading representations to Plaintiffs with the intention of inducing Plaintiffs to continue to permit Kokosing to dump contaminated materials on Plaintiffs' residential property.

258.     Plaintiffs relied upon the verbal and written assurances of Defendants to induce Plaintiffs to continue to allow Kokosing and its agent, Ashcraft, to transport, dump, and spread contaminated fill materials onto Plaintiffs' residential property.

259.      The City and MSD, by and through their employees, represented to Plaintiffs that fill material hauled to Plaintiffs' residential property was clean and unadulterated and that the

black dirt was not from the sewer project. The black foundry sand dumped onto and spread about Plaintiffs' property contained dangerous levels of PAHs and heavy metals and could not be legally dumped on residential property in Kentucky.

260.     Defendants, Kokosing, the City, MSD, ATC, and Ashcraft all knew or should have known that the misrepresentations, as to the chemical composition of the foundry sand and its safe use on residential property, made to Plaintiffs were willful, wanton, malicious, false and utterly misleading.

261.     Defendants each conspired and aided and abetted each other to advance and further a civil conspiracy scheme to defraud Plaintiffs and this conspiracy needed each of them to perform certain individual acts to further the scheme to defraud Plaintiffs.

262.     If Kokosing had hauled the City's contaminated foundry sand to a licensed landfill rather than dump it on Plaintiffs' property, the City would have incurred waste management surcharges, transportation costs, laboratory costs, administrative fees, and tipping fees.

263.     Instead, Defendants acted together in a coordinated and sophisticated fraudulent scheme to dump contaminated fill from the sewer project on Plaintiffs' residential property. In doing so, the City and MSD evaded paying waste management surcharges, transportation costs, laboratory costs, administrative fees, and tipping fees to legally dump contaminated fill from the sewer project into a landfill.

264.     Plaintiffs, to their substantial detriment, relied on the false, willful, malicious, wanton, and misleading representations of the Defendants and thereby sustained injuries and damages, all of which   Plaintiffs are entitled to recover from the Defendants, jointly and severally, as damages, in an amount that exceeds the minimum jurisdictional limits of this Court that will be proven at trial.

265.   The misconduct of the Defendants constitutes the intentional tort of fraud or fraudulent misrepresentation for which Plaintiffs are entitled to recover both compensatory and punitive damages from the Defendants, jointly and severally.

### COUNT V
### NEGLIGENCE CLAIM AGAINST ALL DEFENDANTS

266.   Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-265 of this Complaint, as if fully rewritten herein.

267.   Defendants conspired together in a civil conspiracy, and aiding and abetting each other, to excavate, transport, dump, and spread contaminated fill material on and around Plaintiffs' property. Contamination on Plaintiffs' property from the sewer project poses grave and genuine long-term dangers to human health and the environment. Such dangers and harm will continue to exist until all of the contamination is safely removed and properly placed in a landfill and Plaintiffs' property restored. Until that time, the contaminated materials will cause Plaintiffs acute personal injury, mental suffering and anxiety, and the fine grained sand will continue to blow and be tracked into Plaintiffs home and their personal property.

268.   Defendants, individually, jointly, and severally, acted in a careless, negligent and unsafe manner in failing to correctly identify and accurately characterize the chemical composition of contaminated fill material transported to and dumped and spread on Plaintiffs' residential property.

269.    Defendants are individually, jointly, and severally negligent in failing to exercise that degree of care usually exercised by ordinarily careful, prudent persons under like or similar circumstances. Such failure constituted negligence and has caused Plaintiffs to suffer damages and injuries in an amount that exceeds the minimum jurisdictional requirements of this Court that

will be proven at trial. Plaintiffs are entitled to recover all damages so incurred from the Defendants, jointly and severally.

270.    Defendants, Kokosing, MSD, the City, ATC, and Ashcraft, are individually, jointly, and severally negligent in violating 401 KAR 4:060 Section 5 and Plaintiffs' floodplain permit by dumping and spreading contaminated, reactive fill material far beyond 250 feet from the edge on Route 8 and down towards the banks of the Ohio River.

271.    The Defendants acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, engaged in a continuing tort  of negligence that will continue to cause Plaintiffs' injury and damages for as long as contaminated material from the sewer project remains on their property and the property restored.

272.    Plaintiffs are entitled to receive compensatory and punitive damages against the Defendants, individually, jointly, and severally because the negligence was gross, willful, wanton, and malicious towards Plaintiffs.

## COUNT VI
## NEGLIGENCE  PER SE CLAIM AGAINST ALL DEFENDANTS

273.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-272 of this Amended Complaint, as if fully rewritten herein.

274.    Defendants acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, engaged in a wanton, willful, and fraudulent scheme intended to evade and violate KRS 224.40-100, KRS 224.01-400 and 401 KAR 30.031.

275.    Defendants acting in a civil conspiracy and aiding and abetting each other, to misclassify soil at the sewer project as non-contaminated without sufficient, reasonable, sound, and accurate factual bases. Defendants then aided and abetted each other in the scheme by

dumping thousands of tons of misclassified and hazardous soil from the sewer project on residential property.

276. Defendants acting individually, jointly, and severally and in a civil conspiracy intended to reduce or limit the City's environmental liabilities associated with the sewer project and to transfer those liabilities to innocent residential landowners, such as Plaintiffs, by dumping misclassified, i.e., contaminated, material on their land under the guise of a sham contract and multiple patently-false misrepresentations promising that the fill material "shall not contain contaminants as defined by state and/or federal law."

