**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 19-53-DLB-CJS**

**DAVID BELL, et al.**                                                                                      **PLAINTIFFS**

**v.**                        **MEMORANDUM OPINION AND ORDER**

**KOKOSING INDUSTRIAL, INC., et al.**                                          **DEFENDANTS**

* * * * * * * * * * * * * * * *

This matter is before the court on several motions to dismiss filed by the various defendants; including Defendant Kokosing Industrial, Inc.'s Motion to Dismiss (Doc. # 38), Defendant City of Cincinnati's Motion to Dismiss (Doc. # 40), Defendant Metropolitan Sewer District of Greater Cincinnati's Motion to Dismiss (Doc. # 41), Defendant ATC Group Services LLC's Motion to Dismiss (Doc. # 42), and Defendant Ashcraft Sand & Gravel Co., Inc.'s Motion to Dismiss (Doc. # 37). Each motion has been fully briefed, (Docs. # 49, 50, 54, 55, 56, 57, 58), and are all now ripe for the Court's review.

For the reasons stated herein, Defendant Kokosing's Motion to Dismiss is **granted in part and denied in part**, Defendant City of Cincinnati's Motion to Dismiss is **granted**, Defendant Metropolitan Sewer District of Greater Cincinnati's Motion to Dismiss is **granted**, Defendant ATC Group Services LLC's Motion to Dismiss is **granted**, and Defendant Ashcraft Sand & Gravel Co., Inc.'s Motion to Dismiss is **granted**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In June of 2017, Defendants City of Cincinnati ("the City")—as manager and operator of Defendant Metropolitan Sewer District of Greater Cincinnati ("MSD")[1]—and Kokosing Industrial, Inc. ("Kokosing") entered into a construction contract, the Lick Run Valley Conveyance System Project (the "Lick Run project"), to repair an outdated sewer system in Cincinnati.   (Doc. # 27 at ¶¶ 2, 10–11).   Kokosing served as the general contractor for the project.   *Id.* at ¶ 10.   The Lick Run project was a multi-million-dollar undertaking and involved a substantial amount of excavation work.   *Id.* at ¶¶ 10, 21, 22. Defendant Ashcraft Sand & Gravel Company, Inc. ("Ashcraft") was hired to transport soil that was excavated from the Lick Run project.   *Id.* at ¶ 6.

Much of the area that needed to be excavated was formerly used for industrial work; given its industrial history, there was a concern that the excavated soil may contain pollutants and heavy metals.   *Id.* at ¶¶ 15–16.   In order to comply with environmental regulations and identify potential contaminated soil, the City hired Defendant ATC Group Services LLC ("ATC") as an environmental consultant.   *Id.* at ¶ 17.   ATC "was required to test suspect material encountered during construction activities" and "classify suspect material . . . as either 'contaminated' or 'non-contaminated.'"   *Id.* at ¶¶ 18–19.   Kokosing did not have its own procedure for testing and identifying contaminated soil; it relied on the testing from ATC.   *Id.* at ¶ 36.   If a Kokosing employee suspected that excavated material was contaminated because of its odor or appearance, the employee was

---

[1]      MSD is a county sewer district governed by Ohio law through a partnership with Hamilton County, Ohio and the City of Cincinnati.   (Doc. # 27 at ¶ 4).   Under the partnership, "the City is responsible for the management and operation of the sewer district while the Board of County Commissioners of Hamilton County, Ohio, retains the authority to establish sewer service charges, adopt rules and regulations, and approve operating and capital improvement program budgets."   *Id.*

instructed to suspend work and notify ATC so additional testing could be done.  *Id.* at ¶¶ 38–40.

Under its contract with the City, Kokosing was paid a lump sum for excavating uncontaminated fill material and depositing it at residential properties where it could be used as fill material.  *Id.* at ¶ 24.  Contaminated soil had to be taken to a landfill to be safely disposed of at the City's expense.  *Id.* at ¶¶ 19, 24.  If soil was deposited at a residential property but it was later discovered to be contaminated, Kokosing had to remove the contaminated soil and take it to a landfill, again at the City's expense.  *Id.* at ¶ 42.

Plaintiffs Cindy and David Bell live at one of the residential properties where Kokosing deposited fill material from the Lick Run project.  *Id.* at ¶ 1.  Cindy Bell holds fee simple title to the property.  *Id.* at ¶ 46.  The Bells' property is in Villa Hills, Kenton County, Kentucky; a portion of the Bells' boundary line slopes sharply downward toward the Ohio River and is located within the floodplain.  *Id.* at ¶ 45.  The Bells obtained a floodplain permit to place "inert, non-contaminated fill material on their property" in order to level out the slope down toward the river.  *Id.* at ¶ 47.  While the Bells' property is currently too small to be subdivided under the current zoning regulations in Villa Hills, they argue that in the future, their property could be subdivided into multiple residential lots if the zoning regulations were amended and, presumably, if the sloped elevation was raised.  *Id.* at ¶ 49.  Alternatively, the Bells claim that after their property is leveled, they plan on creating "a small campground overlooking a scenic bend in the Ohio River and an organic garden for the use and benefit of their family and members of their church"; they also wish to build a boat ramp down to the Ohio River to be used by the people at the campground.

*Id.* at ¶¶ 51–52. The Bells insist that they do not intend to use the future campground for commercial purposes. *Id.* at ¶ 51.

In July of 2017, Kokosing approached the Bells and offered to "transport and deliver as much as 100,000 cubic yards of clean, inert, and non-contaminated fill material to their residential property at no cost to Plaintiffs." *Id.* at ¶ 59. The Bells agreed; they said they would "take as much clean, non-contaminated fill, as needed to raise their property out of the floodplain." *Id.* A Kokosing representative inspected the Bells property and verified that they had the necessary permit to accept the fill material. *Id.* at ¶¶ 61–64. Kokosing allegedly told the Bells that the City, MSD, and ATC would each need to inspect the Bells' permits "to approve this potential dumping site before Kokosing could sign a contract with Plaintiffs and begin to place clean fill material on their property." *Id.* at ¶ 64; *see also id.* at ¶ 70 ("The City, ATC, and MSD each reviewed Kokosing's contract with Plaintiffs, the Plaintiffs' floodplain permit, and the commercial driveway permit for Plaintiffs' property issued by the Kentucky Division of Transportation.").

The Bells allege that Kokosing told them that they did not need legal representation during contract negotiations. *Id.* at ¶ 73. The Bells claim that "[a]s an inducement to get Plaintiffs to sign the contract, Kokosing's representatives and agents, including Ashcraft employees, promised . . . the elevated yard would be out of the floodplain, level, stable, and in compliance with their floodplain permit." *Id.* at ¶ 74. The Bells also claim that Kokosing promised that once the lot was level and compacted it "would be suitable for use by their family and members of their church as a camp site." *Id.* at ¶ 76. These alleged representations were made "in mid-July 2017." *Id.* at ¶¶ 74–77.

In mid-July of 2017, David Bell and Kokosing signed a contract (the "Waste Agreement") which allowed for the deposit of uncontaminated fill material from the Lick Run project on the Bells' property.[2]  *Id.* at ¶¶ 73–110.  The Bells argue that the Waste Agreement was a form contract that Kokosing also used with other residential property owners.  *See id.* at ¶ 79.  Specifically, the Waste Agreement gives Kokosing "the right to ingress and egress from [the Bells' property] . . . and the right to deposit waste material" on the property.  (Doc. # 27-2 at 1) (the Waste Agreement).  "Waste materials" was defined as "dirt, earth, rock, concrete subsurface and other material . . . from a construction project;" none of the waste material should have contained "any contaminants as defined by state and/or federal law."  *Id.* at 1–2.  The Waste Agreement also states that Kokosing will indemnify the Bells for any "losses, liabilities, costs, expenses, suits, actions, claims, and all other obligations and proceedings . . . arising out of injuries to persons . . . or damage to property caused by [Kokosing]" except those arising out of the Bells' negligence.  *Id.* at 3.  David Bell claims that he modified several sections in the Waste Agreement, including striking out certain language in Sections 1, 2, 5, 7, 10, 11, 12, and 17 and adding the phrase "no contaminated material of any type" to Section 5.  (Doc. # 27 at ¶ 88).  The Bells claim that a Kokosing representative told Mr. Bell to sign the contract and then send it to the Kokosing headquarters where a Kokosing representative would also sign.  *Id.* at ¶ 84.  Mr. Bell signed the contract; he did not keep a copy for himself.[3]  *Id.* at ¶ 89.

---

[2]     Cindy Bell was not home when the Kokosing representative came to the Bells' property to execute the contract.  *Id.* at ¶ 83.

[3]     On July 27, 2018, over a year after Mr. Bells signed the Waste Agreement, the Bells claim that Kokosing's counsel emailed them a copy of the Waste Agreement that had two significant alterations: there was an extra section titled "MSD HELD HARMLESS" and Mr. Bell's handwritten

In August 2017, Kokosing and Defendant Ashcraft began shipping fill material from the Lick Run project to the Bells' property.  *Id.* at ¶ 104.  The Bells claim that between "the beginning date in August 2017 and until September 29, 2017, Defendant Ashcraft, acting for and as the actual or ostensible agent of all the named Defendants, transported approximately 1,393 loads of fill material to Plaintiffs' property."  *Id.*  The fill material placed on their property "was not sampled or tested by Kokosing, the City, MSD, ATC, or Ashcraft before being dumped and spread on Plaintiffs' property."  *Id.* at ¶ 106.  The Bells claim that despite multiple requests, Kokosing and Ashcraft refused to provide the Bells with documentation for where the fill material was coming from at the Lick Run project or verification that the fill material was free of contaminants.  *Id.* at ¶ 109.

On September 29, 2017, Kokosing started depositing additional fill material onto the Bells' property that was excavated from a location within the Lick Run project known as CSA 20.  *Id.* at ¶ 111.  CSA 20 included a former McDonald's restaurant located at 2321 Beekman Street, which the City purchased in 2015.  *Id.* at ¶ 112.  According the Bells, the City, MSD, and ATC knew or should have known that the fill material at the McDonalds site contained "black foundry sand contaminated with heavy metals and polyaromatic hydrocarbons."  *Id.* at ¶ 113. The Bells allege that the City was informed multiple times beginning in 2002 that the soil at 2321 Beekman Street was likely contaminated.  *Id.* at ¶¶ 121–30.  The Bells also claim that the "black sand was patently obvious" and "had a petroleum odor that should have alerted the Defendants that the foundry sand was contaminated and not suitable for use on residential property."  *Id.* at

---

modification to Section 5 that "no contaminated material of any type" would be added to their property was removed.  *Id.* at ¶ 91.  The allegedly-modified Waste Agreement was signed by Jonathon A. Turton, an authorized agent for Kokosing.  *Id.* at ¶ 92.

¶¶ 118, 119.  CSA 20, however, was labeled as "not contaminated soil" on the Lick Run project construction drawings; the Bells claim that the City, MSD, and ATC intentionally misclassified fill material from CSA 20.  *Id.* at ¶¶ 117, 132.  Between September 29, 2017 and October 16, 2017, Kokosing and Ashcraft deposited approximately 1,985 loads of fill material totaling approximately 18,000 cubic yards from CSA 20 onto the Bells' property. *Id.* at ¶¶ 135–36.

The Bells claim that the Defendants began communicating among themselves in early October 2017 about the potentially contaminated foundry sand that the Defendants were dumping on the Bells' property.  *Id.* at ¶¶ 137–46.  According to the Bells, on October 2, 2017 Kokosing met with the City, MSD, and ATC to discuss the excavation; the City, MSD, and ATC told Kokosing that "the 'specifications prevail' and Kokosing should handle the black foundry sand as non-contaminated fill for use on residential property."  *Id.* at ¶ 137.  On October 12, 2017, Kokosing asked ATC to test the foundry sand found on CSA 20, *id.* at ¶ 138, and sent MSD a letter requesting a modification to the construction timeline to allow Kokosing to effectively respond to the environmental conditions of CSA 20, *id.* at ¶ 140.  On October 17, 2017, ATC responded to Kokosing's request and affirmed that the fill material at CSA 20 was uncontaminated, even though they had only tested soil 4 to 6 feet below the surface; at the time Kokosing was excavating soil deeper than 6 feet.  *Id.* at ¶¶ 142–44.  The Bells also claim that "Kokosing's internal weekly log" for October 14 "reported CSA 'had soils that had a petroleum odor [and that] ATC took samples.'"  *Id.* at ¶ 141.  On October 19, 2017, Kokosing again requested verification from the City, MSD, and ATC.  *Id.* at ¶ 145.  On October 31, 2017, the City, MSD, and ATC

responded that the "[a]nalytical data is not available beyond the 4-6' depth for this site. The maximum depth of fill material is 11.5' beneath the foundry property."  *Id.* at ¶ 146.

While these discussions between Kokosing, the City, MSD, and ATC were ongoing, the Bells allege that "representatives of both Kokosing and Ashcraft—in person, through text messages and emails, and by multiple cellphone calls" were "falsely assur[ing] Plaintiffs that the black sandy material was 'clean,' totally harmless, 'inert,' and 'contained no contaminants,' and was 'perfectly safe.'"  *Id.* at ¶ 148.  The Bells claim that "Kokosing's representatives repeatedly assured Plaintiffs that the black foundry sand was just 'city dirt' from Cincinnati and its chemical composition complied with the terms and conditions in its contract with the Plaintiffs."  *Id.* at ¶ 149.  The Bells "talked to Ashcraft's truck drivers about the black sand material being dumped on their property beginning on or about October 2, 2017 and were told the material was just old 'city' dirt from the westside of Cincinnati."  *Id.*  The Bells claim that during October 2017 "Kokosing's representatives and agents continued to maliciously, wantonly, falsely, and intentionally tell Plaintiffs that the black sand . . . was 'perfectly safe,' 'the material was black in color because it came from the westside of City of Cincinnati,' and the 'material contained no contaminants.'"  *Id.* at ¶ 156; *see also id.* at ¶ 157.

On October 13, 2017, the U.S. Coast Guard took pictures of the Bells' property while traveling along the Ohio River.  *Id.* at ¶ 150.  The pictures show "a Kokosing contractor using a bulldozer to push black fill material down the hillside towards the Ohio River in violation of Plaintiffs' floodplain permit."  *Id.* at ¶ 151.  The Bells allege that on October 13, 2017 a representative from Kentucky Division of Water ("KDOW") met with Mike Luessen of ATC "about the black fill material," and afterwards Mr. Luessen emailed

KDOW to ask "to have the U.S. Army Corps of Engineers contact Luessen directly regarding fill material dumped in the floodplain." *Id.* Representatives from KDOW also visited the Bells' property to examine whether the Bells' were in compliance with their floodplain permit. *Id.* at ¶ 152.

On October 20, 2017, "ATC, the City and MSD notified Kokosing, in writing, that the soils taken to Plaintiffs' property were "classified as Type 1 but restricted to commercial/industrial use" and "[were] contaminated with PAHs and heavy metals . . . present[ing] 'a potential future liability if disposed at a residential property.'" *Id.* at ¶¶ 160–61. On October 27, 2017, Kokosing sent a letter to MSD and ATC requesting confirmation that the fill material deposited on the Bells property was non-contaminated and asking how it should be handled; the Amended Complaint does not say whether MSD responded. *See id.* at ¶¶ 164–66. The Bells claim that Kokosing told Ashcraft on November 3, 2017 to "put brown soil overtop the black material to 'cover it up'" and removed their equipment from the Bells property. *Id.* at ¶ 168. On November 4, 2017, two engineers from the City and MSD visited the Bells' property and took photographs and videos. *Id.* at ¶ 169.

Concerned about the petroleum odors coming from the fill material, the Bells took samples of the soil themselves and sent them to a lab to be tested. *Id.* at ¶ 173. On November 21, 2017, the Bells received results that the "black fill material was high in heavy metals." *Id.* The Bells claim that they "told representatives of Kokosing, Ashcraft, and the City" about the lab results, *id.* at ¶ 174, but that Kokosing continued to "falsely insist that the material was perfectly safe" and that it was just "city dirt," *id.* at ¶ 175. Additionally, the Bells allege that Kokosing and Ashcraft both "denied responsibility for

the contamination . . . and instead pointed their fingers at the City as being the guilty party in the scheme." *Id.* at ¶ 177.  When Mr. Bell called Raymond Schork, a senior engineer for the City, and asked for an explanation, Mr. Bell says that Schork told him he would look into the matter and get back to him.  *Id.* at ¶ 179.  After a few days, Schork responded and "falsely, maliciously, wantonly, and intentionally told Mr. Bell that 'the dark dirt' did not come from the City's sewer project."  *Id.* at ¶ 180.  Schork allegedly told the Bells to ask an Ashcraft employee where the black dirt came from and "suggested that Plaintiffs place a two-foot thick cap of clean soil over the dark dirt—at Plaintiffs' expense—because of the high levels of heavy metals in this dirt."  *Id.* at ¶ 182.  The Bells argue that at the time he sent that email, however, Schork knew or should have known that the black fill material came from CSA 20.  *Id.* at ¶ 181.

In December of 2017, the Superfund Branch of Kentucky Division of Waste Management ("KDWM") became involved.  *Id.* at ¶ 190.  The KDWM tested the fill material on the Bells' property and confirmed that it contained high amounts of heavy metals in violation of Kentucky laws and regulations.  *Id.* at ¶ 192.  Since then, the Defendants have been involved in ongoing negotiations with the Bells and KDWM about how to address the contamination.  *Id.* at ¶¶ 193–214; *see also* (Doc. # 38 at 23) (stating that remedial discussions are still ongoing).  There appear to be two potential remedial approaches: (1) remove all the contaminated fill material from the Bells' property and dispose of it properly at a landfill, and (2) place an engineered cap overtop the contaminated fill material to encapsulate it.  (Doc. # 27 at ¶¶ 199, 213).  The second option would also require the Bells to "record an environmental covenant in the chain of title of their property" to "restrict[] the use of their property [and] maintain the integrity of the cap in perpetuity."  *Id.*

at ¶ 213.