277. KRS 224.40-100, KRS 224.01-400 and 401 KAR 30.031 that Defendants willfully, intentionally and repeatedly violated were intended to protect Plaintiffs and other innocent residential property owners from the illegal dumping of dangerous, toxic, and hazardous contaminated fill material on residential property.

278. Defendants, individually, jointly, and severally, acted in a civil conspiracy to violate the terms of Plaintiffs' fill permit and 401 KAR 4:060 Section 5 by dumping and spreading contaminated, reactive fill material far beyond 250 feet from the edge on Route 8 and spread the contamination down towards the banks of the Ohio River.

279. Defendants acted in a civil conspiracy and aided and abetted each other in failing to exercise that degree of care usually exercised by ordinarily careful, prudent persons under like or similar circumstances. Such failure constitutes negligence *per se* and has caused Plaintiffs damages and injury in an amount that exceeds the minimum jurisdictional requirements of this Court.

280. Kentucky Revised Statute §446.070 provides that any person injured by violation of any statute may recover from the offender any damages sustained by reason of the violation. Pursuant to KRS §446.070, Plaintiffs are entitled to recover monetary damages from the

defendants, jointly and severally, in an amount that exceeds the minimum jurisdictional limits of this court and will be proven by the evidence at trial to fairly and reasonably compensate Plaintiffs for all damages they have sustained by reason of the said violation(s).

## COUNT VII
## INTENTIONAL TRESPASS CLAIM AGAINST ALL DEFENDANTS

281    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-280 of this Amended Complaint, as if fully rewritten herein.

282.    Defendants, individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, had a limited contractual license to dump clean fill -- dirt, earth, rock and concrete subsurface -- that did not contain any contaminants as defined by state and federal law -- onto Plaintiffs' property.

283.    Defendants, individually, jointly, severally, and in a civil conspiracy violated this limited contractual license by illegally, intentionally, and maliciously transporting, dumping, and spreading foundry sand and other materials that contained contaminants, including but not limited to PAHs and heavy metals, onto Plaintiffs' property. Such misconduct was intentional, willful, wanton, and malicious. All Defendants knew or should have known that the foundry sand and other materials dumped and spread on Plaintiffs' property contained contaminants.

284.    Defendants, individually, jointly, severally, and in a civil conspiracy, entry upon Plaintiffs' land to dump contaminated foundry sand was not authorized by contract and was without the knowledge, consent, or authorization of Plaintiffs. Such unauthorized entry constituted an intentional act of trespass for which Plaintiffs are entitled to recover from Defendants both compensatory and punitive damages.

285.    Defendants, individually, jointly, severally, and in a civil conspiracy, committed willful and intentional trespass was done without the knowledge, permission, or consent of

Plaintiffs and this intentional trespass resulted in thousands of tons of contaminated foundry sand being dumped on Plaintiffs' property, which will require millions of dollars to clean up and restore Plaintiffs' property and also may result in civil penalties and other relief being assessed against Plaintiffs for violation of KRS 224.40-100, KRS 224.01-400, 401 KAR 30.031, and 401 KAR 4:060 Section 5.

286.     Plaintiffs are entitled to injunctive relief to abate the effects of Defendants' intentional trespass and to receive compensatory and punitive damages in an amount that exceeds the minimum jurisdictional limits of this Court as proven by the evidence at trial against the Defendants, individually, jointly, and severally, as a result of their intentional trespass.

**COUNT VIII**
**CLAIM FOR VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT,**
**K.R.S. §367.110, _et seq._, AGAINST ALL DEFENDANTS**

287.     Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-286 of this Amended Complaint, as if fully rewritten herein.

288.     Plaintiffs are residential property owners in Villa Hills, Kentucky, who thought they were receiving clean fill material without contaminants for their personal use from Kokosing in exchange for the company placing clean material on their residential property without charge.

289.     Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, committed "unfair, false, misleading, or deceptive acts" in a consumer transaction by surreptitiously dumping and spreading contaminated foundry sand and other contaminated materials on Plaintiffs' property in violation of the Kentucky Consumer Protection Act and state law.

290.     While Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, engaged in this illegal, unfair, and false scheme, Defendants

repeatedly and frequently told Plaintiffs, directly and indirectly, false and deceptive misrepresentations that the fill material was clean, unadulterated, and free of any contaminants and appropriate to be dumped and spread on Plaintiffs' residential property.

291.   Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, knew or should have known that their statements to Plaintiffs were patently false, untrue, inaccurate, deceitful, and just plain outright lies designed to further, advance, and carry out an oppressive, malicious scheme or conspiracy against Plaintiffs. Other times, Defendants remained silent to Plaintiffs to further their illegal and fraudulent scheme.

292.   Defendants', acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, committed unfair, false, misleading, and deceptive acts that resulted in emotional distress and acute physical injury to Plaintiffs and substantial damage to their residential property. The contamination to the residential property will cost millions of dollars to safely clean up and will require substantial environmental engineering expertise.

293.   Defendants' unfair, false, misleading, and deceptive acts have subjected Plaintiffs to a NOV, demands for injunctive relief, and a threat of substantial civil penalties from the Kentucky Environmental Protection Cabinet, as well as liability and a responsibility to clean up the contamination as required by KDWM. Defendants', acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, dumped and spread contaminated foundry sand and other contaminated materials on Plaintiffs' property constitute fraud, oppression, malice, and/or gross negligence.