On April 26, 2019, the Bells filed suit against Kokosing, the City, MSD, ATC, and Ashcraft.  (Doc. # 1).  After each Defendant filed a motion to dismiss, (Docs. # 9, # 11, # 13, # 25), the Bells filed an Amended Complaint, (Doc. # 27).  The Amended Complaint lists fourteen causes of action: breach of contract, promissory estoppel, equitable estoppel, fraudulent misrepresentation, negligence, negligence per se, intentional trespass, consumer protection laws, criminal mischief, punitive damages, private nuisance, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), joint venture, and takings.  *See generally id.*  The Bells also allege that the Defendants acted in concert as part of a civil conspiracy to illegally dump contaminated fill material onto the Bells' property.  *See, e.g.*, *id.* at ¶ 134.  The Bells are seeking declaratory and injunctive relief in addition to compensatory and punitive damages.  *Id.* at ¶¶ 392–93.  In response to the Amended Complaint, each Defendant has filed a Motion to Dismiss. (Docs. # 37, 38, 40, 41, 42).  The Motions are fully briefed, (Docs. # 49, 50, 54, 55, 56, 57, 58), and ripe for the Court's review.

## II.    ANALYSIS

### A.    Threshold Considerations

Before addressing the merits of the Bells' claims, the City, MSD, and ATC raise threshold challenges to their involvement in this suit.  First, MSD argues that it is not a proper party to this suit because it does not have the capacity to be sued.  (Doc. # 41-1 at 1).  Second, the City, MSD, and ATC challenge this Court's personal jurisdiction over them and move for dismissal under FED. R. CIV. P. 12(b)(2).  (Docs. # 41-1 at 4, # 40 at 5–11, and # 42 at 4–7).  Finally, the City and MSD additionally claim that they are immune

from suit.  (Docs. # 40 at 11–13 and # 41-1 at 4).  The Court will address each of these threshold considerations in turn.

### 1.    MSD's Capacity to be Sued

MSD argues that it does not have the capacity to be sued because it is a subdivision of the City of Cincinnati.  (Doc. # 41-1 at 1–2).  In response, the Bells claim that MSD is a proper party because MSD "has been a party to numerous lawsuits."  (Doc. # 49 at 16) (citing Ohio state court cases in which MSD was a party).

The Court looks to "the law of the state where the court is located" to determine whether an entity that is not an individual or a corporation has the capacity to be sued. FED. R. CIV. P. 17(b)(3).[4]  "Under Kentucky law, a governmental entity is a non-suable entity if the nature of the defendants and allegations, and the function of the entity indicate

---

[4]      MSD claims that the choice of law is governed by Fed. R. Civ. P. 17(b)(2), which states that capacity to be sued "for a corporation" is determined "by the law under which it was organized."  (Doc. # 41-1) (citing CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1562 (3d ed. 2020)).  In cases where a political subdivision is sued, however, most courts, however, have followed FED. R. OF CIV. P. 17(b)(3) and applied the law of the state where the court is located to determine whether a political subdivision has the capacity to be sued.  *See, e.g.*, *Arbogast v. Kansas Dep't of Labor*, 686 F. App'x 556, 557 (10th Cir. 2017) (the capacity of a Kansas Department of Labor to be sued "is determined 'by the law of the state where the court is located.'" (quoting FED. R. CIV. P. 17(b)(3))); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 393 (4th Cir. 2014) (holding that "the law of the state in which the district court sits determines" whether the Baltimore City State's Attorney's Office had the capacity to be sued); *Doe v. Delaware State Police*, 939 F. Supp. 2d 313, 325 (S.D.N.Y. 2013) (collecting cases where federal courts applied the law of the forum state to determine whether political subdivision's of other states have the capacity to be sued).  Therefore, the Court will apply Kentucky law, the law of the state in which the district court sits, rather than Ohio law, the law of the state in which MSD is incorporated.

Even if the Court were to apply Ohio law as MSD requests, the result would not change; under Ohio law, subdivisions of both municipalities and counties do not have the capacity to be sued.  *See, e.g.*, *Hendricks v. Office of Clermont Cty. Sheriff*, 326 F. App'x 347, 349 (6th Cir. 2009) (finding that a county sheriff office "is not an independent legal entity and therefore is incapable of suing or being sued"); *Goodwin v. Cty. of Summit, Ohio*, 45 F. Supp. 3d 692, 698 (N.D. Ohio 2014) ("Administrative units of local government . . . are not sui juris because they lack the power to sue, and cannot be sued absent positive statutory authority."); *Saint Torrance v. Firstar*, 529 F. Supp. 2d 836, 850 (S.D. Ohio 2007) ("The Cincinnati Water Works, as a department of the City of Cincinnati, a municipal corporation, is not sui juris and cannot be sued absent statutory authority.").

the claim is essentially against the county or city." *Hocker v. Pikeville City Police Dept.*, No. 7:11-cv-122-EBA, 2013 WL 587897, at *4 (E.D. Ky. Feb. 13, 2013) (citing *Smallwood v. Jefferson Cty. Gov.*, 743 F. Supp. 502, 503 (W.D. Ky. 1990)).  In other words, if the entity being sued is "merely an extension of the county or city," the proper party to be sued is the county or city rather than the individual governmental entity.  *Id.*  Courts look to the level of control the city or county has over a department to determine whether it is an independent, suable entity or an extension of the county or city.  *See, e.g.*, *Pittman v. Rutherford*, No. 2:19-cv-36-DLB-CJS, 2019 WL 5558572, at *3–5 (E.D. Ky. Oct. 28, 2019) (finding that the Ohio Brown County Department of Job and Family Services was not a suable entity under Kentucky law because the board of county commissioners had a significant role in managing and overseeing the department, including appointing the department director); *Carver v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:12-CV-247-H, 2014 WL 2805539, at *4 (W.D. Ky. June 20, 2014) (finding that the city police department was not a suable entity because it had no separate identity apart from the metropolitan government); *Hocker*, 2013 WL 587897, at *4 (holding that a city police department was not a suable entity because the city exercised significant control over the department "including the hiring of officers, the size of the police force, and other significant policy determinations"). Courts also consider how the department presents itself to the public. *Longwood, LLC v. Voegele*, No. 3:17-cv-00676-TBR, 2018 WL 1660086, at *5–6 (W.D. Ky. Apr. 5, 2018) (finding that a County Engineer department was not separate from the County Fiscal Court because the County Engineer website prominently featured County Fiscal Court and listed the County Engineer as one "among a list of several other services performed by the Oldham County Fiscal Court").

Here, MSD is not an independent, suable entity because the city and county exercise significant control over its operations.  MSD is a county sewer district governed by an agreement between the City and the Board of County Commissioners of Hamilton County ("Hamilton County"); the City is the manager and operator of MSD, and Hamilton County is the owner.  *United States v. Bd. of Cty. Comm'rs of Hamilton Cty.*, 937 F.3d 679, 681–83 (6th Cir. 2019).   The City "provide[s] a total and complete management service for the operation of [MSD]," including "all thing necessary to manage and operate [MSD] in an efficient and businesslike manner."  *Id.* at 682 (alteration in original) (internal quotation omitted).  Hamilton County oversees the City's management of MSD, including "fixing sewerage service charges, adopting Rules and Regulations and approving capital improvement programs, and undertaking the necessary legislation."  *Id.*  According to MSD's website, the Cincinnati City Manager appoints the director of MSD, and Hamilton County approves MSD's operating budget.  *About MSD*, METROPOLITAN SEWER DISTRICT OF GREATER CINCINNATI (June 12, 2020), http://www.msdgc.org/about_msd/index.html.  Furthermore, MSD's Rule and Regulations require MSD to follow stringent reporting guidelines to Hamilton County, including providing notice of any legal proceedings.  *See* Metropolitan Sewer District of Greater Cincinnati Rules and Regulations § 2403 (2018).

Furthermore, the allegations in the Amended Complaint also confirm that MSD is controlled by the City and Hamilton County.  (Doc. # 27 ¶¶ 3) (describing the City as the "principal and sole manager of MSD" and acknowledging that Hamilton County "retains the authority to establish sewer service charges, adopt rules and regulations, and approve operating and capital improvement program budgets").  Based on the level of control that the City has over MSD's employees' and daily operations and the level of control Hamilton

County has over MSD's budget and organizational structure, it is clear that MSD is not an independent, suable entity; it is a hybrid subdivision under the joint control of the City and Hamilton County.[5]

In opposition, the Bells argue that MSD is a suable entity because the Kentucky Supreme Court has found that Kentucky sewer districts are suable entities. *Calvert Invs., Inc. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 805 S.W.2d 133, 139 (Ky. 1991). *Calvert*, however, is distinguishable. In *Calvert*, the Court considered whether the Louisville & Jefferson County Metropolitan Sewer District ("Louisville & Jefferson") was a suable entity. *Id.* at 135. Unlike MSD, Louisville & Jefferson is organized under Kentucky law as "a public body corporate, and political subdivision, with power to adopt, use, and alter at its pleasure a corporate seal, sue and be sued, contract and be contracted with, and in other ways to act as a natural person." KY. REV. STAT. § 76.010. MSD does not have similar powers. *See, e.g.*, (Doc. # 13-2 at 9) (the City, not MSD, is the party that contracted with Kokosing to complete the LRV Project). Because MSD has significantly less control over its own operations than Louisville & Jefferson, the Bells' reliance on *Calvert* is misguided.[6] In summary, MSD is merely an extension of the City and Hamilton County without independent control of its operations; thus, it does not have the capacity to be sued and is not a proper party to this case. Accordingly, MSD's Motion to Dismiss

---

[5] MSD's hybrid structure does not change this result. While MSD's organizational structure is atypical, it is clear that MSD does not have independent control of its operations; it is entirely governed by the partnership between the City and Hamilton County. Entities that are merely extensions of either municipalities or counties are not proper parties under Kentucky law. *See Hocker*, 2013 WL 587897, at *4.

[6] Furthermore, the fact that MSD has been named as a party in Ohio state court cases does not, as the Bells claim, (Doc. # 49 at 16), mean that MSD has capacity to be sued in this federal court where MSD's capacity to be sued is governed by Kentucky law.

is **granted**.

### 2.   *Personal Jurisdiction*

#### a.   **Standard of Review**

When a defendant brings a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the burden is on the plaintiff to establish that the court has personal jurisdiction over each defendant.  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  If the court has not conducted an evidentiary hearing,[7] then the plaintiff's burden is "relatively slight," and the plaintiff must only make a prima facie showing of personal jurisdiction.  *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008); *see also Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  A plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [themselves] and the forum state to support jurisdiction.'"  *Neogen*, 282 F.3d at 887 (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987)).  The court views the pleadings, affidavits, and additional evidence in the light most favorable to the plaintiff and "does not weigh the controverting assertions of the party seeking dismissal."  *Theunissen*, 935 F.2d at 1459; *see also Neogen*, 282 F.3d at 887 ("[T]his court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff.").

If the defendant, however, submits "a properly supported motion for dismissal, [then] the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."  *Theunissen*, 935 F.2d at 1458; *see also Parker v. Winwood*, 938 F.3d 833, 839–40 (6th Cir. 2019); *Miller v. AXA*

---

[7]    None of the parties have requested an evidentiary hearing.  *See generally* (Doc. # 40-1, 41-1, 42, 49).

*Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012); *Carrier Corp. v. Outokumpu Oyi*, 673 F.3d 430, 449 (6th Cir. 2012). In the face of "affirmative evidence showing that the court lack[s] jurisdiction," the plaintiff's "mere allegations of jurisdiction are not enough." *Parker*, 938 F.2d at 839–40. If the plaintiff fails to put forth specific facts in opposition of a properly-supported motion to dismiss for lack of personal jurisdiction, then the court will "find personal jurisdiction lacking unless there are sufficient allegations in the complaint to establish personal jurisdiction *which stand unrefuted* by the sworn evidence provided" by the defendant. *Babcock Power, Inc. v. Sterling Grp., LP.*, No. 3:16-cv-789-CRS, 2017 WL 3161624, at *2 (W.D. Ky. July 25, 2017) (emphasis added); *see also Theunissen*, 935 F.2d at 1459 ("[T]he court disposing of a 12(b)(2) motion does not weigh the *controverting* assertions of the party seeking dismissal.") (emphasis added).

A federal court sitting in diversity must look to the law of the forum state to determine the reach of the district court's personal jurisdiction over parties, subject to constitutional due process requirements." *Air Prods. & Controls, Inc. v. Safetech, Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007). Thus, here personal jurisdiction must be proper under both the Kentucky long-arm statute and the federal Due Process Clause. *See id.* "The Kentucky Supreme Court has held that the state's long-arm statute (KY. REV. STAT. § 454.210) does not reach the outer limits of the Due Process Clause." *Hall v. Rag-O-Rama, LLC*, 359 F. Supp. 3d 499, 505 (E.D. Ky. Jan. 8, 2019) (citing *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011)). Therefore, analysis of personal jurisdiction under Kentucky law is a "two-step process." *Newberry v. Silverman*, 789 F.3d 636, 641 (6th Cir. 2015) (citing *Caesars*, 336 S.W.3d at 57). "First, a court must look to see if the cause of action arises from the type of conduct or activity that is enumerated in

the [Kentucky long-arm] statute itself." *Id.* If there is jurisdiction under the long-arm statute, "then the court must assess whether 'exercising personal jurisdiction over the non-resident defendant offends his federal due process rights.'" *Id.*

### b.   Long-arm Statue

The Kentucky long-arm statute provides nine categories of conduct which may subject a defendant to personal jurisdiction in a Kentucky court.  KY. REV. STAT. § 454.210. The plaintiff's claims must "arise from" the enumerated conduct in order for personal jurisdiction to lie.  *Id.* at § 454.210(b)(2).  "A claim 'arises from' certain conduct when there is a 'reasonable and direct nexus' between the conduct causing injury and the defendant's activities in the state."  *Holbrook v. Mazda Motor Corp.*, 6:17-cv-244-DCR, 2018 WL 1571905, at *2 (E.D. Ky. Mar. 30, 2018) (citing *Caesars Riverboat Casino,* 336 S.W.3d at 57).  Courts "ultimately have to depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction," when determining whether the plaintiff's claims arise from the defendants' actions.  *Caesars Riverboat Casino,* 336 S.W.3d at 59.  The Bells appear to argue that this Court has jurisdiction over the City and ATC based on three of the nine categories of conduct enumerated in the Kentucky long-arm statute: "(1) transacting any business in this Commonwealth; (2) contracting to supply services or goods in this Commonwealth; [and] (3) causing tortious injury by an act or omission in this Commonwealth."  (Doc. # 49 at 6) (citing KY. REV. STAT. § 454.210(2)(a)(1)–(3)).[8]  A person is subject to the Kentucky long-arm statute whether he "acts directly or by an

---

[8]      The Bells do not explicitly state that their allegations only fall within these three categories.  *See* (Doc. # 49 at 6–8).  After a careful review of all nine enumerated categories, however, the Court concludes that the three categories listed by the Bells are the only categories applicable to the Defendants' alleged conduct.  Thus, the Court will limit its analysis to whether the Defendants' conduct falls within any of the three categories highlighted by the Bells.

agent."  KY. REV. STAT. § 454.210(2)(a).

There is no agreed-upon interpretation of what it means to "transact any business" in Kentucky under the long-arm statute.  *See Hall*, 359 F. Supp. 3d at 505–06 (collecting cases).  Read most liberally, even the slightest business transaction such as sending emails to a Kentucky resident is sufficient to exercise long-arm jurisdiction over a defendant.  *Id.* at 506 (a defendant corporation transacted business in Kentucky when it "sent emails to a Kentucky resident, knowing he was in Kentucky, and asked him to 'send samples and instructions for his products, which [plaintiff] fulfilled form Kentucky.'" (quoting *Eat More Wings, LLC v. Home Mkt. Foods, Inc.*, 282 F. Supp. 3d 965, 970 (E.D. Ky. 2017))).  A defendant is subject to jurisdiction for "contracting to supply services or goods in this Commonwealth," KY. REV. STAT. § 454.210(2)(a)(2), if the defendant contracts to supply "services or goods to be transported into, consumed or used in Kentucky,"  *Hinners v. Robey*, 336 S.W.3d 891, 896 (Ky. 2011).  The contract itself does not have to be made or executed in Kentucky.  *Id.*  In contrast, under § 454.210(2)(a)(3), the act or omission causing tortious injury must occur in Kentucky.  *See Caesars*, 336 S.W.3d at 57–58; *see also Doe v. Griffin*, No. 2:19-cv-126, 2020 WL 1816139, at *4 (E.D. Ky. Apr. 9, 2020) (collecting cases).

Here, the Bells cite several direct actions that the City and ATC allegedly took which the Bells argue subject them to jurisdiction under the Kentucky long-arm statute. First, the Bells allege that the City "'supervise[d], overs[aw], manage[d], coordinate[d], control[led], and document[ed]' the *entire* sewer project including the decision to dump soil from the sewer project on the Bells' land in Kentucky."  (Doc. # 49 at 6–7) (alterations in original) (quoting (Doc. # 27 at ¶ 30)).  In addition, the Bells claim that the City and ATC

were both "intricately involved in the agreement between Kokosing and the Bells to dump soil on the Bells' property, including reviewing and approving all documentation." *Id.* at 7. The Bells do not clarify, however, how this conduct falls within any of the three identified, enumerated categories of conduct in the long-arm statute. *See id.* at 6–7.