294.    By dumping and spreading contaminated sand and other contaminated materials onto Plaintiffs' residential property and lying to Plaintiffs about the composition and characteristics of the contamination, Defendants were unjustly enriched by the fact they could

avoid paying substantial amounts of money in tipping fees and transportation costs to dump the material at a permitted waste facility.

295.    Plaintiffs are entitled to compensatory and punitive damages, as well as payment of their attorney fees as a result of Defendants' violation of the Kentucky Consumer Protection Act, for their fraudulent, oppressive, and malicious scheme to dump contaminated sand and other contaminated materials on Plaintiffs' property.

## COUNT IX
## CLAIM FOR VIOLATION OF KRS § 512.020, CRIMINAL MISCHIEF IN THE FIRST DEGREE AGAINST ALL DEFENDANTS

296.    Plaintiffs refer to and incorporate here by reference all of the allegations in the foregoing paragraphs 1-295 of this Amended Complaint, as if here fully set forth.

297.    Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, committed the crime of Criminal Mischief in the First Degree and violated KRS §512.020 when, having no right to do so or reasonable ground to believe that they had such right, they intentionally or wantonly damaged Plaintiffs' property by dumping tens of thousands of tons of contaminated, toxic, harmful, and carcinogenic material on Plaintiffs' residential real estate, thereby damaging Plaintiffs' property and causing pecuniary loss of $1,000 or more. Defendants all knew or should have known that the material dumped onto Plaintiffs' residential real estate was contaminated, toxic, harmful, and potentially carcinogenic.

298.    KRS §446.070 provides a private cause of action and right to recover from offender(s) all damages sustained by reason of the violation of any statute. Plaintiffs are, therefore, entitled to recover from the Defendants, jointly and severally, an amount of money that exceeds the minimum jurisdictional limits of this Court and these damages will be proven at

trial in an amount to sufficient to fully and adequately compensate Plaintiffs for all damages they sustained by reason of the Defendants' violation of KRS §512.020.

## COUNT X
## PUNITIVE DAMAGES CLAIM AGAINST ALL DEFENDANTS

299.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-298 of this Amended Complaint, as if fully rewritten herein.

300.    Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, engaged in a wanton, willful, and fraudulent scheme involving the illegal disposal of chemical waste contaminants on residential property and in the floodplain of the Ohio River in violation of KRS 224.40-100, KRS 224.01-400, 401 KAR 30.031, and 401 KAR 4:060 Section 5.

301.    Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, engaged in a wanton, willful, and fraudulent scheme by excavating and transporting contaminated waste material across state lines and then dumping, and spreading contaminated sand and other contaminated materials on and about Plaintiffs' residential property. Defendant's knowing, willful, intentional, malicious and wanton misconduct resulted in millions of dollars in damage to Plaintiffs' property and injury to Plaintiffs.

302.    Defendants knowingly participated in this scheme and were fully aware they were dumping contaminated waste sand on a floodplain that was (and is) subject to erosion and stability issues from high river levels and regular flood events and cognizant of the likely consequences of their illegal and wrongful misconduct.

303.    While conducting this fraudulent scheme, Defendants falsely and deceptively lied to Plaintiffs, directly and indirectly, about the composition and characteristics of the

contaminated fill material and falsely misrepresented that all fill material transported, dumped, and spread onto Plaintiffs' property was totally and utterly free of contaminants, as defined by federal and state law.

304.    While conducting this fraudulent scheme, Defendants falsely, knowingly, and deceptively lied to Plaintiffs, directly and indirectly, about the safety of placing the contaminated fill material on residential property and inside the floodplain of a major source of fresh water for Plaintiffs and other members of the public, knowing that the contaminants were carcinogenic and/or neurotoxic to human health and the environment.

305.    Defendants' misconduct was intentional, utterly reckless, malicious, willful and wanton, and caused millions of dollars in damage to Plaintiffs' property and continues to pose substantial danger to human health and the environment. Defendants' malicious and willful misconduct also caused emotional distress and acute physical injury to Plaintiffs.

306.    The contaminated fill material dumped and spread by Defendant Kokosing—in conspiracy with and aided and abetted by the other Defendants—is eroding and falling into the Ohio River and allowing the contaminated black sand material to wash down into the river, which is the primary drinking water supply for many citizens and residents of the Commonwealth of Kentucky and other neighboring states. Defendants' misconduct is intentional, reckless, malicious, willful and wanton, and should be punished by this court.

307.    Defendants' fraudulent scheme probably would not have been discovered, but for the patent boldness of the fraudulent activities and the happenstance of a U.S. Coast Guard boat cruising on the Ohio River to witness a bulldozer pushing black contaminated fill material over a hillside and down towards the river bank, which lead to KDWM personnel coming to Plaintiffs' property.

308.    KDWM came to Plaintiffs' property and tested the fill. Soon thereafter, the state declared the situation to be an imminent threat to human health and the environment. It will cost millions of dollars to clean up this mess.

309.    But for the activities of KDWM, Defendants would have covered up the contaminated fill material with brown dirt, denied all responsibility, and fled the scene of their fraudulent, willful, and wanton activities, leaving Plaintiffs with a highly contaminated piece of residential property and the potential of long, expensive, and difficult legal battle against highly sophisticated, experienced, and well-financed opponents in a court of law.