The Bells have not established with reasonable particularity that the City or ATC directly, transacted business, contracted to supply services or goods, or caused tortious injury in Kentucky. Both the City and ATC supported their motions to dismiss with affirmative evidence showing that this Court lacks jurisdiction. (Doc. # 40-1 at 5); (Doc. # 42 at 4). The City submitted an affidavit from Pat Arnette, the Deputy Director of Engineering for MSD and employee of the City. (Doc. # 13-2).[9] Arnette states that the City hired Kokosing to serve as the general contractor of the Sewer Project and testifies that the "City performed the Lick Run project entirely in Ohio." *Id.* at 2–3. Arnette claims that "prior to learning that Kokosing had placed fill material on the Bells' property, the City had no contacts with Kentucky on the Lick Run project," including any interaction with the Bells. *Id.* at 3. The City also attached a copy of the contract between itself and Kokosing, which states that "[t]he City shall not supervise, direct, or have control or authority over, nor be responsible for, [Kokosing's] means, methods, techniques, sequences, or procedures of construction." *Id.* at 32. Similarly, ATC supports its Motion to Dismiss with an affidavit from Michael Luessen, a Principal of ATC. (Doc. # 42-1). Luessen states

---

[9] Arnette's affidavit was an exhibit to the City's original motion to dismiss, which was denied without prejudice with right to renew after the Bells filed the Amended Complaint (Doc. # 34). Because Arnette's affidavit has been filed in the record, the Court will consider it as support of the City's current Motion to Dismiss, even though it was not attached to the Motion currently before the Court. *See Kepley v. Lanz*, No. 3:10-cv-695-CRS, 2015 WL 1978706, at *6–7 (W.D. Ky. May 1, 2015) (relying on a declaration attached to an earlier motion to find that the court lacked personal jurisdiction over the defendant).

that "prior to and during the [fill] material placement activities described in the complaint of Plaintiffs, ATC had no knowledge of Plaintiffs or Plaintiff's property and had no interaction with Plaintiffs in the Commonwealth of Kentucky or otherwise." *Id.* at 1.  ATC also "never entered the [Bells'] property" and "did not perform any services consulting or otherwise related to the [Lick Run Project] within the Commonwealth of Kentucky before the cessation of the material placement activities described in the complaint." *Id.* at 2.

Since both the City and ATC properly-supported their Motions to Dismiss, the Bells cannot "stand on [their] pleadings." *Theunissen*, 935 F.2d at 1458.  They must "set forth specific facts showing that the court has jurisdiction." *Id.*  Despite this clear warning, however, the Bells continue to try and stand on their pleadings.  They argue that the City and ATC are subject jurisdiction based solely on the allegations in the Amended Complaint.  *See* (Doc. # 49 at 6–8) (citing the Amended Complaint).  The Bells do not submit an affidavit in support or otherwise provide supplementary support to their Amended Complaint.  Accordingly, the Bells have not met their evidentiary burden.  *See Theunissen*, 935 F.2d at 1458.  Because the Bells have not met their evidentiary burden, the Court will only consider those facts in the Amended Complaint that are unrefuted by the City and ATC's affidavits.  *Babcock Power*, 2017 WL 3161624, at *2; *see also BlackJack Sulky, Ltd. v. Evolution Racing L.L.C.*, No. 5:04-CV-780, 2005 WL 8166101, at *4 (N.D. Ohio Apr. 14, 2005) (accepting the statements in the defendant's affidavit after the plaintiff failed to set forth specific facts showing that the court had jurisdiction).

The City's and ATC's affidavits directly contradict the Bells' claim in the Amended Complaint that the Defendants were intricately involved in the agreement between Kokosing and the Bells.  (Doc. # 27 ¶¶ 68, 70).  Specifically, the City and ATC claim that

21

they did not learn about Kokosing's contract with the Bells until after Kokosing had deposited contaminated soil on their property.  *See* (Doc. # 13-2); (Doc # 42-1).  The City and ATC's declaration is further supported by the Bells' own allegations in the Amended Complaint.  *See* (Doc. # 27 at ¶ 71) (citing a letter from MSD to Kokosing which stated that Kokosing deposited 30k of soil to the Bells' property before submitting paperwork to the City).  Because the City and ATC deny that they supervised Kokosing's contract with the Bells and because the Bells failed to submit specific facts refuting the Defendants' claim, the Bells cannot rely on the City and ATC's alleged approval and supervision of Kokosing as a basis for jurisdiction.[10]

Moreover, ATC's direct contacts with Kentucky are also insufficient to bring it within the reach of Kentucky's long-arm statute.  According to ATC's unrefuted affidavit, ATC was not involved with the Bells, either in Ohio or Kentucky, until after the contaminated fill material was placed on the Bells' property; ATC did not even know that Kokosing had contracted with the Bells.  (Doc. # 42-1).  After ATC learned of the contamination, it did additional testing of the soil on the Bells' property and created a Corrective Action Plan to remedy the contamination of the Bells' property under the direction of the Superfund Branch of Kentucky Division of Waste Management.  (Doc. # 27 ¶¶ 190–208).   Even if

---

[10]    Even if the City and ATC did not deny the Bells' allegations, the Defendants' supervision and approval of Kokosing's contract with the Bells likely does not fall within any of the categories of conduct enumerated in the Kentucky long-arm statute.  Approval and supervision of another parties' contract has not been recognized as either transacting business or contracting for services or goods in Kentucky.  *See Preferred Care of Delaware*, No. 5:15-cv-88-KKC-EBA, 2016 WL 2593924, at *6 (E.D. Ky. May 4, 2016) ("[O]ne corporation's acts within a forum cannot be imputed to a related corporation to establish jurisdiction."); *Modern Holdings, LLC v. Corning Inc.*, No. 5:13-cv-405-GFVT, 2015 WL 1481443, at *7 (E.D. Ky. Mar. 31, 2015) ("[T]he actions of a subsidiary within a forum cannot be imputed to a foreign parent corporation in order to establish jurisdiction."); *Clark v. Kolbell*, No. 2014-CA-000747-MR, 2016 WL 304625, at *4 (Ky. Ct. App. Jan. 22, 2016) (an out-of-state physician who was contracted by a third-party to review plaintiff's medical report did not transact business in Kentucky).

these activities are enough to qualify as transacting business under Kentucky's long-arm statute, the Court could still not exercise jurisdiction over ATC because the Bells' claims do not arise from ATC's activities in Kentucky.  *Caesars*, 336 S.W.3d at 59 (finding that there must be "a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm-jurisdiction").  Here, ATC's activities in Kentucky would not constitute even a but-for cause of the Bells' injuries; ATC did not become involved in the Bells' affairs until *after* the injuries occurred.  (Doc. # 42-1); *see also Caesars*, 336 S.W.3d at 58–59 (holding that but-for causation is insufficient).  Therefore, the Bells cannot rely on ATC's limited direct conduct in Kentucky to prove personal jurisdiction.

Similarly, the Bells cannot rely on the City's direct contacts with Kentucky to establish jurisdiction.  Like ATC, the City did not take any action in Kentucky until after the contaminated fill material was placed on the Bells' property.  (Doc. # 27 ¶¶ 190–208).  On November 3, 2017, City engineer Raymond Schork and another City engineer also visited the Bells' property to inspect the alleged contamination.  *Id.* at ¶ 169.   On November 24, 2017, Mr. Bell also called Schork to ask him about the contaminated soil on his property.  *Id.* at ¶ 179.  On November 27, 2017, Schork emailed Mr. Bell a response stating that "'the dark dirt' did not come from the City's sewer project."  *Id.* ¶ 180.  Additionally, like ATC, the City took part in remediation negotiations under the direction of the Superfund Branch of Kentucky Division of Waste Management after the contamination was discovered.  *Id.* at ¶¶ 190–208.  The Bells argue that these limited direct contacts with Kentucky are enough to find that the City transacted business in Kentucky.  (Doc. # 49 at 6–7).  However, these contacts cannot support personal

jurisdiction over the City, because the Bells' claims do not arise from the City's activities in Kentucky. *Caesars*, 336 S.W.3d at 59. There is no reasonable and direct nexus between either the engineer's visit to the Bells' property or Schork's email to Mr. Bell in November 2017 and the injuries the Bells suffered through the contamination of their land in September and October of 2017.

Finally, the Bells contend that this Court has personal jurisdiction over the City and ATC because Kokosing was their agent operating in Kentucky. *Id.* at 7–8. While a defendant may be subject to jurisdiction through the actions of its agent, *see* KY. REV. STAT. § 454.210(2)(a), the Bells have not met their burden to prove that Kokosing was acting as the City or ATC's agent. Both the City and ATC have submitted affidavits denying that Kokosing acted as their agent in contracting with the Bells. (Doc. # 13-2) (affidavit from City employee) ("[Kokosing] is not the City's agent."); (Doc. # 42-1) (affidavit from ATC employee) (stating that ATC had no knowledge of Kokosing's agreement with the Bells until after the excavation work had stopped). Because the Defendants supported their motions to dismiss with specific facts and evidence, the Bells cannot stand on their pleadings. *See Theunissen*, 935 F.2d at 1458. The Bells, however, attempt to do just that when making this argument. (Doc. # 49). Because the Bells have failed to meet their burden of proof, the Court will not accept their unsupported allegations that Kokosing was acting as the City and ATC's agent.

In conclusion, the Bells have failed to demonstrate with reasonable particularity sufficient contacts between either the City or ATC and Kentucky to establish personal jurisdiction. While the Plaintiffs' burden is relatively slight, the Bells cannot merely rely on their pleadings in the face of Defendants' affidavits refuting jurisdiction. Despite this

clearly-established principle, the Bells have not provided any additional evidence beyond the allegations in the Amended Complaint.  Without additional evidence, the Court can consider only the facts in the Amended Complaint that are unrefuted by the City and ATC, which are insufficient to establish jurisdiction under the Kentucky long-arm statute.  Since there is no jurisdiction under the long-arm statute, the Court will stop at step one and not consider whether there is jurisdiction under the federal Due Process Clause.  Accordingly, as the Court does not have personal jurisdiction over the City and ATC, the City and ATC's Motions to Dismiss are **granted**.[11]

## B.     Failure to State a Claim

Having resolved the threshold consideration brought by the City, MSD, and ATC, the Court will next consider Defendant Kokosing and Defendant Ashcraft's Motions to Dismiss for failure to state a claim.  (Docs. # 37 and 38).

### 1.     *Standard of Review*

In order "to survive a motion to dismiss, a complaint must contain factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint does not have to show that liability is probable, "but asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In adjudicating a motion to dismiss, the Court accepts all allegations in the complaint as true and considers them in the light most favorable to the plaintiff.  *Hill v.*

---

[11]     Because the Court lacks personal jurisdiction over the City, the Court need not consider whether the City is protected by immunity.

*Snyder*, 878 F.3d 193, 203 (6th Cir. 2017) (citing *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570).  It need not, however, "accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555.  Merely stating the elements of a claim is insufficient; while "legal conclusions can provide the framework of the complaint, they must be supported by factual allegations."  *Ashcroft*, 556 U.S. at 678–79.  The Court "may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein."  *DeJohn v. Lerner, Sampson & Rothfuss*, No. 1:12-cv-1705, 2012 WL 6154800, at *2 (N.D. Ohio Dec. 11, 2012) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).  Considering documents beyond these converts a motion to dismiss into a motion for summary judgment.  *Spencer v. Grand River Nav. Co., Inc.*, 644 F. App'x 559, 561–62 (6th Cir. 2016) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

Here, the Bells attached several documents to their Amended Complaint: a summary of bids for the LRV Project, (Doc. # 27-1), the Waste Agreement, (Doc. # 27-2), site drawings from the LRV Project, (Doc. # 27-3), letters between Kokosing and the City, (Docs. # 27-5, 27-8, 27-9, and 27-10), and pictures of the Bells' property, (Docs. # 27-3, 27-6, 27-7, and 27-11).  All of the attached documents are referenced in the Complaint, *see* (Doc. # 27 at ¶¶ 1, 8, 19), and are central to the claims therein; thus, they may be considered by the Court in evaluating the present Motion, *Burns v. United States*, 542 F. App'x 461, 466 (6th Cir. 2013) (citing *Commercial Money Ctr., Inc.*, 508 F.3d at 336); *Bassett*, 528 F.3d at 430 (citing *Amini*, 259 F.3d at 502).

##### 2.    *Choice of Law*

Federal courts in diversity cases[12] apply the substantive law of the state in which the court sits, *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (discussing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)); this includes that state's choice-of-law rules, *Phelps v. McClellan*, 30 F.3d 658, 661 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820 (6th Cir. 1990)).   Kentucky has different choice-of-law rules for cases that sound in tort versus those that sound in contract.  *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707 (E.D. Ky. 2013) (citing *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009)).   In all cases, however, there is a "strong preference" for the law of the Commonwealth to apply to cases brought in Kentucky courts.  *Wells Fargo Fin. Leasing, Inc.*, 970 F. Supp. 2d at 707 (collecting cases).   The parties do not appear to dispute that Kentucky law applies to the claims currently before the Court, *see generally* (Doc. # 38) (Kokosing applying Kentucky law to the state-law claims); (Doc. # 37) (Ashcraft applying Kentucky law to the state-law claims) (Doc. # 50) (the Bells applying Kentucky law to the state-law claims), and the Court agrees that Kentucky law is appropriate here.

For tort claims, Kentucky law will apply if there are any "significant contacts—not necessarily the most significant—with Kentucky."[13]  *Foster v. Leggett*, 484 S.W.2d 827,

---

[12]     While the majority of the Bells' claims are state-law claims brought under diversity jurisdiction, Count XII is a federal RICO claim brought under 18 U.S.C. § 1962.  (Doc. # 27 at ¶¶ 335–79).  Thus, the Court will apply federal law to the RICO claim.

[13]     There is some suggestion "that Kentucky may have abandoned the 'any significant contact' test in tort cases for the 'most significant contact' test."  *Cutter v. Ethicon, Inc.*, 5:19-cv-443-DCR, 2020 WL 109809, at *4 n.4 (E.D. Ky. Jan. 9, 2020) (citing *Kirilenko v. Kirilenko*, 505 S.W.3d 766, 769 (Ky. 2016)).  It is "unclear, however, because *Kirilenko* was a divorce case that did not involve a tort claim" and "supports [the apparent principle that the most significant contact test is applied to tort claims] by citing to a *Saleba* footnote that explicitly endorses the 'any

829 (Ky. 1972); *see also Saleba*, 300 S.W.3d at 181; *Brewster v. Colgate-Palmolive Co.*, 279 S.W.3d 142, 145 n.8 (Ky. 2009).  Thus, Kentucky law applies here because the Bells are residents of Kentucky and, therefore, the tort claims brought by the Bells have a significant contact to Kentucky.  *Warndorf v. Otis Elevator Co.*, No. 2:17-cv-159-DLB-CJS, 2019 WL 137585, at *2 (E.D. Ky. Jan. 8, 2019) (Kentucky law governs tort claims brought in Kentucky when the plaintiff is a Kentucky resident) (citing *Aces High Coal Sales, Inc. v. Cmty. Tr. & Bank of W. Ga.*, No. 2:15-cv-161-DLB-HAI, 2017 WL 3122661, at *12 (E.D. Ky. July 21, 2017)).

While the test applied to contracts claims is less straightforward, the Court finds that Kentucky law also applies to the contract issues underlying the Bells' claims.  In general, Kentucky law applies in contract cases when Kentucky meets "the 'most significant contacts' test, set forth in § 188 of the Restatement (Second) of Conflict Laws."[14]  *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 981 (E.D. Ky. 2016) (citing *Saleba*, 300 S.W.3d at 181).  It is less clear, however, what test applies when the contract in question contains a choice-of-law provision.[15]  The Waste Agreement included a

---

significant contact' test for choice of law determinations regarding tort claims."  *Id.* (citing *Saleba*, 200 S.W.3d at 182 n.2).

[14]   This section of the Restatement directs a Court to consider the following factors to determine which law applies to a contract "[i]n the absence of an effective choice of law by the parties": "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (AM. LAW INST. 1971).  The Restatement notes that the "contacts are to be evaluated according to the relative importance with respect to the particular issue" and often when a contract is negotiated and performed in the same state, that state's law will apply unless an exception in §§ 189–199, 203 of the Restatement applies.  *Id.*

[15]   In *Wallace Hardware Co., Inc. v. Abrams*, the Sixth Circuit found that Kentucky courts apply § 187 of the Restatement (Second) of Conflict Laws to contracts with an express choice-of-law provisions.  223 F.3d 382, 398 (6th Cir. 2000).  Under § 187, the court should follow the parties' choice of law provision unless (1) "the chosen state has no substantial relationship to the

choice-of-law provision, but it is unclear.   (Doc. # 27-2).   Section 17 of the Kokosing

Contract states in full:

> Kentucky Law to Apply: This Agreement shall be construed under and in
> accordance with the laws of the State of Ohio, and all obligations of the
> parties created hereunder are to be performed in Campbell County,
> Kentucky.

*Id.* at 4.   Someone, presumably Mr. Bell, crossed out "Campbell" and wrote in "Kenton."

*Id.; see also* (Doc. # 27-1 at ¶ 88) ("David Bell also wrote . . . 'Kenton' to Section 17 of the

form contract to reflect the proper county in which his property was located.").   Given the

references that seem to suggest both Kentucky law and Ohio law should apply, Section

17 cannot be interpreted as an express choice-of-law provision; at best, it is ambiguous

regarding whether Kentucky or Ohio law governs the contract.   Accordingly, the Court will

apply the most-significant-contacts test of § 188 of the Restatement rather than § 187.

Kentucky clearly has the most-significant contacts with this dispute.   Among other things,

the Bells allege that they negotiated the contract in Kentucky, Mr. Bell signed the contract

in Kentucky, and the place of performance was the Bells' property in Kentucky.   (Doc. #

27 at ¶¶ 59, 75, 89); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 188.