310.    Defendants' fraudulent scheme is particularly vexing to Plaintiffs and other residential property owners. Kokosing, in conspiracy with and aided and abetted by the other Defendants, entered into multiple contracts using the same language with other residential property owners around the tri-state area to accept waste from the sewer project.

311.    Kokosing contracts with residential property owners because dumping "clean" fill on residential property is not regulated by federal or state or local environmental authorities. All Kokosing needs is a residential landowner with a local fill permit to dump materials excavated from the sewer project.

312.    The *only* document provided to Plaintiffs by Defendants related to the fill material dumped on their property is Kokosing's adhesion contract stating that its fill material does not contain any contaminants, as defined by state or federal law.

313.    The adhesion contract fails to mention that the Defendants never analytically tested the fill material. The form contract does not disclose to Plaintiffs that the fill material came from a known Contaminated Soil Area at the sewer project.

314.    Unlike the process employed when taking a dump-truck load of fill material to a licensed landfill, the trucking company does not provide a residential landowner any document

disclosing the weight and chemical composition of the fill material being dumped on their property.

315.     Private residential landowners, including the Plaintiffs, have virtually no understanding or knowledge of environmental laws or regulations, nor the potential health consequences or environmental liabilities arising from unknowingly accepting contaminated fill. Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, take advantage of the residential landowner's ignorance by falsely promising the fill material is pure, unadulterated, and without contaminants.

316.     If the contaminated waste causes a release at a future date, each Defendant can each claim in its defense: (a) it did not generate the waste;  (b) it did not transport the waste; (c) it did not apply for any permit related to the waste; (d) it did not push off the waste; and, (e) access to the residential property was "uncontrolled and not exclusive to Defendants." All of these factual "defenses" are available if the soil is dumped on residential property and it is later found to be contaminated waste. Kokosing has already asserted these factual defenses to KDWM in demanding that its NOV be rescinded.[19]

317.     Under Kokosing's adhesion contract, the residential landowner is responsible for final site restoration and stabilization. Once Kokosing, in conspiracy with and aided and abetted by the other Defendants, was finished dumping fill material on the property, language in the contract tries to limit or end Kokosing's potential responsibility to the landowner.

318.     For many residential property owners, multiple contractors also may dump fill material in the same general location. As a result, fill material from the sewer project is co-mingled with fill material from other sites.  If the fill needs to be re-excavated because of an

---

[19] KDWM has not acted on Kokosing's demand to withdraw the NOV issued to it.

environmental problem, Kokosing and the other Defendants can and will likely argue that no one can say with any certainty where the material originally came from.

319.    The commingling of fill creates a very difficult evidentiary proof problem for the landowner, particularly if Kokosing or any of the other Defendants deny that the contaminated fill material came from the sewer project.

320.    When residential property is bought or sold, banks and lending institutions do *not* require a real estate buyer to perform a Phase 1 or Phase 2 Environmental Site Assessment to purchase the property or to borrow money on it. Such assessments are normally limited to transactions involving commercial and industrial properties.

321.    Without such assessments, the fill material will likely sit in the ground undetected unless there is a release from the contaminated material. If there is a release, it will be difficult to clean up and the cost to do so may far exceed the fair market value of the property or the financial resources of the landowner.

322.    Defendants each financially benefited by participating in the fraudulent scheme.

323.    The City paid Kokosing almost $15 million to excavate and haul away soil classified as "non-contaminated." In return, the City got a fixed price in its sewer project contract for the excavation and removal of all soil classified by ATC as non-contaminated. The City paid ATC for classifying soil at the sewer project.[20]

324.    Kokosing paid Ashcraft a fee for each truckload of contaminated fill that Ashcraft dumped and spread on Plaintiffs' residential property.

325.    Unlike dumping clean fill on a residential property, the City paid all of the costs associated with excavating, handling, and disposing of soils identified as "contaminated" in a

---

[20] Kokosing never tested any material that it excavated, hauled, and dumped on Plaintiffs' property to verify or confirm the clean soil classification assigned by the City, MSD and ATC.

licensed landfill. Thus, the City (and MSD) had financial incentive to sit silent or turn their heads when dealing with soils that were misclassified as clean fill for residential property.

326.   Even when confronted by Plaintiffs, city engineer Schork told Plaintiffs (in writing) that the black foundry sand dumped on Plaintiffs' property was not from the sewer project. Shortly thereafter, Ashcraft covered the black foundry sand up with a thin layer of brown soil and removed all of the heavy equipment and porta-potties from Plaintiffs' residential property. As a result, signs of Defendants' activities at the property were gone except the contaminated material buried underneath the thin layer of brown soil.

327.   The City, MSD, ATC, Kokosing, and Ashcraft all knew that the fraudulent scheme would be difficult for a residential landowner to understand, much less expose and prove.

328.   Kokosing's contract expressly stating that the fill material "shall not contain contaminants as defined by state and/or federal law" would make it very difficult to prove in court that Kokosing dumped contaminated fill material on residential property. Plaintiffs are incredibly lucky that the U.S. Coast Guard passed by their property and noticed a bulldozer pushing black fill over the bank towards the river on October 13, 2017. Plaintiffs are also fortunate that the U.S. Coast Guard sent word to the state agency and the agency took action.

329.   In carrying out this fraudulent scheme and conspiracy, Defendants also knew that it would be very expensive to clean up contaminated fill dumped on residential property and it is far cheaper to deny, deceive, and delay responsibility for their fraudulent illegal acts than to do the right thing. Those litigation tactics do nothing for the innocent landowner, whose home and yard are contaminated with heavy metals and potential carcinogens.