---

parties or the transaction and there is no other reasonable basis for the parties' choice," or (2)
"application of the law of the chosen state would be contrary to a fundamental policy of a state
which has a materially greater interest." *Wallace Hardware*, 223 F.3d at 398 (quoting § 187 of the
Restatement (Second) of Conflict Laws).   The Kentucky Supreme Court, however, has recently
called *Wallace*'s holding into question.   *See Schnuerle v. Insight Commc'n Co., L.P.*, 376 S.W.3d
561, 566–67 (Ky. 2012).   There, the Kentucky Supreme Court rejected a choice-of-law provision
which stated that New York law should apply, instead applying Kentucky law because Kentucky
had "the greater interest and the most significant relationship to the transaction and the parties."
*Id.* at 567 (quoting *Breeding v. Massachusetts Indem. And Life Ins. Co.*, 633 S.W.2d 717, 719
(Ky. 1982)).   Several of our sister courts, however, have distinguished *Schnuerle* and continued
to adhere to *Wallace.   See GEICO Indem. Co. v. Crawford*, 36 F. Supp. 3d 735, 741 (E.D. Ky.
2014); *CNH Capital Am. LLC v. Hunt Tractor, Inc.*, No. 3:10-cv-350, 2013 WL 1310878, at *9–10
(W.D. Ky. Mar. 26, 2013) ("*Schnuerle* did not repudiate *Wallace Hardware*'s holding on choice-
of-law provisions in commercial contracts."), *aff'd in part and rev'd in part on other grounds*, 568
F. App'x 461 (6th Cir. 2014).

"[B]ecause the parties agree that Kentucky law should apply to the substantive claims and Kentucky appears to have the 'most significant contacts' to the facts underlying [the Bells'] alleged injuries, the Court will apply Kentucky law to the substantive issues without belaboring the choice of law analysis."  *Cutter*, 2020 WL 109809, at *4.

### 3.    *Civil Conspiracy*

Before considering the Bells' substantive claims, the Court must address whether a conspiracy existed between the Defendants.    Many of the Bells' claims rely on allegations that the Defendants were involved in "a sophisticated conspiracy . . . to illegally dispose of contaminated soil on the Bells' residential property rather than in a licensed landfill."   (Doc. # 50 at 1); *see also* (Doc. # 27 at ¶¶ 249, 267, 274, 282, 289, 297, 300, 332, and 336) (alleging that a civil conspiracy motivated each substantive claim).   The Bells argue that as coconspirators, each defendant is liable for both their own actions and the actions of their codefendants.   *Id.* at 12; *see also Ky. Speedway, LLC, v. Nat'l Ass'n of Stock Car Racing, Inc.*, 410 F. Supp.2d 592, 599 (E.D. Ky. 2006) ("Every member of the conspiracy is liable for the acts of every other member.").   The Defendants, however, argue that there was no conspiracy.   (Doc. # 38 at 2).   If there was no conspiracy, then the Bells' must rely on the individual actions of each defendant to prove their substantive claims.

A civil conspiracy is not a free-standing claim in Kentucky: "[I]t merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Christian Cty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 458–59 (6th Cir. 2013) (quoting *Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, Nos. 2008-CA-002389-MR, 2009-CA-000026-MR, 2010 WL 2696278, at *13 (Ky. Ct.

App. July 9, 2010)).  There are four elements to a civil conspiracy: "(1) an agreement or combination, (2) that is unlawful or corrupt, (3) entered into by two or more persons, (4) for the purpose of accomplishing an unlawful goal."  *Vivid Impact Co., LLC v. Ellis*, 3:17-CV-509-JHM, 2017 WL 5505024, at *5 (W.D. Ky. Nov. 16, 2017) (citing *Ellington v. Fed. Home Loan Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W.D. Ky. 2014)); *see also James v. Wilson*, 95 S.W.3d 875, 897 (Ky. Ct. App. 2002).  Put another way, the plaintiffs must show "that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act."  *Peoples Bank of N. Ky. v. Crowe Chizek & Co., LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995), *overruled on other grounds*, *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229 (Ky, 2013)).

Here, the Bells do not allege specific facts to support the existence of a conspiracy. Critically, there are no allegations that the Defendants acted pursuant to a common design or rendered substantial assistance to one another to "illegally dispose of contaminated soil on the Bells' residential property."  (Doc. # 50 at 1).  Based on the Amended Complaint's description of the communication between the Defendants, it appears that there was no agreement between the Defendants about the disposal of fill material on the Bells' property.  For example, the Bells allege that Kokosing deposited a large quantity on the Bells' property *before* seeking the City and MSD's approval to deposit fill material on the Bells' property, which suggests no overarching agreement among the parties.  (Doc. # 27 at ¶ 71).  The Bells describe in detail how Kokosing repeatedly sent letters to the City, MSD, and ATC asking that the other defendants verify that the fill material being placed on the Bells' property was uncontaminated, *see, e.g.*,

*id.* at ¶¶ 142, 145, which suggests that Kokosing was not working in combination with the other defendants to illegally dispose of contaminated fill material.   The Bells also fail to allege that there was any agreement between Kokosing and Ashcraft to conspire to illegally deposit contaminated soil; rather, it appears that Ashcraft was simply contracted to truck the soil from the LRV Project to the Bells' property.  *See id.* at ¶¶ 6, 139.  Finally, the Bells admit that once it was discovered that contaminated fill material had been deposited on their property, the Defendants started to blame each other.  *Id.* at ¶ 171.  In sum, the Bells have failed to present factual allegations which plausibly state that an agreement existed among the Defendants to illegally dispose of contaminated fill material. Accordingly, the Court finds that there was no conspiracy between the Defendants, and the Bells can only rely on the individual actions of each Defendant to prove each substantive claim.

### 4.   *The Bells' Claims*

The Bells bring fourteen claims in their Amended Complaint: breach of contract, promissory estoppel, equitable estoppel, fraudulent misrepresentation, negligence, negligence per se, intentional trespass, violation of the Kentucky Consumer Protection Act ("KCPA"), criminal mischief, punitive damages, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), joint venture, and takings.  *See generally* (Doc. # 27).   The first three claims—breach of contract, promissory estoppel, and equitable estoppel—are only against Kokosing.  *Id.*  Kokosing does not move to dismiss the breach of contract claim in its motion to dismiss.  (Doc. # 38 at 1).  The remaining claims, with the exception of the takings claim which is only against the City and MSD,[16] are against

---

[16]      The Court need not consider the Bells' taking claim since the City and MSD have been dismissed from this action.

all the Defendants.  *Id.*  The Court will address the two contested claims against only Kokosing first and then consider the remaining claims as they relate to both Kokosing and Ashcraft, the two remaining defendants.  When there are relevant factual distinctions between Kokosing's and Ashcraft's conduct, the Court will separate the analysis for each Defendant.

### a.      Promissory Estoppel

The first claim that Kokosing challenges is the Bells' promissory estoppel claim. The Bells argue that they are bringing a promissory estoppel claim "[i]n the alternative— if Defendant Kokosing alleges in its defense that there was no valid contract with Plaintiffs."  (Doc. # 27 at ¶ 233).  The Bells claim that Kokosing promised that only clean, uncontaminated fill material would be placed on their property and that Kokosing would "indemnify and hold Plaintiffs harmless from all costs and expenses arising from and/or related to dumping and spreading fill material on Plaintiffs' property."  *Id.* at ¶¶ 234–37. In response, Kokosing argues that the Bells' promissory estoppel claim should be dismissed because "Kokosing agrees that the relationship between it and the Plaintiffs was contractual in nature" and "promissory estoppel is not an alternative claim to a breach of contract and may not be used as a means to create terms not contained with a written agreement signed by the parties."  (Doc. # 38 at 1).

Under Kentucky law, there are four elements to a promissory estoppel claim: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise."  *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 778 (E.D. Ky. 2019) (quoting *Schlenk v.*

*Goodwill Indus. of Kentucky, Inc.*, 3:16-cv-00601-JHM, 2016 WL 6836945, at \*3 (W.D. Ky. May 28, 2019)); *see also Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009).  A mere formulaic pleading that a defendant made a promise is insufficient; rather a complaint must identify a specific promise that the plaintiff relied upon to his or her detriment.  *Kallick v. U.S. Bank Nat'l Ass'n*, No. 2:12-cv-106-DLB-CJS, 2012 WL 5178152 at \*4 (E.D. Ky. Oct. 18, 2012).   The purpose of the promissory-estoppel doctrine is to allowed certain gratuitous promises that would otherwise be unenforceable for lack of consideration to be enforced.  *Arnold*, 392 F. Supp. 3d at 778.

Promissory estoppel "is 'fundamentally different from a contract.'"  *Id.* (quoting *Jan Rubin Assocs., Inc. v. Hous. Auth. of Newport*, No. 2:03-cv-160, 2007 WL 1035016, at \*13 (E.D. Ky. Mar. 30, 2007)).  Because promissory estoppel "is not intended to provide an alternative to a breach of contract claim, where a contract exists on the subject matter of the alleged promise sought to be enforced, a claim for promissory estoppel is not cognizable."  *Jan Rubin*, 2007 WL 1035016, \*14 (citing *Shane v. Bunzl Distrib. USA, Inc.*, 200 F. App'x 397, 404 (6th Cir. 2006)) (affirming the "widely accepted principle that promissory estoppel is applicable only in the absence of an otherwise enforceable contract" on the subject matter); *see also Davis*, 399 F. Supp. 2d at 799 ("[A]n oral promise made prior to the execution of a written agreement that is inconsistent with the unambiguous terms of the written agreement cannot form the basis of a promissory estoppel claim.").

Here, the Bells' promissory estoppel claim should be dismissed.  As an initial matter, there is no need for the Bells' to bring the promissory estoppel claim "[i]n the alternative" because Kokosing agrees with the Bells' that there was a valid contract

between the parties.  (Doc. # 38 at 5) ("Kokosing agrees that the relationship between it and the Plaintiffs was contractual in nature."); *see also* (Doc. # 54 at 3) ("[T]he validity of the Waste Agreement is not at issue.").  Furthermore, while the Bells are correct that the Federal Rules of Civil Procedure allow plaintiffs to plead alternative and even inconsistent claims for relief, *see* FED. R. CIV. P. 8(d), under Kentucky law, a plaintiff cannot bring a claim for promissory estoppel if there is a valid contract that covers the same subject matter.[17]  *Jan Rubin*, 2007 WL 1035016, at *14.  Thus, the Bells' promissory estoppel claim also fails because Kokosing's alleged promises that form the basis of the promissory-estoppel claim mirror the terms of the Waste Agreement.  *Compare, e.g.*, (Doc. # 27 at ¶ 234) (alleging that Kokosing promised that fill material would be free of contaminates), *with* (Doc. # 27-2) ("waste material shall not contain any contaminants"); *compare* (Doc. # 27 at ¶ 237) (alleging that Kokosing promised to indemnify and hold Plaintiffs harmless), *with* (Doc. # 27-2 at 3) (discussing indemnification).  Accordingly, Kokosing's motion to dismiss the promissory-estoppel claim is **granted**.

### b.    Equitable Estoppel

Second, the Bells bring an equitable estoppel claim against Kokosing.  (Doc. # 27 at ¶¶ 239–46).  Like their promissory estoppel claim, the Bells argue that if "[i]n the alternative . . . Kokosing alleges in its defense that there was no contract with Plaintiffs," then Kokosing is still liable under a theory of equitable estoppel for "repeatedly [making]

---

[17]    The Bells mistakenly rely on *North Atlantic Operating Co. v. ZZSS, LLC* to argue that "a plaintiff is 'permitted to plead promissory estoppel as an alternative to breach of contract.'" (Doc. # 50 at 6) (quoting *N. Atl. Operating Co. v. ZZSS, LLC*, No. 3:17-cv-214, 2018 WL 1411266, at *4 (W.D. Ky. Mar. 21, 2018)).  In *N. Atl. Operating Co.*, however, the validity of the contract between the parties was in question.  *N. Atl. Operating Co.*, 2018 WL 1411266, at *4.  Here, Kokosing is not disputing the validity of the Waste Agreement, so *North Atlantic Operating Co.* does not apply. (Doc. # 54 at 3) ("Kokosing does not . . . deny that it contracted with the Bells.").

multiple false and misleading statements and representations to Plaintiffs to induce them to unknowingly accept contaminated fill material."  *Id.* at ¶ 240.  Kokosing again argues that the equitable estoppel claim should be dismissed because the parties agree that their dispute is governed by contract and because equitable estoppel is not an affirmative claim.  (Doc. # 38 at 6).

"Equitable estoppel is a *defensive* doctrine founded on the principles of fraud, under which one party is prevented from taking advantage of another party whom it has falsely induced to act in some injurious or detrimental way."  *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594–95 (Ky. 2012) (emphasis added); *see also Williams v. Hawkins*, 594 S.W.3d 189, 193 (Ky. 2020) ("Equitable estoppel precludes a defendant, because of his own wrongdoing, from using the statute of limitations as a defense.").[18]  The essential elements of equitable estoppel are: (1) false representation or concealment of material facts "calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;" (2) the intent or knowledge that the other party will rely on the false representation of concealment; and (3) "knowledge, actual or constructive, of the real facts."  *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 62 (Ky. 2010).

---

[18]    The Bells dispute the idea that equitable estoppel is always a defensive doctrine under Kentucky law.  (Doc. # 50 at 6) (citing *Ky. Ret. Sys. v. Fryrear,* 316 S.W.3d 307, 314 (Ky. App. 2009); *Elec. & Water Plant Bd. v. Suburban Acres Dev., Inc.*, 513 S.W.2d 489, 491 (Ky. 1974)). The cases the Bells rely on, however, were published before *Ping*.  Additionally, neither case involves a plaintiff affirmatively seeking damages under a claim of equitable estoppel.  *See Fryrear*, 316 S.W.3d at 314 (holding that the defendant is estopped from denying the plaintiff retirement benefits); *Elec. & Water Plant*, 513 S.W.2d at 491 (finding that defendant is estopped from denying water service to the plaintiffs). Thus, the Bells' argument that equitable estoppel is an affirmative action in addition to a defensive action lacks support.

Here, the Bells' equitable estoppel claim should be dismissed because Kokosing does not deny the validity of the Waste Agreement.  (Doc. # 54 at 3).  The Bells only brought the equitable estoppel claim "in the alternative—if Defendant Kokosing alleges in its defense that there was no contract with Plaintiff," (Doc. # 27 at ¶ 240).  Since Kokosing does not deny that it had a valid contract with the Bells, Kokosing's motion to dismiss the equitable-estoppel claim is **granted**.

### c.      Fraudulent Misrepresentation

Next, the Bells bring a claim for fraudulent misrepresentation against all Defendants.  (Doc. # 27 ¶¶ 247–65).  The Bells allege that the Defendants made a wide array of false representations.  *Id.*  For example, the Bells claim that prior to signing the Waste Agreement, Kokosing represented to the Bells that it would only dump clean fill material on their property and that Kokosing "explicitly represented in the [Waste Agreement] that such fill material 'shall not contain any contaminants as defined by state and/or/federal law.'"  *Id.* at ¶¶ 250–51.  They also allege that each Defendant made false and willful representations that the fill material was safe and uncontaminated.  *Id.* at ¶¶ 252–65.    Kokosing and Ashcraft both argue that the Bells' fraudulent misrepresentation claim should be dismissed for failure to meet the particularity requirement under Federal Rules of Civil Procedure 9(b).  (Docs. # 38 at 6–9 and # 37 at 6–7).  Additionally, Kokosing argues that the claim against it should be dismissed because it is duplicative of the Bells' breach-of-contract claim.  (Doc. # 38 at 6–9).

Claims of fraud brought in federal court must be stated "with particularity."  FED. R. CIV. P. 9(b).  A plaintiff must, at a minimum, "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the

fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (quoting *Ballan v. Upjohn Co.*, 814 F. Supp. 1375, 1385 (W.D. Mich. 1992)); *see also Newberry v. Silverman*, 789 F.3d 636, 645 (6th. Cir. 2015) ("[A] plaintiff must (1) 'specify the allegedly fraudulent statements,' (2) 'identify the speaker,' (3) state 'when and where the statements were made,' and (4) 'explain what made the statements fraudulent.'"). State-law fraudulent misrepresentation claims[19] brought in federal court must also meet the heightened pleading standard of FED. R. CIV. P. 9(b). *Newberry*, 789 F.3d at 645. The particularity requirement of Rule 9(b), however, must also be read "in harmony" with the "short and plain statement of the claim" requirement of Federal Rule of Civil Procedure 8. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006). The purpose of the particularity requirement is to give the defendant sufficient notice of the alleged misrepresentation to allow them to adequately respond to the plaintiff's claim; it should be interpreted liberally. *Coffey*, 2 F.3d at 162.

When there are multiple defendants, the plaintiff must specify which defendant made each allegedly fraudulent misrepresentation so that "a particular defendant [can] determine with what it is charged." *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992). If the defendant is a corporation, however, the plaintiff does not need to identify "the corporation's individual employee who made the alleged fraudulent misrepresentation" as long as the plaintiff identifies the "particular corporate defendant as

---

[19]   Under Kentucky law, a fraudulent misrepresentation claim "requires proof that: (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff." *Giddings & Lewis, Inc. v. Indus. Rick Insurers*, 348 S.W.3d 729, 747 (Ky. 2011).

well as the 'time, place, and content of the alleged misrepresentation.'" *Newberry v. Service Experts Heating & Air Conditioning, LLC*, 806 F. App'x 348, 362 (6th Cir. 2020) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007)).  Claims against "the defendants" are insufficient.  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551–52 (6th Cir. 2012) (collecting cases).  Additionally, while the plaintiff does not need to allege a specific date, the court considers the omission of precise dates when evaluating the specificity of the plaintiff's allegations.  *Ashland Inc. v. Oppenheimer & Co., Inc.*, 689 F. Supp. 2d 874, 883 (E.D. Ky. 2010) ("Although the omission of precise dates is not automatically fatal to the complaint, it ultimately undermines [the plaintiff's] allegations by making it difficult to assess whether the statements in question were false or misleading when made and the materiality of any omission.).