330.   Under the factual circumstances of this case, as set out in this Complaint, Plaintiffs are entitled to an award of punitive damages against Defendants under Kentucky law.

## COUNT XI
## PRIVATE NUISANCE CLAIM AGAINST ALL DEFENDANTS

331.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-330 of this Amended Complaint, as if fully rewritten herein.

332.    Defendants, acting in conspiracy and aiding and abetting each other, have physically interfered with Plaintiffs' property by dumping contaminated material onto the property, thus causing a private nuisance on Plaintiffs property that will continue until the contaminated fill material is removed and their land restored.

333.    Plaintiffs have suffered a substantial loss in the use and enjoyment of their residential property and their home, as well as diminution of the value of their property, as a result of Defendants' illegal, fraudulent, and tortious activities.

334.    Plaintiffs are entitled to compensatory and punitive damages as a result of Defendants' creation of a nuisance on plaintiffs' residential property.

## COUNT XII
## VIOLATION OF RICO AGAINST ALL DEFENDANTS

335.    Plaintiffs refer to and incorporate the preceding allegations set forth in paragraphs 1-334 of this Amended Complaint, as if fully rewritten herein.

336.    The Enterprise consists of the named Defendants, working in a sophisticated civil conspiracy with a common unlawful purpose of evading waste disposal fees at a licensed landfill by wrongly classifying soil at the sewer project as non-contaminated and then hauling and placing such soil on residential property.

337.    The Enterprise consisted of the following persons: (1) the City, who held legal title to the property from which the soil was excavated; (2) ATC is the environmental consultant hired by the City that classified the soil as noncontaminated with the assistance and oversight of the City and MSD; (3) Kokosing is the excavation contractor that dug up the soil and identified

residential landowners who wanted clean fill material and enticed such landowners into accepting fill from the sewer project pursuant to a written contract offering fill to the landowners that "shall not contain any contaminant as defined by state and/or federal law;" and, (4) Ashcraft is the trucking company that hauled soil from the sewer project to residential property in Kentucky and Ohio and then spread the material on the land using heavy equipment. The practical result of the Enterprise was to transfer environmental liabilities associated with contaminated soil excavated at the sewer project from the City to individual residential property owners.

338.    Once the City, MSD and ATC classified soil as "non-contaminated" on its construction drawings, it could be used on residential property without restriction.

339.    The City, MSD, and ATC classified the soil as non-contaminated without taking sufficient and adequate numbers of soil samples in areas at the sewer project known to have contaminated soil, or by employing a biased composite sampling technique to skew the analytical test results, or by classifying the soils as noncontaminated without taking samples and without a sound basis in fact or science.

340.    The City's contract with Kokosing requires Kokosing to excavate soil along the length of the sewer project beginning in east near the outfall to the Mill Creek and then work its way uphill towards the west. The actions taken by Defendants as outlined in this Amended Complaint – and the contaminated soil on Plaintiffs' property and possibly other locations in the tri-state area -- were and remain a continuing enterprise.

341.    The key document for aiding and abetting the activities of the Enterprise is Kokosing's form contract. It is used to entice a residential landowner, who wants clean fill, to enter into a contractual relationship with Kokosing by warranting that the fill material excavated at the sewer project contains no "contaminants as defined by state and/or federal law." This

clause in the contract is a crucial selling point in inducing residential landowners to sign the contract with Kokosing.

342. Once the soil is hauled, dumped, and spread on the residential property, the contract forms the primary legal defense for members of the Enterprise in the event the scheme is discovered or  contaminated fill materials cause a release that imposes an unreasonable risk of harm to human health and the environment. Privity of contract exists only between Kokosing and the residential landowner of the property where the "non-contaminated" fill is dumped.

343. Kokosing, with the knowledge and assistance of the other members of the Enterprise, entered into multiple contracts using the same language with other residential property owners around the tri-state to accept fill material from the sewer project. Only Kokosing has a contractual relationship with the residential landowner accepting fill from the sewer project.

344. On information and belief, Defendants continue to illegally dispose of soils from the sewer project on residential properties in the tri-state area that were classified as "noncontaminated" but are in fact contaminated, potentially dangerous to human health and the environment, and in breach of the terms of the contract between Kokosing and residential landowner(s).

345. Based upon information and belief, when Defendants stopped dumping contaminated materials from CSA 20 on the Plaintiffs' property, they immediately moved to multiple parcels of property owned by Don Bernard along Cleves Warsaw Road in Cincinnati, Ohio. Defendants did so because Kokosing had a signed contract with Mr. Bernard dated August 1, 2017. Kokosing promised Mr. Bernard in the contract that the fill material dumped on his property would "not contain any contaminants as defined by state and/or federal law." Kokosing did, however, pay Mr. Bernard $22.50 per load of "non-contaminated" soil from the sewer

project dumped on his private property. Based on information and belief, Mr. Bernard does not own or operate a licensed landfill to accept contaminated waste soil. A copy of the contract between Kokosing and Bernard is attached hereto as EXHIBIT 12.

346.   Because of the large amount of soil needed to be removed from the sewer project, Kokosing needs multiple residential properties to accept the fill to keep the construction project progressing. Thus, Kokosing and the Enterprise keeps moving from residential dump site to residential dump site as the sewer project proceeds from start to finish and needs more space to dump material.