### i.   Ashcraft

Here, the Bells have failed to sufficiently plead a fraudulent misrepresentation claim against Ashcraft.  Most of the Bells' allegations against Ashcraft fail to meet even the basic "time, place, and content" requirement of Rule 9(b).  Many of the facts supporting the Bells' fraudulent misrepresentation claim against Ashcraft rely on the alleged conspiracy between the Defendants.  *See, e.g.*, (Doc. # 27 at ¶ 249).  These allegations cannot support a fraudulent misrepresentation claim against Ashcraft, however, because there was no civil conspiracy among Defendants.  *See supra* Part II(B)(3) (finding that no conspiracy existed among Defendants).  Additionally, allegations that "Defendants made [ ] material false misrepresentations," *see, e.g.*, (Doc. # 27 ¶¶ 255–57), fail to properly identify which Defendant made the disputed representation.[20]

---

[20]     Throughout the Amended Complaint, the Bells argue that Ashcraft was an agent of Kokosing.  *See, e.g.*, (Doc. # 27 at ¶¶ 74, 148).  The Bells do not provide any facts, however, that

*See Cataldo*, 676 F.3d at 551–52.  In total, the Bells only make one allegation against Ashcraft that satisfies the "time, place, and content" requirement; the Bells claim that "beginning on or about October 2, 2017" Ashcraft truck drivers told the Bells that the fill material "was just old 'city dirt' form the westside of Cincinnati."  (Doc. # 27 at ¶ 149). This allegation still fails the 9(b) test, however, because the Bells have not demonstrated "a sufficient factual basis to support an inference that [Ashcraft's statement that the fill material was "just city dirt" was] knowingly made."  *Coffey*, 2 F.3d at 162.  Stated another way, the Amended Complaint does not state a plausible claim that Ashcraft acted with a fraudulent intent or knew that the fill material was contaminated.  The only factual allegation in the Amended Complaint that suggests Ashcraft may have known at the time that the fill material it delivered to the Bells' property was contaminated is an email Ashcraft sent to the Bells on January 9, 2018.[21]  *Id.* at ¶¶ 110, 135.  In the email, Ashcraft describes the number of loads of soil it deposited at the Bells' property from September 29, 2017 to October 16, 2017.  *Id.* at ¶ 135.  The email states that "all soil hauled to [the Bells' property] was black in color and questioned about color of it."  *Id.* at ¶¶ 110, 135.

---

support the allegation that Ashcraft was Kokosing's agent.  *See generally, id.*  Whether Ashcraft was acting as Kokosing's agent is a legal conclusion, which the Court will not accept without factual support.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Thus, the Court will not attribute statements that the Bells' allege were made by "Kokosing's representative and agents, including Ashcraft," *see, e.g.*, (Doc. # 27 at ¶ 148), to Ashcraft because the Bells have not pled facts that Ashcraft was in fact Kokosing's representative or agent.

[21]     The Bells also claim that Ashcraft took a picture of the CSA 20 excavation site showing the black soil and argue that "[n]o reasonably competent person could have possibly mistaken the environmental conditions in CSA 20 for non-contaminated soil."  *Id.* at ¶ 118.  The Bells' allegation that "no reasonably competent person" could have believe that the soil was uncontaminated, however, is conclusory and need not be accepted by the Court.  *Ashcroft*, 556 U.S. at 678.  Furthermore, the Bells do not specify when the photo was taken, so the Court cannot determine whether it was taken before or after the Ashcraft employees told the Bells that the soil was just "city dirt."  *See* (Doc. # 27 at ¶¶ 118, 149).  Thus, the allegation that an Ashcraft employee took a photograph of CSA 20 is insufficient to support a claim of fraudulent intent.

The Bells do not specify, however, whether Ashcraft or the Bells were questioning the color of the soil.  *See id.*  Even assuming Ashcraft employees were the ones questioning the soil color, simply asking about the black color of the soil, without more, does not suggest that Ashcraft acted fraudulently or with reckless disregard for the truth when its employees told the Bells the fill material was just "city dirt."  Because the Bells have failed to plead factual allegations that could plausibly show that Ashcraft had fraudulent intent, they have not stated claim for fraudulent misrepresentation.  Accordingly, Ashcraft's motion to dismiss the fraudulent-misrepresentation claim is **granted**.

### ii.    *Kokosing*

The Bells' fraudulent misrepresentation claim against Kokosing, however, requires a more detailed analysis.  As an initial matter, Kokosing argues that the claim should be dismissed because it is duplicative of the Bells' breach-of-contract claim.  (Doc. # 38 at 8–9) (citing *Nami Res. Co. v. Asher Land & Mineral Ltd.*, 554 S.W.3d 323, 336 (Ky. 2018)).  Kokosing claims that under Kentucky law a plaintiff cannot bring claims for breach of contract and fraud "unless the damages arising from the alleged fraud are distinct from the damages flowing from the alleged breach of contract."  (Doc. # 38 at 8).  In *Nami*, the Supreme Court of Kentucky held that a plaintiff could not recover punitive damages for a breach of contract when the "plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim, even when the breach is motivated by malice and accomplished through fraud."  554 S.W.3d at 336.  However, if the plaintiff is "aggrieved by fraudulent or malicious conduct which results in damages that differ from the damages sustained by reason of the breach of contract," then the plaintiff "may assert an independent claim for such fraudulent or malicious

conduct seeking whatever damages are appropriate for the independent claim." *Id.* Sister courts have interpreted *Nami* to mean that a party may plead a breach of contract claim and fraud claim in the alternative but may not recover twice for the same damages. *Laurel Grocery Co., LLC v. Freshway, Inc.*, No. 6:18-CV-243-REW, 2019 WL 7290469, at *8 (E.D. Ky. Dec. 30, 2019) ("[F]raud claims, premised on, at bottom, a duty of honesty in qualifying circumstances, stand independent of any contract duty."); *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 6:12-cv-91-GFVT-HAI, 2019 WL 4597500, at *6 (Sept. 23, 2019) (plaintiff's fraud in the inducement claim may "proceed[] alongside its breach of contract claim," but the plaintiff "could not recover twice for the same financial loss"); *see also Eifler v. Greenamyer*, 2019 WL 2712618, at *6 (June 28, 2019) ("[I]t was permissible for [the plaintiff] to plead breach of contract and fraud in the alternative," but the plaintiff may not recover twice for the same injury).

Consistent with *Nami*, the Court finds that the Bells may bring fraud claims against Kokosing in addition to their breach of contract claim. The Bells are alleging that they were injured both by Kokosing's alleged breach of the Waste Agreement and Kokosing's subsequent representations that the fill material being deposited on their land was uncontaminated. These are two separate injuries. *See Laurel Grocery Co.*, 2019 WL 7290469, at *8 n. 16 ("[A] breaching party must not actionably mislead the non-breaching party about the breach; a duty separate from the contractual 'perform or pay' obligation."). While the Bells will not be allowed to recover twice for the same injury, they will be permitted to continue to plead both claims at this stage of the litigation.

Kokosing also claims that the integration clause in the Waste Agreement bars the Bells' fraud claims. (Doc. # 38 at 9). The Waste Agreement states that it "constitutes the

valid, binding, sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties."  (Doc. # 27-2 at 4). Kokosing argues that because "[a]s a matter of Kentucky law, 'a party may not rely on oral representations that *conflict* with the written disclaimers to the contrary which the complaining party earlier specifically acknowledged in writing,'" the fraud claims must be dismissed.  (Doc. # 38 at 9) (quoting *Rivermont Inn Inc. v. Bass Hotels Resorts Inc.*, 113 S.W.3d 636, 640–41 (Ky. Ct. App. 2003)) (emphasis added).  The Bells, however, are not alleging that Kokosing made fraudulent representations that conflict with the promises made in the Waste Agreement; rather, the Bells allege that Kokosing fraudulently told them that the fill material deposited on their property was uncontaminated, which is the same promise that Kokosing made in the Waste Agreement.  *Compare* (Doc. # 27-2 at 2) ([T]he waster material shall not contain any contaminants as defined by state and/or federal law."), *with* (Doc. # 27 at ¶ 250, 254) (Kokosing represented that the fill material was uncontaminated.).  Kokosing's reliance on *Rivermont*, therefore is misguided, and the Waste Agreement does not preclude the Bells from bringing a fraud claim against Kokosing.

While Count IV of the Amended Complaint is labeled as a fraudulent misrepresentation claim, it appears that the Bells are attempting to bring both a fraudulent inducement and a fraudulent misrepresentation claim against Kokosing.  *See* (Doc. # 27 at ¶¶ 247–65).  Under Kentucky law, "a misrepresentation to support an allegation of fraud must be made concerning a present or pre-existing fact, and not in respect to a promise to perform in the future."  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010) (quoting *Filibeck v. Coomer*, 182 S.W.2d 641, 643 (1944)); *see also McDorman*, 2019

WL 3367001, at *3 (quoting *Mario's Pizzeria, Inc.*, 379 S.W.2d 736, 740 (Ky.Ct. App. 1964)).   Despite this general rule, fraud in the inducement can lie from a defendant "making representations as to his future intentions *when in fact he knew at the time the representations were made he had no intention of carrying them out*."  *Bear, Inc.*, 303 S.W.3d at 142 (emphasis added) (quoting *Major v. Christian Cty. Livestock Market*, 300 S.W.2d 246, 249 (Ky. 1957)); *see also Schroerlucke v. Hall*, 249 S.W.2d 130, 131 (Ky. 1952); *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 615 (Ky. Ct. App. 2011).   In other words, fraudulent-inducement claims require proof of the same elements as fraudulent misrepresentation, and effectively fall under the umbrella of fraudulent misrepresentation; the difference is that a misrepresentation claim deals with the misrepresentation of "a present or pre-existing fact" whereas an inducement claim applies to "a misrepresentation of a future fact." [22]  *See LV Ventures, LLC v. Schott*, Nos. 2011-CA-000473-MR, 2011-CA-000640-MR, 2011-CA-001132-MR, 2012 WL 5039235, at *2 (Ky. Ct. App. Oct. 19, 2012); *see also In re Sallee*, 286 F.3d at 905.

   The Bells allege that Kokosing made representations about *both* future facts, *see, e.g.*, (Doc. # 27 at ¶ 250) (claiming that before signing the Waste Agreement, Kokosing represented to the Bells that the fill material spread on their property would be uncontaminated), and present or pre-existing facts, *see, e.g.*, *id.* at ¶ 157 (alleging that Kokosing representatives told the Bells that the fill material being deposited on their

---

[22]   "The proper distinction between fraudulent misrepresentation and inducement derives from the context in which the fraudulent misrepresentation occurred."  *In re Sallee*, 286 F.3d 878, 905 (6th Cir. 2002) (Batchelder, J., concurring).  Specifically, "[i]f this misrepresentation occurred with the 'intention of inducing' a party to act, the result is fraudulent inducement.  If the misrepresentation did not occur within the context of inducing another to act, but instead was a misrepresentation for other purposes, the result is another form of fraud."  *Id.*

property was "perfectly safe").  Thus, the Court will address the fraudulent inducement and fraudulent misrepresentation claims separately.

### 1.     Fraudulent inducement

The Bells' allege that Kokosing made several representations that could serve as the basis for a fraudulent inducement claim.  The Bells claim that "Kokosing's representatives promised Plaintiffs that it would transport inert, clean fill material across state lines, deliver it to their property, and spread it out and compact it with heavy equipment without any cost to Plaintiffs."  (Doc. # 27 at ¶ 75).  Kokosing's representatives also promised that the Bells' property "would be suitable for use by their family and members of their church as a camp site" after the fill material was deposited.  *Id.* at ¶ 76.  These representations were allegedly made in "mid-July 2017" at the Bells' home before the work started.  *Id.* at ¶¶ 59, 75, 76.

As to these representations made before signing the Waste Agreement, the Bells have sufficiently pled "the time, place, and content" or the representations.  *See Coffey*, 2 F.3d at 161–62.  The Bells claim that the representations took place on their property, in mid-July, and that Kokosing representatives represented that they would deliver uncontaminated fill material onto their property to raise it above the floodplain in compliance with state and federal laws.  (Doc. # ¶¶ 27 59, 75,76).  This information is enough to give Kokosing notice of the alleged misrepresentations.  *See Coffey*, 2 F.3d at 162.  The Bells have not, however, pled facts to support the conclusion that Kokosing made these representations with fraudulent intent.  The Bells' allege that in January 2017 and June 2017, prior to the alleged representations, the City, MSD, and ATC provided Kokosing with "[t]wo narrative documents" the "confirm[ed] the presence of the

'McDonalds site'" and said that samples from that site contained "concentrations of arsenic and PAHs exceed residential soil standard." *Id.* at ¶ 130. The Bells do not allege, however, that when Kokosing promised to deliver uncontaminated fill material to the Bells' property that Kokosing knew that the fill material would come from either CSA 20 or the "McDonalds site" specifically. *See generally id.* Because the Bells do not allege that Kokosing knew in July 2017 that the fill material that would deposited on the Bells' property would come from CSA 20 and be contaminated, the Bells' have failed to plead that Kokosing made the July 2017 representations with fraudulent intent, which is a requirement under Rule 9(b). *See Coffey*, 2 F.3d at 162. Therefore, the Bells' fraudulent inducement claim against Kokosing for representations made before the Waste Agreement was signed fails. Accordingly, Kokosing's motion to dismiss the fraudulent-inducement claim is **granted**.

### 2.    *Fraudulent misrepresentation*

The Bells' fraudulent misrepresentation claim, however, is another matter. The Bells allege that Kokosing "representatives and agents lied and fraudulently misrepresented to Plaintiffs that fill material dumped on their residential property were harmless, non-toxic, non-hazardous 'city dirt' that conformed to the limitations set forth in the Waste Agreement and state environmental law." (Doc. # 27 at ¶ 254). Specifically, the Bells claim that:

> Beginning on or around October 2, 2017 and continuing through December 2017, Plaintiffs communicated with representatives of both Kokosing and Ashcraft—in person, through text messages and emails, and by multiple cellphone calls—regarding the safety of the black sand and the petroleum odors emanating from the sand. When Plaintiffs began to smell petroleum odors and questioned the composition and safety of the black sand, Kokosing's representatives and agents, including Ashcraft, continued to falsely assure Plaintiffs that the black sandy material was "clean," totally

46

harmless, "inert," and "contained no contaminants," and was "perfectly safe."

*Id.* at ¶ 148.  Also in October of 2017, Kokosing representatives and agents allegedly "maliciously, wantonly, falsely, and intentionally [told] Plaintiffs that the black sand on their property was 'perfectly safe,' 'the material was black in color because it came from the westside of City of Cincinnati,' and the 'material contained no contaminants.'"  *Id.* at ¶ 156; *see also id.* at ¶ 157 ("Kokosing's representatives and its agents knowingly, wantonly, falsely, repeatedly, and intentionally told Plaintiffs that foundry sand was 'perfectly safe' and that 'it did not have any contaminants as defined by federal or state law' because the City, MSD and ATC tested the material.  Plaintiffs reasonably relied on these representations in October 2017."); *id.* at ¶ 158 ("Kokosing and its agents told Plaintiffs that the companies were dumping and spreading the black foundry sand in full compliance with their floodplain permit. Kokosing and its agents made these false statements to Plaintiffs in October and November 2017.").

The Bells' allegations that Kokosing falsely represented that the fill material delivered in October 2017 was uncontaminated satisfy the particularity requirement of 9(b).  The Bells provide the time, place, and content of the alleged misrepresentation.  *See Coffey*, 2 F.3d at 161.  The Bells allege that the representations occurred in October, November, and December of 2017.  (Doc. # 27 at ¶ 148).  The Bells also specify that *Kokosing*, rather than another defendant, made the representations.  *See id.*; *see also id*. at ¶¶156–58.  As long as the plaintiffs identify the particular corporation, they "need not also identify the corporation's individual employee who made the alleged fraudulent misrepresentation."  *Newberry*, 2020 WL 1062678, at *10 (citing *Bledsoe*, 501 F.3d at 506).  The "place" the representations were made were "in person, through text messages

and emails, and by multiple cellphone calls." (Doc. # 27 at ¶ 148). The Bells also identify the contents of the alleged representations and provide specific quotes from Kokosing representatives and agents. *Id.* Considering that the Sixth Circuit construes 9(b) liberally, *Coffey*, 2 F.3d at 161, the Court finds that the Bells have adequately pled their fraudulent misrepresentation claim and put Kokosing on notice of the alleged misrepresentations.

In addition to pleading the time, place, and content of the alleged misrepresentations, the plaintiff must also plausibly plead fraudulent scheme, fraudulent intent of the defendants, and the injury resulting from the fraud. *Coffey*, 2 F.3d at 162. The Bells claim that Kokosing was involved in a fraudulent scheme to deposit contaminated fill material at the Bells' property to save time and money. (Doc. # 27 at ¶¶ 43, 44, 263). Under Kokosing's contract with MSD, "Kokosing was solely responsible for all costs associated with lost time and delay" of the LRV project. *Id.* at ¶ 43. Specifically, the Bells claim that Kokosing was required to "pay $5,000 per diem for missing deadlines." Id. at ¶ 45. A reasonable juror could conclude that based on the financial penalties Kokosing would face for the delay incurred by handling the uncontaminated soil, they fraudulently undertook to conceal the contaminated nature of the soil from the other Defendants. Thus, the Bells have plead that Kokosing was operating under a fraudulent scheme.

Furthermore, the Bells have alleged that they were injured by Kokosing's allegedly fraudulent misrepresentations. The Bells claim that they relied on Kokosing's representations that the fill material was uncontaminated, *see, e.g.*, (Doc. # 27 ¶ 148), and also was injured through their reliance on these representations because they allowed Kokosing to continue depositing the fill material onto their property, *id.* at ¶ 258.