347.   Kokosing almost certainly contracted with other landowners in the Greater Cincinnati area to accept fill material from the sewer project because the project is still on-going and is not finished. Kokosing almost certainly promised the other landowners that the fill material "shall not contain any contaminant as defined by state and/or federal law."

348.   It is highly unlikely that any fill material excavated from an old, economically depressed commercial and industrial area on the westside of Cincinnati is without any contaminants, as defined by state and/or federal law.  Much of the contamination along the sewer project likely occurred many decades ago and prior to the enactment of federal and state environmental laws. Contaminants released decades ago may not be visible to the naked eye or smelled by the human nose.

349.   Kokosing contracts with residential-property-owners because dumping "clean" fill on residential property is not regulated by federal or state or local environmental authorities. A residential landowner only needs a local fill permit to place clean fill on their property. Kokosing does not apply for the landowner's fill permit and Kokosing does not hold a fill permit for the residential property where the fill is placed.

350.     Once Kokosing and Ashcraft finish dumping and spreading the fill material on a residential property, the only document in the landowner's possession related to the fill material is Kokosing's adhesion contract stating that its fill material does not contain any contaminants, as defined by state and/or federal law.

351.     Kokosing's adhesion contract does not disclose that Kokosing never analytically tested or otherwise confirmed that the fill material is truly non-contaminated. Kokosing does not disclose the location at the sewer project where it dug up the material.[21]

352.     Unlike taking fill material to a licensed landfill, Ashcraft does not provide the residential landowner any document explaining the tonnage or chemical composition of the fill material being dumped on their property. Although Ashcraft may travel across state lines to dump thousands of truckloads of fill on a residential parcel and spread it with a bulldozer, it has no contractual relationship with the landowner.

353.     Private residential landowners, including the Plaintiffs, have virtually no understanding, training, education or knowledge of environmental laws or regulations, nor the potential health consequences or environmental liabilities arising from unknowingly accepting contaminated fill. To the contrary, residential landowners accepting fill material from Kokosing believe that the fill contains no contaminants as defined by state and/or federal land because that is what the written contract clearly tells them.

354.     If the contaminated waste causes a release at a future date, the members of the Enterprise, other than Ashcraft, can claim that they never generated the waste; they did not transport the waste; they did not apply for any permit related to the waste; they did not push off

---

[21] Here, the form contract does not disclose to Plaintiffs that the fill material came from within a known contaminated area, i.e., CSA 20, at the sewer project in an old industrial area of Cincinnati.

the waste; and, access to the residential property was an "uncontrolled and not exclusive to the Enterprise."

355.    If confronted by the landowner (or a regulatory agency), Ashcraft can claim innocence by claiming that it did not generate the fill material and pointing to the fill's non-contaminated classification given by the City, MSD and ATC – even if the soil is a black, fine-grained sand that reeks of petroleum odor.

356.    Kokosing has already asserted these factual defenses to KDWM in demanding that its NOV be rescinded by written letter.

357.    Under Kokosing's adhesion contract, the residential landowner is responsible for final site restoration and stabilization – after all the fill is dumped.

358.    Once Kokosing is finished dumping fill material on the property, language in the contract tries to limit or end Kokosing's potential responsibility to the landowner.

359.    As soon as the last load is dumped, Kokosing removes its heavy equipment and porta-potties and leaves the scene. If the fill material is an odd color or smells of an odor and the landowner complains, Kokosing or one of the other members of the Enterprise may have its employees or agents cover up the fill with brown soil.

360.    For many residential property owners, multiple contractors also dump fill material in the same general location. If so, fill material from the sewer project becomes mixed or co-mingled with fill material from other sites.  At a later date, no one can say with certainty where a specific pile or type of fill material may have originated or which trucking company dumped which pile of fill. If the fill material is spread around the property by a bulldozer, the odds of identifying the original source of the fill is greatly diminished.

361.    If the fill material needs to be re-excavated because of an environmental problem, no one can say with any certainty where the material originally came from. This factual defense

is triggered by one or more members of the Enterprise denying that its fill material is the source of the contamination.

362.    For example, the City's senior engineer came to Plaintiffs' property and then just denied that the "dark soil" on Plaintiffs' residential property came from the sewer project.

363.    In the event of a legal dispute, this is a potential very difficult evidentiary hurtle for the residential landowner to overcome in a court of law.

364.    When residential property is bought or sold, banks and lending institutions do *not* require a real estate buyer to perform a Phase 1 or Phase 2 Environmental Site Assessment to purchase property or to borrow money on the property. Such assessments are normally limited to transactions involving commercial and industrial property.

365.    Without such tests, the fill material will likely sit in the ground undetected unless there is a release from the contaminated material. If there is a release, it is difficult to clean up and the cost to do so may far exceed the fair market value of the property or the financial resources of the landowner. Contaminated materials should never be placed on residential property.

366.    Each and all of the named Defendants herein are "persons" within the meaning of 18 U.S.C. §1961(c).[22] Defendants used the interstate commerce and communications, including the U.S. Mail, in violation of 18 U.S.C. §1341, and wire, telephone, and other electronic communications, in violation of 18 U.S.C. §1343, in furtherance of their fraudulent scheme.

367.    Kokosing, its employees, representatives and subcontractors -- acting for themselves and as actual or apparent agents of the City and MSD -- breached their contract by excavating, transporting, dumping, and spreading contaminated black foundry sand and other contamination on and about Plaintiffs' property in violation of the contract and Kentucky law.