Finally, the Bells' have also plausibly pled that Kokosing made these statements with fraudulent intent.  The Bells allege that Kokosing met with the City, MSD, and ATC on October 2, 2017 to discuss the black color and petroleum odor of the fill material being hauled to the Bells' property.  (Doc. # 27 at ¶ 137).  The other defendants told Kokosing that "the 'specifications prevail' and Kokosing should handle the black foundry sand as non-contaminated fill for use on residential property."  *Id.*  On October 12, 2017, however, Kokosing allegedly asked ATC to "test the black foundry sand in CSA 20 because [Kokosing's] workers complained that the black foundry sand emitted a strong petroleum odor."  *Id.* at ¶ 138.  Kokosing also wrote to the City and MSD that same day to notify them of a delay due to "petroleum smelling soil and ground water [that] was uncovered." (Doc. # 27-5).  Kokosing reported that it "left the contaminated area undisturbed" and continued the excavation nearby the contaminated site.  *Id.*  On October 14, 2017, Kokosing's internal log noted that the soil had a "petroleum odor."  (Doc. # 27 at ¶ 141). On October 16, 2017, Kokosing sent a letter to the City requesting that they "verify a document prepared by ATC showing new boundary lines for contaminated foundry sand" and "the depth of the contamination."  *Id.* at ¶ 142.  The next day, Kokosing suspended "all exporting of soils offsite" after it received information from ATC that contradicted the initial reports that the soil was uncontaminated.  (Doc. # 27-8 at 1).  On October 20, 2017, Kokosing received noticed from ATC that the soil at CSA 20 was "restricted to commercial/industrial use."  *Id.*

Under Kentucky law, to succeed on a fraudulent misrepresentation claim a plaintiff must show that the defendant "knew the representation to be false or made it with reckless disregard for its truth or falsity."  *Giddings & Lewis*, 348 S.W.3d at 747.  Based on the

communications between Kokosing and the City, MSD, and ATC, it is plausible that Kokosing acted with reckless disregard for the truth when in October, November, and December 2017 it told the Bells that the fill material was "perfectly safe," (Doc. # 27 at ¶ 148), and "was black in color because it came from the westside of Cincinnati," *id.* at ¶ 156.  During this same time period, Kokosing was internally reporting that the soil smelled like petroleum and was repeatedly requesting that the City, MSD, and ATC verify that the soil was uncontaminated.  *See, e.g.*, *id.* at ¶ 137.  A reasonable juror could conclude that based on Kokosing's communications with the other defendants, Kokosing recklessly disregarded the truth when it represented to the Bells that the fill material was uncontaminated.  The Bells have stated a plausible fraudulent misrepresentation claim based on the statements Kokosing employees made to the Bells between October 2017 and December 2017 that the fill material from being placed on their land was uncontaminated.   Accordingly, Kokosing's motion to dismiss the fraudulent-misrepresentation claim is **denied.**

### d.    Negligence

Next, the Bells bring a negligence claim against all the Defendants.  (Doc. # 27 at ¶¶ 266–72).  The Bells argue that the Defendants negligently "fail[ed] to correctly identify and accurately characterize the chemical composition of contaminated fill material transported to and dumped and spread on the Plaintiffs' residential property."  *Id.* at ¶ 268.  Kokosing argues that the Bells' negligence claim must be dismissed because it fails to articulate a separate legal duty from the those created by the terms of the Waste Agreement.   (Doc. # 38 at 10).   Ashcraft claims that the claim against it should be dismissed because the Bells cannot point to any specific actions Ashcraft took individually

that were negligent.  (Doc. # 37 at 7).

To succeed on a common-law negligence claim in Kentucky, a plaintiff must prove four elements—(1) the defendant owed plaintiff a duty, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the plaintiff's injury was caused by the defendant's breach of duty.  *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).  To succeed on the fourth element, the plaintiff must show both factual and proximate causation.  *Power & Tel. Supply Co., Inc. v. Suntrust Banks, Inc*, 447 F.3d 923, 932 (6th Cir. 2006).  The underlying principles of a common-law cause of action for negligence are "foreseeability and reasonable care."  *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 533 (Ky. 2003).

In Kentucky, the existence of duty is a matter of law for the court to decide because '[w]hen a court resolves a question of duty it is essentially making a policy determination." *Id.* (quoting *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d, 245, 248 (Ky. 1992)). "The court must determine whether 'upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'" *Power & Tele. Supply Co., Inc.*, 447 F.3d at 932 (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).  "If no duty is owed by the defendant to the plaintiff, there can be no breach thereof and therefore no actionable negligence." *Ashcraft v. People's Liberty Bank & Tr. Co.*, 724 S.W.2d 228, 229 (Ky. Ct. App. 1986).

"Kentucky courts recognize a universal duty of care under which every person owes a duty to every other person to exercise ordinary care to prevent foreseeable injury."

*Lee v. Farmer's Rural Elec. Co-op. Corp.*, 245 S.W.3d 209, 212 (Ky. Ct. App. 2007); *see also Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 297 (Ky. 2015); *Shelton*, 413 S.W.3d at 908.  The universal duty of care, however, "is not boundless."  *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005).  "The examination must be focused so as to determine whether a duty is owed, and consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation."  *Id.* (quoting *Fryman v. Harrison*, 896 S.W.2d 908, 909 (Ky. 1995)).   The foreseeability of the injury is considered from the perspective of the defendant at the time the alleged negligence occurred and cannot be based on hindsight; the Court must consider "whether a reasonable person in a defendant's position would recognize undue risk to another."  *Lee*, 245 S.W.3d at 212–13.  Importantly, "[w]hether a harm was foreseeable in the context of determining duty depends on the general foreseeability of such harm, not whether the *specific mechanism* of the harm could be foreseen."  *Id.* at 212 (emphasis added).  A plaintiff does not have to prove that the "*exact manner* in which the injury occurred was foreseeable" in order to succeed in a negligence claim.  *Isaacs v. Smith*, 5 S.W.3d 500, 502 (Ky. 1999) (emphasis added).  Additionally, the risk of injury must be unreasonable in order for the defendant to be held liable.  *Waldsachs v. Inland Marine Serv., Inc.*, 5:10-cv-5, 2011 WL 3813093, at *4 (W.D. Ky. Aug. 26, 2011) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 91 Ky. 2003)).

### i.    Ashcraft

The Bells have not pled specific facts which plausibly suggest that Ashcraft could foresee that the Bells may be injured by its actions.  From the allegations in the Amended Complaint there is no evidence that Ashcraft knew the fill material from CSA 20 was

contaminated when it was delivering the soil to the Bells' property.   As previously described, the only specific allegation the Bells make concerning Ashcraft's knowledge is an email which states that the soil "was black in color and questioned about color of it." (Doc. # 27 at ¶ 135).   Without additional facts, simply questioning the black color of the fill material does not plausibly suggest that could foresee at the time that the soil was contaminated.   In other words, a reasonable person in Ashcraft's position would not recognize that the fill material placed the Bells' property presented an undue risk; therefore, Plaintiffs have not adequately pled that Ashcraft violated a legal duty. *See Lee*, 245 S.W.3d at 212–13.   Accordingly, Ashcraft's motion to dismiss the Bells' negligence claim is **granted**.

### ii.    Kokosing

The Bells' negligence claim against Kokosing also fails, albeit for a different reason.   A party may bring both a breach-of-contract claim and a negligence claim if there is a separate independent legal duty underlying the negligence claim.   *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 792 (Ky. 2017) (quoting *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 589 (Ky. 2004) (Keller, J., concurring)); *see also Nami*, 554 S.W.3d at 336 (affirming *Superior Steel*).   Put another way, a plaintiff may not bring a claim for negligence that is "merely [a] contract claim[] repackaged as a tort claim[]."   *Nelson v. Columbia Gas Transmission, LLC*, -- F. App'x --, 2020 WL 1608738, at *6 (6th Cir. Apr. 2, 2020).   In *Nelson*, the Sixth Circuit affirmed the district court's dismissal of the plaintiff's negligence claim against a subcontractor for "negligently [blowing] wood chips off the right of way" when the subcontractor already "had a contractual duty . . . to dispose of the wood chips."   *Id.*

Here, it appears that the Bells' negligence claim against Kokosing is simply its breach-of-contract claim repackaged as a tort claim.   The Bells argue that the "Defendants, individually, jointly, and severally, acted in a careless, negligent and unsafe manner in failing to correctly identify and accurately characterize the chemical composition of contaminated fill material transported to and dumped and spread on Plaintiffs' residential property."  (Doc. # 27 at ¶ 268).  The Bells claim that the Defendants negligently failed to exercise ordinary care and that their conduct "constituted negligence." *Id.* at ¶ 269.   The Bells do not identify a legal duty that Kokosing owed to them independent of its contractual obligations; in fact, the Bells do not distinguish *any* legal duty that Kokosing owed the Bells.  *See generally id.*  While it is difficult to discern what conduct underlies the Bells' negligence claim given the general and conclusory nature of the obligations, it appears that the actions underpinning their negligence claim against Kokosing mirror the conduct underlying their breach-of-contract claim.  *Compare* (Doc. # 27 at ¶ 221) ("Kokosing breached the contract with Plaintiffs by causing, directing, or allowing its agent to dump and spread contaminated fill material closer to the river than allowed under Plaintiffs' floodplain permit."), *with id.* at ¶ 270 ("Kokosing, MSD, the City, ATC, and Ashcraft, are individually, jointly, and severally negligent in violating 401 KAR 4:060 Section 5 and Plaintiffs' floodplain permit by dumping and spreading contaminated, reactive fill material far beyond 250 feet from the edge on Route 8 and down towards the banks of the Ohio River.").  Under Kentucky law, if the conduct complained of also serves as the basis for a breach-of-contract claim, then the plaintiff may only bring a tort claim if they identify an independent legal duty.  *Mims*, 226 S.W.3d at 836; see also *Laurel Grocery*, 2019 WL 7290469, at *7 (quoting *Presnell*, 134 S.W.3d at 589 (Keller, J.,

concurring)) ("The best 'indicator of whether an action is appropriate in tort . . . is the source of the duty upon which the tort claim is premised.'").  Because the Bells failed to identify an independent legal duty, their negligence claim against Kokosing cannot stand. Accordingly, Kokosing's motion to dismiss the Bells' negligence claim is **granted**.

### e.    Negligence Per Se

The Bells also bring a negligence per se claim against all the Defendants.  (Doc. # 27 at ¶¶ 273–80).  Ashcraft moves to dismiss the claim against it, arguing that the Bells have failed to demonstrate that Ashcraft violated the statutes in question.  (Doc. # 37 at 9).  Kokosing does not move to dismiss the negligence per se claim at this time.  (Doc. # 38 at 1).

A negligence per se claim is a negligence claim where a statutory standard of care is substituted for the common-law standard of care.  *Pile v. City of Brandenburg*, 215 S.W.3d 36, 41 (Ky. 2005).  Kentucky codified negligence per se in KY. REV. STAT. § 446.070, which states that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."  K.R.S. § 446.070.  While the language of § 446.070 is broad, courts have imposed restrictions on its application.  The plaintiff must prove three elements: (1) that the underlying statute is criminal in nature without an inclusive civil remedy, (2) that the plaintiff is within the class of persons the statute is intended to protect, and (3) that the plaintiff's injury is the type of injury the statute was designed to prevent.  *Hickey v. Gen. Elec. Co.*, 539 S.W.3d 19, 23–24 (Ky. 2018).  In addition to statutes, KY. REV. STAT. § 446.070 applies to administrative regulations if they are "consistent with the enabling legislation and . . . apply to the safety of the citizenry."

*St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 535 (Ky. 2011); *see also Centre Coll. v. Tzrop*, 127 S.W.3d 562, 566–67 (Ky. 2003).

Here, the Bells argue that Ashcraft is liable for negligence per se for violating KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.01-400,[23] and 401 KAR 30.031.  (Doc. # 27 at ¶ 274).  KY. REV. STAT. § 224.40-100 states that "no person shall transport to or dispose of waste at any site or facility other than a site or facility for which a permit has been issued" and prohibits the use of open dump sites.  KY. REV. STAT. § 224.40-100(1)– (2).  KY. REV. STAT. § 224.1-400 dictates the reporting requirements that must be followed in the event of hazardous waste spill or contamination.  *See generally* KY. REV. STAT. § 224.1-400.  Overall, the purpose of Chapter 224 is "to provide for the management of solid waste . . . in a manner that will protect the public health and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, and enhance the beauty and quality of our environment."  *Iles v. Com.*, 320 S.W.3d 107, 115 (Ky. Ct. App. 2010) (quoting KY. REV. STAT. § 224.43-010).  Similarly, the stated purpose of 401 KAR 30.031 is to "determin[e] which waste sites or facilities pose a reasonable probability of adverse effects on human health or the environment."   401 KAR 30.031 § 1.

According to the Bells, KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.01-400, and 401 KAR 30.031 were all "intended to protect Plaintiffs and other innocent residential property owners from the illegal dumping of dangerous, toxic, and hazardous contaminated fill material on residential property."  *Id.* at ¶ 277.  The Court disagrees.

---

[23]    KY. REV. STAT. § 224.01-400 has since been renumbered as KY. REV. STAT. § 224.1-400.

The plain text of KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.01-400, and 401 KAR 30.031 suggest that they were designed to protect the general public and the environment at large, not specific residential property owners. *Newsome v. Columbia Nat. Res., Inc.*, is particularly instructive on this point. No. 7:03-cv-257-KKC, 2005 WL 2386228 (E.D. Ky. Sept. 27, 2005). In *Newsome*, a flood caused hazardous waste material to escape from the defendant's property and harm the plaintiff's property. *Id.* at 2005 WL 2386228, *1. Plaintiffs, residential property owners, argued that the defendant's "actions constituted negligence per se due to its alleged violation of the reporting requirements of K.R.S. 224.01-400." *Id.* at 2005 WL 2386228, *3. The court dismissed the claim. *Id.* at 2005 WL 2386228, *4. According to the court in *Newsome*, KY. REV. STAT. § 224.1-400 was intended "to force the transmission of information, not to remedy any losses caused." *Id.* The statute was designed to protect the general public who may be harmed if toxic spills were not properly reported, not property owners like the plaintiffs in *Newsome*. *Id.* The Bells' position is very similar to the property owners in *Newsome*; they are residential property owners whose property was damaged by hazardous material. Like the plaintiffs in *Newsome*, the Bells are not within the class of people that KY. REV. STAT. § 224.04-1— or KY. REV. STAT. § 224.1-400 and 401 KAR 30.031—were intended to protect.

Equally fatal to the Bells' negligence per se claim, the injury suffered by the Bells is not the type of injury that KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.1-400, or 401 KAR 30.031 were designed to prevent. For example, KY. REV. STAT. § 224.40-100 and 401 KAR 30.031 were designed to prevent injuries caused by the operation of unpermitted waste disposal facilities that improperly disposed of hazardous material. *See Iles*, 320 S.W.3d at 115 (finding that a landowner violated § 224.40-100 by operating an

open dump on his property with "rimless tires, vehicle parts, discarded batteries, scrap metal, and household trash").   KY. REV. STAT. § 224.1-400 was designed to prevent injuries "to the public at large due to the delay caused in notification" when there was a hazardous waste spill.   *Newsome*, 2005 WL 2386228, *4.   The Bells have not cited, and the Court has not found, any cases that suggest KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.1-400, or 401 KAR 30.031 were designed to prevent the type of injury suffered by the Bells.   The Bells were injured after the Defendants allegedly deposited contaminated fill material on their property in violation of an agreement to allow for the dumping of clean material; their injury is distinct from injuries caused by the unintentional leaching of toxic materials from either an open dump or a hazardous waste spill.   In sum, the laws the Bells attempt to rely upon were not created to protect individual property owners like the Bells or to prevent the type of injury that they suffered.   Accordingly, the Bells cannot use KY. REV. STAT. § 224.40-100, KY. REV. STAT. § 224.1-400, or 401 KAR 30.031 to bring a negligence per se claim.[24]   Accordingly, Ashcraft's motion to dismiss the negligence-per-se claim is **granted**.

---

[24]      The Bells also claim that "Defendants, individually, jointly, and severally, acted in a civil conspiracy to violate the terms of Plaintiffs' fill permit and 401 KAR 4:060 Section 5 by dumping and spreading contaminated, reactive fill material far beyond 250 feet from the edge on Route 8 and spread the contamination down towards the banks of the Ohio River."   (Doc. # 27 at ¶ 278). While it is unclear whether the Bells are attempting to use 401 KAR 4:060 as another basis for their negligence per se claim, such an attempt would be futile.   As an initial matter, the Bells cannot rely on a conclusory statement about a civil conspiracy to show that Ashcraft individually violated 401 KAR 4:060.   *See supra* Part II(B)(3) (finding that there was no civil conspiracy among Defendants).   Furthermore, the Bells do not claim that they are within the class of people 401 KAR 4:060 are intended to protect.   *See* (Doc. # 27 at ¶ 278).   Thus, the Bells are missing one of the essential elements of their prima facie case.   *Hickey*, 539 S.W.3d at 23–24.

### f.      Intentional Trespass

Next, the Bells bring a claim of intentional trespass against all the Defendants. (Doc. # 27 at ¶¶ 281–86).   The Bells allege that the Defendants "individually, jointly, severally, and in a civil conspiracy, [entered] Plaintiffs' land to dump contaminated foundry sand" without the "knowledge, consent, or authorization of Plaintiffs."  *Id.* at ¶ 284.   They also argue that "[a]ll Defendants knew or should have known that the foundry sand and other materials dumped and spread on Plaintiffs' property contained contaminants."  *Id.* at ¶ 283.   The Bells do not allege which Defendants specifically trespassed on their property; instead, they once again attempt to rely on the conclusory argument that the Defendants acted together as part of a civil conspiracy.   *See generally id.* ¶¶ 281–86. Both Kokosing and Ashcraft argue that the Bells have failed to plausibly state a claim for intentional trespass because the Bells did not allege that they intentionally violated the scope of their permission to be on the Bells' property.  (Doc. # 38 at 10–11); (Doc. # 37 at 9).