---

[22] "Person" includes any individual or entity capable of holding a legal or beneficial interest in property.

368.    Defendants, Kokosing, MSD, the City, ATC, and Ashcraft, individually, jointly, and severally conspired to violate KRS 224.01-400, KRS 224.40-100, 402 KAR 30.031, and 401 KAR 060 Section 5 by failing to transport and deposit contaminated fill material to a permitted waste facility. Instead, Defendants transported and deposited the contaminated material to and on Plaintiffs' residential property and spread such contamination down to the riverbank in violation of Plaintiffs' floodplain permit.

369.    Defendants defrauded Plaintiffs by lying and misrepresenting that the foundry sand contaminated with toxic industrial waste as safe, clean, "city dirt." Defendants made many such fraudulent misrepresentations to Plaintiffs during the period of the time that Defendants were illegally dumping toxic waste on Plaintiffs' residential property. Defendants made such misrepresentations to advance their fraudulent and illegal scheme.

370.    Other times, Defendants stayed silent and kept material information away from Plaintiffs to continue and otherwise advance their fraudulent and illegal scheme.

371.    Defendants knew that they were illegally dumping and spreading contaminated materials on a floodplain and that this property would have long-term stability issues associated with high river levels and flooding events, and therefore, it was likely that contaminated materials could and would wash down into the Ohio River.

372.    Fraud is a racketeering activity as defined in 18 U.S.C. §1961(1). Plaintiffs were the intended victims of this fraudulent activity.

373.    During August, September, October, and November 2017, Defendants transported more than 3,400 dump truck loads of contaminated fill material across state lines and illegally dumped the contaminants in these trucks onto Plaintiffs' residential property in violation of state and federal law. Defendants, Kokosing and Ashcraft, also dumped, pushed and spread the

reactive, contaminated materials outside the boundaries allowed by Plaintiffs floodplain permit in violation of 401 KAR 4:060 Section 5.

374.    While conducting this fraudulent and unlawful scheme, Defendants falsely, deceptively, and repeatedly lied to Plaintiffs and otherwise hid information about the composition and characteristics of the contaminated fill material. Throughout the period of racketing activity, Defendants falsely misrepresented to Plaintiffs that all fill material transported, dumped, and spread onto their property was free of any contaminants, as defined by federal and/or state law.

375.    By carrying out this fraudulent and illegal scheme, Defendants were able to avoid paying substantial tipping fees and transportation costs by dumping the contaminated sand and other material on Plaintiffs' residential property rather than at a permitted waste facility. Upon information and belief, Defendants racketeering activity is ongoing as to other residential landowners in the Greater Cincinnati area.

376.    Defendants' fraudulent and illegal scheme also has subjected Plaintiffs to a NOV issued by KDWM and subjected them to a potential assessment of civil penalties and joint and several liability (with Defendants) to clean up and remove thousands of tons of contaminated sand and other contaminated materials from their property and to restore the property to its prior environmental condition.

377.    Defendants' fraudulent scheme has caused Plaintiffs to engage legal counsel and incur legal fees and litigation expenses under a written fee contract with counsel and these fees and expenses are ongoing and increasing in amount.

378.    Plaintiffs have demanded that Defendants remove all of the contaminated materials that they have illegally dumped on Plaintiffs' residential property and replace it with clean, non-contaminated fill material, but Defendants have so far refused to do so.

379.     All of the contaminated materials outlined in this Amended Complaint are still located on Plaintiffs' property in violation of state and federal law and such illegal activity will continue until Defendants clean up the contamination and restore Plaintiffs' property to its prior environmental condition.

**COUNT XIII**
**JOINT VENTURE CLAIM AGAINST ALL DEFENDANTS**

380.     Plaintiffs refer to and incorporate the preceding allegations set forth above in paragraphs 1-379, as if fully rewritten herein.

381.     Defendants entered into an association, combining their money, efforts, skill, and knowledge for improper gain. Defendants had an express or implied agreement, with each Defendant having a voice in their enterprise, and a common purpose of disposing of contaminated soils and other contaminated materials dug up from the sewer project and transporting and dumping these materials on residential property in Kentucky and in other locations around the Greater Cincinnati area.

382.     Defendants each profited from their joint venture, to the detriment of Plaintiffs. Plaintiffs are entitled to compensatory and punitive damages as a result of Defendants' joint venture.

383.     As joint venturers, Defendants are jointly and severally liable for their wrongful acts and/or omissions by any single member, as apportionment of fault is inapplicable to joint venturers.

**COUNT XIV**
**TAKINGS CLAIM AGAINST THE CITY OF CINCINNATI AND MSD**

384.     Plaintiffs refer to and incorporate the preceding allegations set forth above in paragraphs 1-383, as if fully rewritten herein.

385.     The Fifth Amendment to the United States Constitution, applicable to the States pursuant to the Fourteenth Amendment to the United States Constitution, prohibit the direct or indirect taking of private property without just compensation.

386.     Similarly, Sections 13 and 242 of the Kentucky Constitution prohibit the direct or indirect taking of private property without just compensation.

387.     The invasion of Plaintiff's real estate by dumping the City's and MSD's contaminated earth, sand, or other toxic, polluted material is a taking under the U.S. and Kentucky constitutions.