Under Kentucky law, a plaintiff may bring a claim for intentional trespass for "[a]ny intended intrusion or encroachment which is not privileged" regardless of "the shortness of the period of the interference."  *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 54 (Ky. 2007).  Liability for intentional trespass attaches regardless of proof of harm to the plaintiff's property; in contrast, proof of harm is required under a theory of negligent trespass.  *Id.*  Reckless conduct also constitutes intentional trespass.  *Harrod Concrete and Stone Co. v. Crutcher*, 458 S.W.3d 290, 298 (Ky. 2015) (citing Sandlin v. Webb, 240 S.W.2d 69 (Ky. 1951)).  "[E]very trespass is presumed willful, with the burden upon the trespasser to prove his innocence."  *Church and Mullins Corp. v. Bethlehem Minerals Co.*,

887 S.W.2d 321, 323 (Ky. 1992).   An "intentional trespasser is one who trespasses knowing that he is wrong, while an innocent trespasser believes that he is right." *Hammonds v. Ingram Indus., Inc.*, 716 F.2d 365, 372 (6th Cir. 1983) (citing *Lebow v. Cameron*, 394 S.W.2d 773, 776 (Ky. 1965); *Rudy v. Ellis*, 236 S.W.2d 466, 468 (Ky. 1951)).[25]   Whether a trespasser was right or wrong is determined by examining the "intention, or the state of mind, of the trespasser based upon the circumstances surrounding the trespass at the time the trespass occurred."   *Church & Mullins*, 887 S.W.2d at 324.

Here, the Bells have stated a plausible claim for relief against Kokosing, but not Ashcraft.   Both Kokosing and Ashcraft had permission to be on the Bells' property to deposit uncontaminated fill material.   *See* (Doc. # 27 at ¶ 78).   Kokosing and Ashcraft exceeded the scope of their permission when they placed contaminated fill material on the Bells' property.   *Id.* at ¶¶ 132–46.   As previously explained in detail, however, the Bells did not allege facts to show that Ashcraft knowingly or recklessly exceeded the scope of its permission.   *See supra* Part II(B)(4)(c)(i).   Accordingly, the Bells have not pled a claim for *intentional* trespass against Ashcraft.   In contrast, the Bells plausibly allege that Kokosing—through its communications with the City and ATC and internal logs repeatedly noting the petroleum odor coming from the fill material—acted, at a minimum,

---

[25]      In contrast, the Bells argue that "there is no requirement that the complaint allege that Defendants knowingly engaged in wrongdoing, rather 'only an intentional act is required.'"  (Doc. # 50 at 16) (quoting *Merrick v. Diageo Americas Supply, Inc.*, 5 F. Supp.3d 865, 880 (W.D. Ky. 2014)).  Citing *Rudy v. Ellis*, the court in *Merrick* found that actual knowledge of wrongdoing is not required to state a claim for intentional trespass.  *Merrick*, 5 F. Supp. 3d at 879–80.  *Merrick*'s rule, however, appears to be an outlier.  *See, e.g.*, *Journey Acquistion-II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 458 (6th Cir. 2016) (finding in the context of mineral trespass a willful trespasser acts dishonestly or in bad faith under Kentucky law); *Harrod Concrete & Stone*, 458 S.W.3d at 297 (finding that a willful trespasser knowingly encroaches on another's property); *Lewbow*, 394 S.W.2d at 776 ("A willful trespasser knows he is wrong.") (citing *Rudy*, 236 S.W.2d at 468).

recklessly when it deposited fill material from CSA 20 onto the Bells' land.  *See supra* Part II(B)(4)(c)(ii).  Because reckless action can support a claim for intentional trespass, *Harrod Concrete & Stone*, 458 S.W.3d at 298, the Court finds that the Bells have sufficiently pled a claim against Kokosing.  Accordingly, Ashcraft's motion to dismiss the intentional-trespass claim is **granted**, and Kokosing's motion to dismiss the intentional-trespass claim is **denied**.

### g.    Kentucky Consumer Protection Act

The Bells also bring a claim against all Defendants under the KCPA.  (Doc. # 27 ¶¶ 287–95).  The Bells argue that the Defendants "individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other" violated the KCPA by engaging in a fraudulent and illegal scheme to deposit contaminated fill material on their property.  *Id.* Kokosing presents three arguments for why its transaction with the Bells is not covered by the KCPA: 1) the Bells did not purchase or lease anything from Kokosing, 2) the fill material provided by Kokosing is not a consumer good, and 3) the Bells will not use the fill material for primarily personal, family, or household purposes.  (Doc. # 38 at 12–14). Like Kokosing, Ashcraft argues that the KCPA claim against it should be dismissed because Ashcraft did not provide goods or services to the Bells for personal, family, or household purposes and because there is no privity of contract between the Bells and Ashcraft.  (Doc. # 37 at 10–11).

The KCPA prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  KY. REV. STAT. § 367.170.  A person may sue under the KCPA if he "purchases or leases goods or service primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property,

real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KY. REV. STAT. § 367.170." *Id.* at § 367.220.  The KCPA is "designed to provide broad protection to consumers victimized by unlawful and deceptive trade practices." *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 903 (Ky. 2008).

Several key terms such as "purchases," "consumer good," and "personal, family or household purposes" are left undefined by the KCPA.  *See* KY. REV. STAT. § 367.110 (Definitions); *see also Craig & Bishop*, 247 S.W.3d at 903 ("purchases" is not defined).  Thus, we look to precedent to interpret each term.  Privity of contract is generally required for a plaintiff to bring a claim under the KCPA.  *McIntosh v. E-Backgroundchecks.com, Inc.*, No. 5:12-cv-310-DCR, 2013 WL 1187038, at *5 (E.D. Ky. Mar. 20, 2013) ("The plain language of the statute requires that privity of contract exist between the parties in a suit alleging a violation of the KCPA.").  The lack of a binding contract, however, is not "fatal to a claim for unfair trade practices under the KCPA" if the defendant still qualifies "as [a] purchaser[] under the KCPA."  *Craig & Bishop*, 247 S.W.3d at 903.

Additionally, courts have relied on the KUCC's definition of "goods" as "all things . . . which are moveable at the time of identification to the contract for sale" when interpreting "goods" under the KCPA.  *Aud v. Illinois Cent. R. Co.*, 955 F. Supp. 757, 759 (W.D. Ky. 1997).  Not all movable goods, however, are consumer goods under the KCPA. *Id.* (finding that improvements on the land, while moveable, were not "consumer goods used primarily for personal, family or household purposes"); *see also Cohen v. N. Ridge Farms, Inc.*, 712 F. Supp. 1265, 1272 (E.D. Ky. 1989) (holding that a thoroughbred horse was not a consumer good under the KCPA).  In particular, courts have been reluctant to extend the KCPA to real estate transactions.  *Craig v. Keene*, 32 S.W.3d 90, 91 (Ky. Ct.

App. 2000) ("[W]e do not believe that the Kentucky Consumer Protection Act applies to real estate transactions by an individual homeowner."); *see also Aud*, 955 F. Supp. at 759 (holding that a piece of land with "improvements consisting of ballast, railroad ties, and tracks" was not a consumer good under the KCPA); *Miles v. Shauntee*, 664 S.W.2d 512, 518–19 (Ky. 1983) (the KCPA does not apply to a landlord who fails to comply with local code provisions).

Here, the Bells' claim against Ashcraft fails because there is no privity of contract between Ashcraft and the Bells and the Bells did not purchase or lease anything from Ashcraft.  The Bells do not allege that they bought, leased, or negotiated with Ashcraft; the only factual allegations against Ashcraft deal with Ashcraft's transportation of fill material from the LRV Project to the Bells' property *after* the Bells had signed a contract with Kokosing.  *See generally* (Doc. # 27).  Because there was no privity of contract between the Bells and Ashcraft and no purchase or lease between the two parties, the Bells' KCPA claim against Ashcraft fails.  Accordingly, Ashcraft's motion to dismiss the KCPA claim is **granted**.

While Kokosing may qualify as a purchaser,[26] the Court need not reach that issue because it is clear that the agreement between the Bells and Kokosing was not an agreement for the purchase or lease of *consumer* goods.  The Waste Agreement between

---

[26]    While the Kentucky Supreme Court has not defined "purchase" for purposes of the KCPA, in past cases it has cited the broad definition in Kentucky's Uniformed Commercial Code.  *Craig & Bishop*, 247 S.W.3d at 902.  There, "purchase" is defined as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien, security interest, issue, or reissue, gift, or any voluntary transaction creating an interest in property."  *Id.* (citing KY. REV. STAT. § 355.1-201(2)(ac)); *see also Petrey v. Ethicon, Inc.*, No. 5:19-cv-298-DCR, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (citing *Craig & Bishop*).  In regards to the KCPA, "negotiation" is also defined "in the more general commercial context, mean[ing], '[d]ealings conducted between two or more parties for the purpose of reaching an understanding.'"  *Craig & Bishop*, 247 S.W.3d at 902 (second alteration in original) (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)).

the Bells and Kokosing concerned the transfer of "waste material" from the LRV Project in Cincinnati to the Bells' property.  (Doc. # 27-2 at 1).  The Waste Agreement explains that: "the term 'waste' material as used in the Agreement is a common term used in the *construction industry* and it is defined as the removing of dirt, earth, rock, concrete subsurface and other material . . . from a construction project and depositing the waste materials at another location."  *Id.* (emphasis added).  From the plain language of the contract, the Waste Agreement was not an agreement for the purchase or lease of consumer goods; it was an agreement for the transfer of construction materials from one site to another.  *Id.*  The Bells have not cited any case law where a court has found that construction materials or improvements to land such as fill material qualify as consumer goods under the KCPA merely because they are being used at a residential property, *see* (Doc. # 50 at 17–18).  to the contrary, caselaw suggests that the KCPA does not apply to real estate transactions, *see Craig*, 32 S.W.3d at 91.  Because fill material as defined by the Waste Agreement, is not a consumer good, the Bells have failed to state a KCPA claim against Kokosing.  Accordingly, Kokosing's motion to dismiss the KCPA claim is **granted**.

### h.    Criminal Mischief

Next the Bells bring a claim against all the Defendants for criminal mischief.  (Doc. # 27 ¶¶ 296–98).  The Bells argue that the Defendants committed criminal mischief in the first degree in violation of KY. REV. STAT. § 512.020 when "they intentionally or wantonly damaged Plaintiffs' property by dumping tens of thousands of tons of contaminated . . . material on Plaintiffs' residential real estate."  *Id.* at ¶ 297.  Because KY. REV. STAT. § 512.020 is a criminal statute which does not provide a private cause of action, the Bells

somewhat confusingly, appear to be bringing this criminal mischief claim as another negligence per se claim under KY. REV. STAT. § 446.070.  *Id.* at ¶ 298.

Under KY. REV. STAT. § 512.020, a person is guilty "of criminal mischief in the first degree when, having no right to do so or any reasonable ground to believe that he or she has such right, he or she intentionally or wantonly defaces, destroys, or damages any property causing pecuniary loss of $1,000 or more."  KY. REV. STAT. § 512.020, *amended by* 2020 Kentucky Laws Ch. 12 (HB 44).  In a multi-defendant case, the defendant is only liable if there is evidence that the defendant personally caused $1,000 or more of damage to the property.  *Bratcher v. Com.*, No. 2008-SC-000151-MR, 2010 WL 252245, at *3 (Ky. Jan. 21, 2010) (finding that a defendant was not guilty of criminal mischief because a reasonable juror could not find that the specific defendant rather than his co-defendants caused over $1,000 of damage to the property in question).  In order to bring a private cause of action for a violation of KY. REV. STAT. § 512.020, plaintiffs must satisfy the requirements of KY. REV. STAT. § 446.070, Kentucky's negligence per se statute. *Ungerbuehler v. Fed. Deposit Ins. Corp.*, No. 5:08-cv-20-REW, 2010 WL 3732205, at *8 (E.D. Ky. Sept. 20, 2020) (applying KY. REV. STAT. § 446.070 to plaintiff's private cause of action from criminal mischief).  As described in detail previously, *see supra* Part II(B)(4)(e), KY. REV. STAT. § 446.070 requires the plaintiff to prove three elements: (1) that the underlying statute is criminal in nature without an inclusive civil remedy, (2) that the plaintiff is within the class of person the statute is intended to protect, and (3) the plaintiff's injury is the type of injury the statute was designed to prevent.  *Hickey*, 539 S.W.3d at 23–24; *see also Ungerbuehler*, 2010 WL 3732205, at *8.

Here, the Bells' claim of criminal mischief is entirely deficient.  The Bells do not include even conclusory allegations that would meet the three elements required to prove a negligence per se claim.  Instead, the Bells simply argue that they are "entitled to recover from the Defendants" merely because the Defendants violated KY. REV. STAT. § 512.020 and "KY. REV. STAT. § 446.070 provides a private cause of action and right to recover from offender(s) all the damages sustained by reason of the violation of any statute." (Doc. # 27 at ¶ 298).  The Bells do not state that KY. REV. STAT. § 512.020 fails to provide a civil remedy, that the Bells were within the class of people KY. REV. STAT. § 512.020 was intended to protect, or that the Bells' injury was the type of injury KY. REV. STAT. § 512.020 was designed to prevent.  *See id.*  Accordingly, the Bells have not stated a private cause of action based on KY. REV. STAT. § 512.020 and their criminal mischief claim fails.[27]  Accordingly, both Ashcraft's and Kokosing's motions to dismiss the criminal-mischief claim are **granted**.

### i.    Punitive Damages

Next, the Bells attempt to bring a punitive-damages claim against all Defendants for engaging in a "wanton, willful, and fraudulent scheme involving the illegal disposal of chemical waste contaminants on residential property."  (Doc. # 27 at ¶¶ 299–330).  Punitive damages are awarded in Kentucky when a "plaintiff proves by clear and convincing evidence that a defendant acted with fraud, oppression, or malice [or] . . . if gross negligence is shown."  *Yung*, 563 S.W.3d at 65 (citing *Williams v. Wilson*, 972

---

[27]    Even if the Bells had satisfied the requirements of KY. REV. STAT. § 446.070, their criminal mischief claim would fail on the merits because they have not alleged that each Defendant individually caused pecuniary loss of $1,000 or more.  (Doc. # 27 at ¶ 297) ("Defendants, acting individually, jointly, severally, in a civil conspiracy, and aiding and abetting each other, . . . damage[ed] Plaintiffs' property and casu[ed] pecuniary loss of $1,000 or more.").

S.W.2d 260, 626–65 (Ky. 1998)).  Punitive damages, however, are only awarded for other tort violations; a claim for punitive damages "is not an independent cause of action."  *Price v. AgriLogic Ins. Servs., LLC*, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014); *see also Smith v. Westlake Vinyls, Inc.*, 403 F. Supp. 3d 625, 635–36 (W.D. Ky. 2019).  Simply put, the Bells' independent punitive-damages claim is not actionable under Kentucky law.  Accordingly, both Ashcraft's and Kokosing's motions to dismiss the punitive-damages claim are **granted**.

### j.   Private Nuisance

The Bells bring a claim for private nuisance.  (Doc. # 27 at ¶¶ 331–34).  They argue that "Defendants, acting in conspiracy and aiding and abetting each other, have physically interfered with Plaintiffs' property by dumping contaminated material onto the property," causing the Bells to suffer "a substantial loss in the use and enjoyment of their" land.  *Id.* at ¶¶ 332–33.  Kokosing and Ashcraft both argue that this claim should be dismissed because neither Defendant used its property to interfere with the Bells' use of their land. (Doc. # 38 at 17–18); (Doc. # 37 at 12).

A nuisance "arises from the unreasonable, unwarrantable, or unlawful use by a person of *his own property* and produces such material annoyance, inconvenience, discomfort, or hurt that the law will presume a consequent damage."  *Smith v. Carbide & Chems. Corp.*, 507 F.3d 372, 379 (6th Cir. 2007) (emphasis added) (quoting *City of Somerset v. Sears*, 233 S.W.2d 530, 532 (Ky. 1950)).  A private nuisance, as opposed to a public nuisance, "affects only an individual or limited number of individuals."  *Modern Holdings*, 2015 WL 1481457, at *3.

Here, the Bells private nuisance claim fails for a simple reason: neither Kokosing nor Ashcraft used its own property to interfere with the Bells' use of their land.   The Amended Complaint clearly states that "[a]ll soil excavated by Kokosing during the sewer project *belonged to the City*."   (Doc. # 27 at ¶ 115) (emphasis added).   The Bells do not attempt to argue that Kokosing or Ashcraft owned the contaminated fill material which allegedly interfered with their enjoyment of their property.   Because the Bells do not state a plausible claim that Kokosing and Ashcraft used its own property to harm their property, their private-nuisance claim fails.   Accordingly, both Ashcraft's and Kokosing's motions to dismiss the private-nuisance claim are **granted**.

### k.    RICO

RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of" one of the statute's prohibited activities listed in 18 U.S.C. § 1962.   18 U.S.C. § 1964(c).   Section 1962(c) makes the following unlawful: "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[28]   *Id.* at § 1962(c).   To establish a § 1962(c) violation, a plaintiff must prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."   *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

---

[28]    The Amended Complaint fails to specify which section of the RICO statute serves as the basis of the Bells' claim.   (Doc. # 27 at ¶¶ 335–79).   In their Response, however, the Bells appear to argue that they are attempting to bring a RICO claim under 18 U.S.C. § 1962(c).   *See* (Doc. # 50 at 21–22).