388.     Defendants, MSD and the City, individually, jointly, severally, and by and through their agents, including Kokosing and Ashcraft, transported, dumped, and spread contaminated foundry sand and other materials, including but not limited to PAHs and heavy metals, onto Plaintiffs' property.

389.     In doing so, MSD and the City have interfered with the Plaintiffs' use and enjoyment of their land and have substantially decreased the value of Plaintiffs' land.

390.     The disposal of contaminated sand from City-owned property is a public burden, which should not be borne by Plaintiffs.

391.     Plaintiffs are entitled to compensatory and punitive damages as a result of the actions of the City and MSD in taking Plaintiffs' property without just compensation.

## **DECLARATORY AND INJUNCTIVE RELIEF**

392.     Plaintiffs refer to and incorporate the preceding allegations set forth above in paragraphs 1-391, as if fully rewritten herein.

393.      Plaintiff requests that the Court find and declare by judgment that:

           a. The contract between Kokosing and Plaintiffs is a valid and enforceable instrument, as modified by Plaintiff, David Bell, more fully described in paragraphs 85 and 88 of

this Amended Complaint, and that the Court strike the unilateral modifications to the contract added by Kokosing after Plaintiff, David Bell, signed the contract and submitted it to the company, as more fully described in paragraph 91 and 92 of this Amended Complaint;

b.     The law of Kentucky be applied to resolve the disputes described in this complaint, including finding that Kokosing is liable to Plaintiffs and obligated by the contract for damages to Plaintiffs, including paying all attorneys' fees and litigation expenses incurred by Plaintiffs related to this action and/or to the events that led to the filing of this action and/or to the administrative action before the Kentucky Energy and Environmental Protection Cabinet;

c.     Kokosing be required to pay for all costs to clean up and remove all contaminated soil or other contaminated materials from the sewer project that were dumped and spread on Plaintiffs' real property and replace it with clean soil without any contaminants as defined by state and/or federal law;

d.     Kokosing be required to place a layer of three feet of clean top soil on Plaintiffs' property to allow Plaintiffs to plant and grow trees on their property.

e.     Kokosing be ordered to pay all costs to restore, plant, grow, and maintain a vegetative cover on Plaintiffs' property;

f.     Kokosing be permanently prohibited from using language in a contract that promises a residential landowner its fill material is without any contaminant as defined by state and/or federal law.

g.     Kokosing be permanently required to analytically test all fill material that it or its contractors or agents transport, dump and/or spread on residential property to ensure that the material complies with the terms of its contract with the landowner and all applicable state and local environmental laws and regulations.

h.      Kokosing be required to provide written notice by certified mail to all residential property owners where fill material from the sewer project was dumped and/or spread on residential land and to offer the landowner(s) an opportunity to test the analytical composition of the fill material, at Kokosing's sole cost, to ensure the fill material placed on their property meets the terms of the contract all applicable state or local environmental laws and regulations for residential property.

and

i.      Kokosing be required to restore and to backfill Plaintiffs' real property with clean, non-contaminated, proper fill materials sufficient to place Plaintiffs' property in the condition it would have been in if Kokosing properly performed the promises and requirements made to Plaintiff and those set forth in the contract between them.

**WHEREFORE**, Plaintiffs demand:

1.  Trial to the Court;

2.  That Plaintiffs be awarded compensatory damages from Defendants, jointly and severally, in an amount that exceeds the minimum jurisdictional limits of this Court and in an amount that will fully and adequately compensate them for all of the damages, losses, and injuries they have and will continue to incur, including but not limited to the costs of having third-party, environmental contractors remove all contamination from Plaintiffs' property; the costs of refilling, compacting, and landscaping the property to the condition that was intended by the contract between Kokosing and Plaintiffs; and other compensatory damages.

3.  That Plaintiffs recover exemplary or punitive damages in an amount not to exceed ten times the compensatory damages awarded to Plaintiffs, from the Defendants, jointly and severally, to punish Defendants for their intentional misconduct and disregard for

Plaintiffs' property and the environment in general and to dissuade the Defendants, and others similarly situated, from engaging in such misconduct in the future.

4. That Plaintiffs recover from the Defendants, jointly and severally, pre-judgment and post-judgment interest; their court and litigation costs and attorneys fees, as provided for in the contract and under Kentucky law;

5. Declaratory and injunctive relief requiring the Defendants to fully compensate responsible third-party environmental contractors to remove all contaminated, toxic, carcinogenic, or otherwise potentially harmful materials from the Plaintiffs' property; properly dispose of the contaminated materials; and replace clean fill on Plaintiffs' property, as contemplated and specified by in the Waste Agreement, all at Defendants' cost; and

6. All other relief to which Plaintiffs may appear entitled entitled under law or in equity.

Respectfully submitted,

/s/*Jeffrey M. Sanders*
JEFFREY M. SANDERS (Ky Bar 82106)
LAW OFFICE OF JEFFREY M. SANDERS PLLC
34 GLENWAY AVENUE
FORT THOMAS, KENTUCKY 41075
Telephone: (859) 380-6867
Email: jms@sanderslaw.com

WALLACE BOGGS, PLLC

/s/ *Jeffrey C. Shipp*
JEFFREY C. SHIPP (81414)
SCOTT A. BEST (88844)
300 Buttermilk Pike, Suite 100
Ft. Mitchell, KY 41017
Telephone: (859) 578-5410
Facsimile: (859) 331-5337
Email: jshipp@wallaceboggs.com
          sbest@wallaceboggs.com

*Counsel for Plaintiff*