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A plaintiff must prove three elements to establish the existence of an enterprise under 1962(c):

> 1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; 2) that the members of the enterprise functioned as a continuing unit with established duties; and 3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged.

*Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) (citing *United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002)).  At minimum, an enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  Simply put, the plaintiff must show "a continuing unit that functions with a common purpose."  *Id.* at 948.  The enterprise does not need to have a hierarchal structure or fixed roles for each person; it can be organized on an ad hoc basis.  *Ouwinga*, 694 F.3d at 794.  Finally, while "the existence of an enterprise is a separate element that must be proved, the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'"  *Id.* (quoting Boyle, 556 U.S. at 947).

 "Racketeering activity consists of acts which are indictable under a number of federal statutes listed in 18 U.S.C. 1961(1)(B)."  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).  To establish a "pattern of racketeering activity," a plaintiff must show, at a minimum, that the defendant committed two predicate acts within a ten-year period.   18 U.S.C. § 1961(5).  Additionally, the plaintiff must

demonstrate that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).   In the Sixth Circuit, this is known as the "relationship plus continuity" test.   *Heinrich*, 668 F.3d at 409.

Both the relationship prong and the continuity prong must be satisfied to establish a pattern of racketeering activity.   *See id.*   A plaintiff may satisfy the relationship prong by alleging predicate acts that have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."   *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006) (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989)).   The continuity requirement may be met by pleading either a closed or open-ended period of racketeering.   *Id.*   A closed period of continuity "may be demonstrated 'by proving a series of related predicates extending over a substantial period of time.'"   *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).   While there is no definition of what qualifies as a substantial period of time, courts have dismissed RICO claims which allege that the predicate offence took place during a period of time ranging from six to seventeen months.   *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 805 (6th Cir. 2015) (collecting cases).   An open period of continuity may be demonstrated "through facts showing 'a distinct threat of long-term racketeering activity,' or by showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'"   *Moon*, 465 F.3d at 726–27 (quoting *H.J. Inc.*, 492 U.S. at 242).   Put another way, "open-ended continuity requires an indefinite, as opposed to unknown, end date."   *Columbia Park East MHP, LLC v. U.S. Bank Nat'l Assoc.*, 766 F. App'x 271, 275 (6th Cir. 2019)

(citing *Heinrich*, 668 F.3d at 410).  The threat of continuity must be viewed at the time the racketeering activity occurred."  *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991).  Whether open-ended continuity exists is a fact-specific inquiry.  *Heinrich*, 668 F.3d at 410.

Here, the Bells allege that the Defendants were all part of an enterprise with "a common unlawful purpose of evading waste disposal fees at a licensed landfill by wrongly classifying soil at the sewer project as non-contaminated and then hauling and placing such soil on residential property."  (Doc. # 27 at ¶ 336).  The Bells also describe the roles of each Defendant in the alleged enterprise: 1) the City and MSD owned the fill material which was excavated, 2) ATC classified the fill material, 3) Kokosing was the "excavation contractor" who identified residential landowners who desired clean fill material, and 4) Ashcraft "hauled the soil from the sewer project to residential property."  *Id.* at ¶ 337.  Taking all the allegations in the Amended Complaint as true, however, the Bells have failed to demonstrate how Kokosing and Ashcraft worked with the other Defendants as a "continuing unit" to fulfill the enterprise's stated purpose of evading waste disposal fees. The Amended Complaint suggests the City, ATC, and MSD may have misclassified soil avoid disposal fees, but it does not allege that Kokosing or Ashcraft were aware of or played a role in the classification.  *See id.* at ¶ 339 ("The City, MSD, and ATC classified the soil as non-contaminated without proper testing.").  At most, the Amended Complaint states that Kokosing "with the knowledge and assistance of the other members of the Enterprise," contracted with residential land owners to deposit clean fill material on their property, *id.* at ¶ 343, and that Ashcraft trucked the fill material to the residential properties, *id.* at ¶ 350.   There are no allegations that Kokosing or Ashcraft had a

relationship with the other Defendants for the purpose of avoiding waste disposal fees. Simply put, the Bells have not put forth factual allegations suggesting that either Kokosing or Ashcraft were part of a RICO enterprise.

The Bells also have failed to allege a pattern of racketeering activity among the Defendants.  The Bells claim that they have pled at least two predicate offenses because the "Amended Complaint includes multiple allegations of fraud by way of mail and e-mail," which qualify as predicate offenses.  (Doc. # 50 at 21–22).  In support, the Bells refer to several paragraphs in the Amended Complaint: 1) on July 27, 2018 Kokosing's counsel emailed the Bells an "altered" version of the Waste Agreement, (Doc. # 27 ¶ 91), 2) Ashcraft sent a picture to David Bell of CSA 20; the Bells do not state when the picture was taken or sent, *id.* at ¶ 118, 3) beginning around October 2, 2017 and continuing through December 2017 representatives of Kokosing and Ashcraft "through text messages and emails" falsely assured the Bells that the fill material was uncontaminated, *id.* at ¶ 148, 4) on November 4, 2017 City engineers drove the Bells property and, "[a]ccording to a later email to [the Bells,] took pictures of their property, *id.* ¶ 169, and 5) on November 27, 2017, a City engineer told the Bells in an email, inter alia, that the contaminated fill material did not come from the City's property, *id.* at ¶¶ 180–84.

Even if the Court makes the charitable assumption that these allegations qualify as predicate offenses,[29] the Bells have failed to make a plausible showing that the

---

[29]      It is not at all clear that the Bells' allegations meet the heightened pleading requirements for predicate offenses of mail and wire fraud.  *See Heinrich*, 668 F.3d at 404 ("When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008))).  Because the Bells' RICO claim is so obviously deficient in other areas, however, the

Defendants engaged in a pattern of racketeering; the Bells cannot meet the continuity requirement.  It appears that the Bells are attempting to argue an open-ended period of continuity.[30]  (Doc. # 27 at ¶ 340) ("The actions taken by Defendants as outlined in this Amended Complaint . . . were and remain a continuing enterprise); *see also id.* at ¶ 375 ("Upon information and belief, Defendants racketeering activity is ongoing as to other residential landowners in the Greater Cincinnati area.").  There is no evidence, however, of "a distinct threat of long-term racketeering activity."  *H.J. Inc.*, 492 U.S. at 242.  Rather, the alleged pattern of racketeering has a definite end date; the enterprise's purpose— evading waste disposal fees "by wrongly classifying soil *at the sewer project*," (Doc. # 27 at ¶ 336) (emphasis added),—will be fulfilled when the excavation is completed at the LRV project.   Even accepting as true the Bells' speculative statements that "[o]n information and belief, Defendants continue to illegally dispose of soils from the sewer project on residential properties," *id.* at ¶ 344, the Bells do not allege that the racketeering activity may continue after the completion of the LRV project.   The Sixth Circuit has refused to find open-ended continuity where the racketeering activity has "a built-in ending point."  *Heinrich*, 668 F.3d at 410–11 (collecting cases); *see also Thompson v. Passche*, 950 F.2d 306, 311 (6th Cir. 1991) (finding no open-ended continuity where the racketeering activity involved selling nineteen lots of land).   Thus, because the threat of

---

Court will not expend judicial resources analyzing whether each alleged action by Defendants qualify as a predicate offense.

[30]      Alternatively, if the Bells are attempting to allege close-ended continuity, their claim fails. At most, the Bells' allegations span from October 2, 2017 to July 27, 2018, which is 9 months and 25 days; that is not a substantial period of time.  *See Moon*, 465 F.3d at 724–25 (a nine-month period was not a substantial period of time).  Therefore, the Bells' have not demonstrated closed-ended continuity.

racketeering will end when the excavation at the LRV Project ends, the Bells have not stated a plausible claim for open-ended continuity.

In sum, the Bells' RICO claim fails for multiple reasons. First, they have not stated that Kokosing and Ashcraft were involved in a RICO enterprise because there are no facts to suggest that Kokosing and Ashcraft worked together as a continuing unit to evade waste disposal fees. Second, the Bells have not shown that a pattern of racketeering activity existed because there is no evidence of either closed or open-ended continuity. These deficiencies are fatal to the Bells' RICO claim against Kokosing and Ashcraft; the Court need not spend time reviewing the other potential deficiencies of their pleading. Accordingly, both Ashcraft's and Kokosing's motions to dismiss the RICO claim are **granted**.

## I.        Joint Venture

Next, the Bells attempt to bring a joint venture claim against all the Defendants. (Doc. # 27 at ¶¶ 380–83). The Bells argue that the Defendants "entered into an association, combining their money, efforts, skill, and knowledge for improper gain" to evade waste disposal fees. *Id.* at ¶ 381. Kokosing and Ashcraft both argue that this claim should be dismissed because it is not an independent cause of action, and because the Bells have not shown that the Defendants acted with a common purpose. (Doc. # 38 at 22–23); (Doc. # 37 at 14).

A joint venture, also known as a joint enterprise, is "an informal partnership, existing for a limited purposed and duration." *Abbott v. Chesley*, 413 S.W.3d 589, 604 (Ky. 2013). To establish a joint venture, a plaintiff must establish four elements:

(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of

pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Johnson v. BLC Lexington SNF, LLC*, 2019 WL 2476739, at *16 (E.D. Ky. June 13, 2019) (quoting *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001)).  A "community of pecuniary interest" must include the sharing of the profits and losses of the venture.[31]  *Roethke*, 68 S.W.3d at 364.  As to the fourth element, the members have an equal right to a voice in the direction of the enterprise when "each party 'may equally govern upon the subject of how, when, and where the agreement shall be performed.'"  *Johnson*, 2019 WL 2476739, at *16 (quoting *Fries v. United States*, 170 F.2d 726, 729 (6th Cir. 1948)).

Here, the Bells joint venture claim is fails for multiple reasons.  To begin with, as explained elsewhere in this opinion, Plaintiffs have not alleged the existence of an agreement, expressed or implied, among all the Defendants.  *See supra* Part II(B)(3).  Plaintiffs also do not allege that all the Defendants agreed to share profits and losses.  *See generally* (Doc. # 27).  Finally, the allegations in the Amended Complaint do not support a finding that each Defendant had an equal voice in the enterprise.  *See generally id.*  To the contrary, the Amended Complaint includes allegations that some Defendants had much more control than others.  *See, e.g.*, *id.* at ¶¶ 3–4 (describing the City as the "principal and sole manager of MSD").  Thus, for many reasons, the Bells' joint-venture claim is deficient.  Accordingly, both Ashcraft's and Kokosing's motions to dismiss the joint-venture claim are **granted**.

---

[31]    The Bells argue that profit sharing is not necessarily required to show a common pecuniary interest.  (Doc. # 50 at 24) (citing *Huff v. Rosenberg*, 496 S.W.2d 352, 355 (Ky. Ct. App. 1973)). The Bells are mistaken; *Roethke*, which is controlling over *Huff*, clearly states that "it is necessary to the relationship that there be a sharing of the profits and losses." *Roethke*, 68 S.W.3d at 352.

### m.  Taking

The last claim that the Bells bring is a taking claim against the City and MSD.  (Doc.

# 27 at ¶¶ 384–91).   Because the City and MSD have both been dismissed from this

action, *see supra* Part II(A)(2), the Bells' taking claim is **dismissed**.

## C.  Declaratory and Injunctive Relief

Finally, Kokosing also asks the Court to dismiss some of the Bells' claims for

injunctive and declaratory relief.  (Doc. # 38 at 23–25).  Specifically, Kokosing argues that

the Court should dismiss the following requests for relief:

(1) Kokosing be required to pay for all costs to clean up and remove all contaminated soil or other contaminated materials from the sewer project that were dumped and spread on Plaintiffs' real property and replace it with clean soil without any contaminants as defined by state and/or federal law;

(2) Kokosing be required to place a layer of three feet of clean top soil on Plaintiffs' property to allow Plaintiffs to plant and grow trees on their property.

(3) Kokosing be ordered to pay all costs to restore, plant, grow, and maintain a vegetative cover on Plaintiffs' property;

(4) Kokosing be permanently prohibited from using language in a contract that promises a residential landowner its fill material is without any contaminant as defined by state and/or federal law.

(5) Kokosing be permanently required to analytically test all fill material that it or its contractors or agents transport, dump and/or spread on residential property to ensure that the material complies with the terms of its contract with the landowner and all applicable state and local environmental laws and regulations.

(6) Kokosing be required to provide written notice by certified mail to all residential property owners where fill material from the sewer project was dumped and/or spread on residential land and to offer the landowner(s) an opportunity to test the analytical composition of the fill material, at Kokosing's sole cost, to ensure the fill material placed on their property meets the terms of the contract all applicable state or local environmental laws and regulations for residential property. and

> (7) Kokosing be required to restore and to backfill Plaintiffs' real property with clean, non-contaminated, proper fill materials sufficient to place Plaintiffs' property in the condition it would have been in if Kokosing properly performed the promises and requirements made to Plaintiff and those set forth in the contract between them.

(Doc. # 27 at ¶ 393) (sections c–i).  Kokosing claims that these requests for relief should be dismissed because they either improperly interfere with the ongoing Corrective Action Plan between the parties and administered by the Kentucky Department of Environmental Protection, or because the Bells lack standing to seek the requested relief because their requests "have nothing to do with the Bell property or the with the contract between the Bells and Kokosing."  (Doc. # 38 at 24).

While Kokosing may ultimately be correct that the Bells cannot receive the remedies requested, the Court will decline to dismiss any of the declarative or injunctive requests at this early stage of the litigation before the substantive claims have been resolved.  Kokosing has cited no legal authority[32] for dismissing specific requests for relief at the motion-to-dismiss stage and it is possible that the Bells may be entitled to some type of declaratory or injunctive relief depending on the resolution of the surviving claims. Ultimately, Kokosing's request to block certain remedies before discovery is premature. Accordingly, Kokosing's motion to dismiss the Bells' claims for declaratory and injunctive relief is **denied**.

---

[32]    Despite Kokosing's arguments, this case is not like *W.B. v. Com., Cab. For Health and Family Servs.*, 388 S.W.3d 108 (Ky. 2012).  *See* (Doc. # 38 at 24) (citing *W.B. v. Com.*).  There, the court dismissed a declaratory judgment action where the plaintiff was petitioning the court to declare regulatory and statutory provisions of the Kentucky Cabinet for Health and Family Services unconstitutional.  *W.B. v. Com.*, 388 S.W.3d at 109.  The Court found that it did not have jurisdiction because the underlying administrative record was not fully developed.  *Id.* at 117. Here, the Bells are not directly challenging an administrative decision or asking the court to invalidate administrative processes; they are bringing independent causes of action.

### III.    CONCLUSION

In summary, the Court has distilled the Bells' voluminous Amended Complaint into a relatively straight-forward and limited suit against one defendant.   MSD, the City of Cincinnati, ATC, and Ashcraft are dismissed from this suit entirely.   Nine out of the thirteen claims against Kokosing are also dismissed.   What remains is the Bells' breach-of-contract, fraudulent misrepresentation, negligence per se, and intentional trespass claim against Kokosing.

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)    Defendant MSD's Motion to Dismiss (Doc. # 41) is **GRANTED**;

(2)    Defendant the City of Cincinnati's Motion to Dismiss (Doc. # 40) is **GRANTED**;

(3)    Defendant ATC's Motion to Dismiss (Doc. # 42) is **GRANTED**;

(4)    Defendant Ashcraft's Motion to Dismiss (Doc. # 37) is **GRANTED**; and

(5)    Defendant Kokosing's Motion to Dismiss (Doc. # 38) is **GRANTED IN PART** and **DENIED IN PART**.   Specifically,

(a)    Plaintiff's promissory-estoppel claim (Count II), equitable-estoppel claim (Count III), negligence claim (Count V), Kentucky Consumer Protection Act claim (Count VIII), criminal-mischief claim (Count IX), punitive-damages claim (Count X), private-nuisance claim (Count XI), private-RICO claim (Count XII), and joint-venture claim (Count XIII) against Kokosing are **dismissed**;

(b)    Plaintiff's breach-of-contract claim (Count I), fraudulent-misrepresentation claim (Count IV), negligence-per-se claim (Count VI), and

intentional-trespass claim (Count VII) against Kokosing shall **proceed to discovery**; and

(c)     Kokosing's request to dismiss the Bells' request for declaratory and injunctive relief is **denied**.

(6)     **Within twenty-one (21) days from the date of the entry of this Order**, Plaintiffs and Defendant Kokosing, by counsel, shall meet, either in person or by telephone, to discuss the nature and basis of the Plaintiff's claims and Defendant's attendant defenses, and the possibilities for a prompt settlement or resolution of the case, to make or arrange for the disclosures required by Rule 26(a)(1) of the Federal Rules of Civil Procedure, and to develop a proposed discovery plan. *See* Fed. R. Civ. P. 26(f); and

(7)     **Within ten (10) days after the meeting**, the parties shall file a joint status report containing:

(a)     the proposed discovery plan;

(b)     the parties' estimate of the time necessary to file pretrial motions;

(c)     the parties' belief as to whether the matter is suitable for some form of alternative dispute resolution such as mediation;

(d)     the parties' estimate as to the probable length of trial; and

(e)     whether the parties will consent to the jurisdiction of a Magistrate Judge (Smith) for all further proceedings, including trial, pursuant to 28 U.S.C. § 636(c).  Consent forms are attached to this Order and forms signed by all parties' counsel should be filed no later than the date counsels' joint status report is due.  If all parties, by counsel, so consent, the Clerk of Court

shall reassign this matter to the appropriate Magistrate Judge without the necessity of further order of the Court.  L.R. 73.1(c).

Should the parties find that a joint report is not possible, the parties shall each file individual reports which the Court shall entertain for the purposes of setting out its Scheduling Order or other appropriate Order.

This 22nd day of July, 2020.



Signed By:

*David L. Bunning*

United States District Judge

J:\DATA\ORDERS\Cov2019\19-53 MTD MOO.docx